TERRENCE P. COLLINGSWORTH
(DC Bar # 471830)
International Rights Advocates
621 Maryland Ave NE
Washington, D.C. 20002
Tel: 202-543-5811
E-mail: tc@iradvocates.org
*Counsel for Plaintiff*

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____

| | |
|---|---|
| INTERNATIONAL RIGHTS ADVOCATES,<br>621 Maryland Ave NE,<br>Washington, D.C. 20002<br><br>        Plaintiff,<br><br>        v.<br><br>ALEJANDRO MAYORKAS, Secretary<br>U.S. Department of Homeland Security<br>2707 Martin Luther King Jr Ave SE, MS 0525<br>Washington, DC 20528-052<br><br>TROY A. MILLER, Acting Commissioner<br>U.S. Customs and Border Protection,<br>c/o Office of Chief Counsel,<br>1300 Pennsylvania Ave, Suite 4.4-B<br>Washington, DC 20229<br><br><br>        Defendants. | **Case No.**  1:23-cv-00165 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION AND FACTUAL BACKGROUND**

1.       Plaintiff International Rights Advocates (IRAdvocates) brings this action under the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq*. Plaintiff seeks declaratory and injunctive relief against Alejandro Mayorkas, in his capacity as Secretary of the Department of Homeland Security (DHS), and Troy A. Miller, in his capacity as Acting Commissioner of Customs and Border Protection (CBP), for their failure to take any of the actions required by the Tariff Act of 1930, 19 U.S.C. § 1307, and the applicable implementing regulations, 19 CFR § 12.42 *et seq*, following the February 14, 2020 filing of a credible and well-documented Petition (attached hereto as **Exhibit A**) by IRAdvocates, Corporate Accountability Lab (CAL), and University of California Irvine Law School Human Rights Clinic (UCI). These organizations filed their Petition ***over three years and five months ago*** seeking to ban the importation of cocoa from Côte d'Ivoire by seven major chocolate companies that is harvested in whole or in part by forced child labor. The CBP has not only failed to make a decision but has also failed to respond to an inquiry made two years after the Petition was filed by IRAdvocates, CAL, UCI, and a large number of interested parties and organizations requesting enforcement of the law (letter attached as **Exhibit B**). Because the responsible agencies, DHS and CBP, have failed to take any action at all in response to the Petition, Plaintiff seeks an order from this Court requiring these entities to comply with the law and fulfil their statutory obligations.

**A. STATUTORY AND REGULATORY FRAMEWORK**

2.       Section 307 of the Tariff Act prohibits the importation of goods that are the fruits of forced labor, declaring, *inter alia,* that "[a]ll goods, wares, articles, and merchandise mined, produced, or manufactured ***wholly or in part*** in any foreign country by convict labor or/and

forced labor or/and indentured labor under penal sanctions *shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited*, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision." 19 U.S.C. § 1307 (1997) (emphasis added).

3.      The Tariff Act was amended in 1997 to clarify the definition of forced labor so as to specifically and explicitly prohibit the importation of goods produced by forced *child* labor for the purposes of the Act. "'Forced labor,' as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily. For purposes of this section, the term 'forced labor or/and indentured labor' includes forced or indentured *child* labor." 19 U.S.C. § 1307 (1997) (emphasis added).

4.      The U.S. Customs regulations that implement the Tariff Act, 19 C.F.R. § 12.42, *et seq.*, entitle "[a]ny person outside the Customs Service who has reason to believe that merchandise produced [by convict, forced, or indentured labor] is being, or is likely to be, imported into the United States" to "communicate his belief to any port director or the Commissioner of Customs." 19 CFR § 12.42(b). IRAdvocates, CAL, and UCI acted in good faith under this provision and filed the Petition with CBP on February 14, 2020. There is no question that the Petition was received by CBP as IRAdvocates and CAL have had several discussions about the Petition with staff at CBP and have also supplemented their filing with additional evidence on two occasions.

5.      The Commissioner of Customs, upon receipt of any such communication, "will cause such investigation to be made as appears to be warranted by the circumstances of the case . . ." 19 CFR § 12.42(d).

6.      If the Commissioner of Customs finds at any time "that information available *reasonably but not conclusively* indicates that merchandise within the purview of section 307 [of the Tariff Act] is being, or is likely to be, imported, he will promptly advise all port directors accordingly and the port directors shall thereupon withhold release of any such merchandise pending instructions from the Commissioner as to whether the merchandise may be released otherwise than for exportation." 19 CFR § 12.42(e) (emphasis added).

7.      If it is determined that the merchandise is indeed subject to the provisions of Section 307, such merchandise **must** be denied entry into the United States, "unless the *importer* establishes by satisfactory evidence that the merchandise was not mined, produced, or manufactured in any part with the use of a class of labor specified in the finding." 19 CFR § 12.42(f),(g) (emphasis added).

8.      Section 1307 was further amended in 2016 when Pub. L. 114-125 struck out the "consumptive demand exception" that originally followed after "enforcement of this provision." Prior to this change, the statute read: "[t]he provisions of this section relating to goods, wares, articles, and merchandise mined, produced, or manufactured by forced labor or/and indentured labor, shall take effect on January 1, 1932; but in no case shall such provisions be applicable to goods, wares, articles, or merchandise so mined, produced, or manufactured which are not mined, produced, or manufactured in such quantities in the United States as to meet the consumptive demands of the United States." Prior to the 2016 amendment, the "consumptive demand exception" was very difficult to satisfy, and cases which failed to satisfy the exception were ruled to lack standing. This was demonstrated in the International Labor Rights Fund's prior case filed in 2005 seeking to ban the importation of cocoa harvested with forced child labor. This legal obstacle, now removed, is no longer relevant. 19 U.S.C. § 1307 (1997).

**B. FORCED CHILD LABOR ON COCOA PLANTATIONS IN CÔTE D'IVOIRE IS WELL-DOCUMENTED AND NOT DISPUTABLE**

9.      Côte d'Ivoire is the largest producer of cocoa in the world. While seventy percent of the world's cocoa comes from West African countries, primarily Côte d'Ivoire and Ghana,[1] roughly forty-five percent is produced in Côte d'Ivoire alone.[2] The United States, being the third largest importer of chocolate (following Netherlands and Germany), is a major customer of Côte d'Ivoire's cocoa.[3] The United States accounts for forty-six percent of Côte d'Ivoire's direct exports. However, the quantity of Ivorian cocoa imported into United States is much higher than that percentage would indicate, as countries including Panama, Belgium, and Spain reexport Ivorian cocoa to the U.S. after processing it.

10.      Child labor is rampant in Côte d'Ivoire. In 2013, a UNICEF report estimated that 1.4 million children aged five to seventeen were working in Côte d'Ivoire, with forty-nine percent  working in the agricultural sector alone.[4] The incidence of child labor has only increased in recent years. In October 2020, the Department of Labor issued a report (NORC Report) in conjunction with the University of Chicago; the report estimated (based on 2018/2019 survey findings) approximately **1.56 million child laborers** worked in cocoa production in Côte

---

[1] Marius Wessel & P.M. Foluke Quist-Wessel, *Cocoa production in West Africa, a review and analysis of recent developments*, NJAS: WAGENINGEN J. LIFE SCI., Vol. 74-75 (December 2015), https://doi.org/10.1016/j.njas.2015.09.001.

[2] Elian Peltier, *Ivory Coast Supplies the World With Cocoa. Now It Wants Some for Itself*, NEW YORK TIMES (Aug. 13, 2022), https://www.nytimes.com/2022/08/13/world/africa/ivory-coast-chocolate.html.

[3] Vivek Voora, Steffany Bermúdez, & Cristina Larrea, *Global Market Report: Cocoa*, INT'L INST. FOR SUST. DEV. 1 (2019), https://www.iisd.org/system/files/publications/ssi-global-market-report-cocoa.pdf.

[4] *Promoting the Rights of children in the Cocoa Producing Areas in Côte d'Ivoire*, UNICEF 6 (March 2019), https://open.unicef.org/sites/transparency/files/2020-06/Cote-d-Ivoire-TP5-2018.pdf.

d'Ivoire and Ghana.[5] Of this number, 790,000 worked in Côte d'Ivoire alone.[6] According to the

U.S. State Department, this number increased during the COVID-19 pandemic, but a follow-up

study in November found that the rates had fallen to pre-COVID-19 levels.[7] It bears mentioning

that while the Department of Labor abdicated its responsibility to investigate the presence of

forced labor, its conclusion that ninety-five percent of child laborers (**1.48 million children**)

engage in the **Worst Forms of Child Labor** certainly is a strong indicator that much of the child

labor in Côte d'Ivoire and Ghana is forced.[8] Among those children living in agricultural

households in Côte d'Ivoire, the rate of children engaged in hazardous work, including exposure

to toxic chemicals, hazardous tools, and carrying heavy loads, increased by fourteen percent



---

[5] *NORC Final Report: Assessing Progress in Reducing Child Labor in Cocoa Production in Cocoa Growing Areas of Côte d'Ivoire and Ghana*, NORC AT THE UNIVERSITY OF CHICAGO 10 (Oct. 2020), https://www.norc.org/PDFs/Cocoa%20Report/NORC%202020%20Cocoa%20Report_English.pdf (hereinafter "NORC report").
[6] *Id.*
[7] Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices, 2021: Côte d'Ivoire*, U.S. DEP'T OF STATE39 (2021), https://www.state.gov/wp-content/uploads/2022/02/313615_COTE-D_IVOIRE-2021-HUMAN-RIGHTS-REPORT.pdf.
[8]  NORC Report, *supra* note 5 at 2, 47.

from 2008/2009 to 2018/2019.[9]

11.    It is well-documented that **forced** child labor, and other "Worst Forms of Child Labor" that violate ILO Convention No. 182, is prevalent on cocoa plantations in Côte d'Ivoire that supply U.S. importers.[10] The U.S. State Department, the International Labor Organization (ILO), and UNICEF, among others, have documented the existence of child slavery in cocoa with reports and statistics dating back to the late 1990s. Since that time, Côte d'Ivoire's cocoa production has been controlled by major chocolate companies with the unilateral goal of finding the cheapest sources of cocoa. Various NGOs, including IRAdvocates, have independently confirmed that many of the children working on Ivorian cocoa plantations are forced to work as slaves without any remuneration. Further, many of the adult workers are themselves forced, bonded or indentured laborers. These levels of child labor and forced labor are a direct result of cocoa farmers being impoverished, as nearly seventy percent of cocoa is produced by farmers living on less than two dollars a day.[11]



12.    Since 1997, UNICEF has reported that children from neighboring countries have been trafficked to Côte d'Ivoire to harvest cocoa beans.[12] In a 2019 report, UNICEF reported

---

[9] *Id.* at 70.

[10] The Washington Post published a major exposé on the continued and extensive use of children, many of them trafficked into forced labor, performing hazardous work harvesting cocoa for Defendants in Côte d'Ivoire. Peter Whoriskey & Rachel Siegel, *Cocoa's child laborers*, THE WASHINGTON POST (June 5, 2019), https://www.washingtonpost.com/graphics/2019/business/hershey-nestle-mars-chocolate-child-labor-west-africa/?utm_term=.6cb753bcb6f8.

[11] Voora, Bermúdez, & Larrea, *supra* note 3  at 1.

[12] *See* Carol Bellamy, *The State of the World's Children 1997: Focus on Child Labour*, OXFORD UNIVERSITY PRESS FOR UNICEF (1997), https://www.unicef.org/media/84761/file/SOWC-1997.pdf.

that many children engaged in child labor in Côte d'Ivoire come from countries such as Burkina

Faso, Mali, Togo, Benin, Niger, Guinea, and Ghana.[13] While many of the children migrate with

their families, some migrate alone in search of financial stability, increasing the risk that they

will be victimized and coerced into forced labor.[14] Human traffickers often prey on the most

vulnerable members of society, recruiting financially insecure children from neighboring

countries and tricking them into slavery through false promises of jobs and financial security.[15]

The U.S. Department of Labor describes the conditions of forced child labor in chilling detail:

> [s]ome children are sold by their parents to traffickers, some are kidnapped, and
> others migrate willingly but fall victim to traffickers who sell them to recruiters or
> farmers, where they end up in conditions of bonded labor. Some farmers buy the
> children and refuse to let them leave the farm until the debt of their purchase has
> been worked off. The children are frequently not paid for their work; some of their
> wages are paid to the recruiter or trafficker. These children are held against their
> will on isolated farms, are locked in their living quarters at night, and are threatened
> and beaten if they attempt to escape. They are punished by their employers with
> physical abuse. They are forced to work long hours, including overtime, and are
> required to work even when they are sick. Some children are denied sufficient food
> by their traffickers and employers.[16]

13. The 2021 Country Report on Human Rights Practices, issued by the Department

of State, recognizes Côte d'Ivoire as "a source, transit, and destination country for children

subjected to trafficking in persons."[17] It further explains the state of forced labor in Côte

d'Ivoire:

> The government did not effectively enforce the law [regarding trafficked and forced
> labor]. Penalties were criminal and commensurate with those for comparable
> crimes such as kidnapping but were seldom and inconsistently applied. The

---

[13] *Promoting the Rights of children in the Cocoa Producing Areas in Côte d'Ivoire*, *supra* note 4, at 6.
[14] *Id.*
[15] Trafficking in Persons Report, U.S. DEP'T OF STATE 27 (2011).
[16] Bureau of Int'l Labor Affairs, *List of Goods Produced by Child Labor or Forced Labor*, U.S. DEP'T OF LABOR (September 28, 2022), https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods-print.
[17] *Country Reports on Human Rights Practices, 2021: Côte d'Ivoire*, *supra* note 7, at 31.

government did not provide enough resources or conduct enough inspections to enforce compliance. Forced and compulsory labor, including for children, continued to occur in small-scale and commercial production of agricultural products, particularly on cocoa, coffee, pineapple, cashew, and rubber plantations.[18]

Ultimately, the Ivorian government repeatedly fails to enforce its anti-trafficking laws, and the worst forms of child labor in agriculture are most prevalent in the cocoa and coffee sectors.[19] The State Department's report also found that "[i]nspections carried out during the year did not result in fines for child labor crimes. Penalties were commensurate with penalties for comparable crimes but were seldom applied. The number of inspectors and resources for enforcement were insufficient to enforce the law."[20]

14.    While Ivorian government officials outwardly condemn child labor trafficking, corruption exists at many levels, with "[s]ome observers alleg[ing] low-ranking police on the borders with Mali and Ghana facilitated smuggling, including potential trafficking cases, and organized a system to collect bribes at checkpoints and along bus routes."[21] This form of corruption is consistent with what a group of investigators, working with CAL, witnessed in November 2020. Further, in 2019, staff and agents of IRAdvocates were arrested in Sikasso, Mali, when they were photographing traffickers at the main bus station. The police ignored their demand to arrest the traffickers instead and the IRAdvocates' team was held at the police station for several hours when they refused to pay a bribe.

---

[18] *Id.* at 37 (2021).
[19] *Id.*
[20] *Id.* at 38-39.
[21] *Trafficking in Persons Report,* U.S. DEPT. OF STATE 189 (July 2022), https://www.state.gov/wp-content/uploads/2022/10/20221020-2022-TIP-Report.pdf.



15.     The Department of State does note that, although the Côte d'Ivoire government fails to meet the minimum requirements for the elimination of trafficking, various significant improvements have occurred. While these numbers are likely extremely under-representative of the actual numbers of trafficking victims, the "Trafficking in Persons Report" (July 2022) states that during the reporting period, 1,190 trafficking victims were identified by the Ivorian government, the majority children; of these, 753 were trafficked for forced labor.[22] Some of these children were foreign nationals, coming from Nigeria, Mali, Guinea, Burkina Faso, Niger, Togo, and Benin.[23] The "Trafficking in Persons Report" cites one case investigated by the Sub-Directorate in the Fight against Trafficking and Child Labor (SDLTEDJ), where "law enforcement arrested 24 alleged traffickers and identified 68 child victims, most of whom were from Burkina Faso, exploited in forced labor in cocoa; courts convicted and sentenced five traffickers under Law No. 2016-111 and 17 traffickers under penal code provisions on child

---

[22] *Id.*
[23] *Id.*

labor."[24] Further, in February 2021, four alleged traffickers were arrested along with nineteen rescued children, all from Burkina Faso, who were being transported across the border to work on cocoa plantations.[25]

16.    News sources have also publicized a number of raids conducted by the Ivorian government. In January 2020, *Bloomberg* reported that a raid in Côte d'Ivoire had rescued 137 children from Ghana, Nigeria, and Benin from human traffickers.[26] In a separate raid in October 2020, police arrested three farmers "on suspicion of people trafficking" and rescued eleven children and two teenagers from cocoa farms in the southwestern part of Côte d'Ivoire. According to a *Reuters* article, those children were rescued while shelling cocoa pods.[27] In early February 2021, the Ivorian government arrested a total of seven traffickers and rescued twenty-two children in two separate sting operations.[28]  The Ivorian government again conducted a raid in May of the same year, rescuing sixty-eight children from forced labor conditions on cocoa farms and arresting twenty-five suspected traffickers. *Reuters* reported that most of these children had been trafficked into Côte d'Ivoire from Burkina Faso.[29] Despite these major actions, the role of the government appears to vary by region and is undermined by ongoing corruption. In fact,

[24] *Id.*
[25] *Country Reports on Human Rights Practices, 2021: Côte d'Ivoire*, *supra* note 7, at 38.
[26] Leanne de Bassompierre, *Ivory Coast Rescues 137 Children in Raid on Traffickers*, BLOOMBERG, (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/top-cocoa-grower-rescues-137-children-in-raid-on-traffickers#xj4y7vzkg.
[27] Ange Aboa, *Ivory Coast police rescue 11 children working on cocoa farms*, REUTERS (Oct. 7, 2020), https://www.reuters.com/article/us-ivorycoast-cocoa/ivory-coast-police-rescue-11-children-working-on-cocoa-farms-idUSKBN26S3C4.
[28] Ange Aboa, *Ivory Coast arrests three suspected child traffickers in cocoa belt*, REUTERS (Feb. 12, 2021), https://www.reuters.com/article/cocoa-childlabour-ivorycoast/ivory-coast-arrests-three-suspected-child-traffickers-in-cocoa-belt-idUSL8N2KI3GR.
[29] Ange Aboa, *Ivory Coast police rescue 68 children working on cocoa farms*, REUTERS (May 10, 2021), https://www.reuters.com/world/africa/ivory-coast-police-rescue-68-children-working-cocoa-farms-2021-05-10/.

the recent increased attention to forced labor trafficking, including a new anti-trafficking center,[30] has forced child labor further underground as the traffickers are now acting more discreetly.

17.     Beginning in 1999, Plaintiff IRAdvocates (and its predecessor organization, International Labor Rights Forum) conducted several investigative trips to Côte d'Ivoire and Mali to document forced and trafficked child labor in cocoa harvesting, as well as children working under hazardous conditions that violate ILO Convention No. 182. Most recently, in December 2020, IRAdvocates investigators visited five different regions in Côte d'Ivoire. While in those areas, the investigators spoke with children they encountered and asked them questions about their work, school, and parents. Many of the children the investigators spoke with were young, did not appear to be attending school, and were using sharp objects, such as machetes. Such work would be considered as fitting within the "worst forms of child labor" and is therefore prohibited under ILO Convention No. 182. The investigators found indicators of abuse of vulnerable children, abusive working and living conditions, and isolation, all well-established criteria for "forced labor." Many of the children had been trafficked from Mali and Burkina Faso.  In some cases, the trafficked child workers initially said they were from Côte d'Ivoire and were working for their "uncle," but upon further questioning they admitted they had been trafficked.

18.     As part of the investigation, IRAdvocates spoke to leaders of various cocoa cooperatives. All of them either admitted that child labor was common or claimed not to know the conditions on the plantations from which they sourced their cocoa beans. While the major

---

[30] The anti-trafficking center referred to here is one of the centers that the First Lady's Office has established. Abou Traoré, *Travail des enfants dans les plantations de cacao: Le trafic a la peau dure*, CENOZO (Jan. 8, 2019), https://cenozo.org/travail-des-enfants-dans-les-plantations-de-cacao-le-trafic-a-la-peau-dure/.

chocolate companies claim they are moving towards "transparency" and "sustainability," whatever those terms mean, it is clear that very little has changed on the ground in Côte d'Ivoire.

## C.   CHOCOLATE COMPANIES HAVE KNOWINGLY BENEFITTED FROM FORCED CHILD LABOR FOR DECADES DESPITE THEIR PLEDGES TO END THE ABUSE OF CHILD WORKERS IN THEIR COCOA SUPPLY CHAINS.

19.      In 1999, various labor rights and consumer groups, including the International Labor Rights Forum and the Child Labor Coalition, urged Congress to pressure the major chocolate companies to stop using trafficked and forced child labor and to pay the adult workers a living wage. They worked with then-Congressman Bernie Sanders and Congressman Elliot Engel to introduce legislation to ban the importation of cocoa (and other products) harvested by forced child labor. In 2001, that bill passed the House by a 291-115 vote and went to the Senate, where Senator Tom Harkin sponsored it. However, the pending legislation, known as the Harkin-Engel bill, was halted before a Senate vote due to intense industry lobbying against a mandatory program with real consequences. Once the lobbyists were done with the bill, it was transformed to the 2001 Harkin-Engel Protocol (the "Protocol"), a "voluntary" initiative that gave participating companies until 2005 to "phase out" the use of child labor. The Protocol, attached hereto as **Exhibit C**, was personally signed by the Chief Executive Officers of the major chocolate companies, including Nestlé, Hershey, and Mars, as well as the overall industry group, the Chocolate Manufacturers Association. They explicitly acknowledged that forced child labor and other "worst forms of child labor" prohibited by ILO Convention No. 182 were endemic in cocoa harvesting in Côte d'Ivoire and Ghana. The Protocol was therefore an explicit admission by the major companies in 2001 that their cocoa was harvested by exploited children. The Protocol is also not a bygone example of the recent history of such admissions; as discussed

below, the major companies flouted the Protocol's timeline and extended the deadline to

eradicate child labor to 2008, then 2010, then 2020, then 2025—and then abandoned a set

date.[31]

20.     The World Cocoa Foundation (WCF) is a non-profit member organization whose

members represent more than eighty percent of the cocoa sector.[32] Among the WCF's almost

100 members are leading chocolate manufacturers, suppliers, and producers such as Nestlé, the

Hershey Company, Mars Wrigley, Barry Callebaut, Olam International, and Cargill. The

foundation's stated purpose is to "convene the private sector, governments, civil society and

cocoa-growing communities to focus on three goals: increasing farmer income, combating child

and forced labor, and ending deforestation in cocoa."[33] In actuality, the WCF has become a

home base for cocoa companies to coordinate public relations positions and strategize about

how to avoid making major changes in their child labor-dependent system of cocoa harvesting.

21.     The International Cocoa Initiative (ICI) is a Geneva-based non-profit

organization established pursuant to Article 5 of the Harkin-Engel Protocol. The group is a

multi-stakeholder partnership between cocoa and chocolate producers, farming communities,

---

[31] *See Joint Statement from U.S. Sen. Tom Harkin, Rep. Eliot Engel and the Chocolate/Cocoa Industry on Efforts to Address the Worst Forms of Child Labor in Cocoa Growing Protocol Work Continues* (July 1, 2005),
http://www.cacao.gouv.ci/commun/documents/jointstatementSenateurTomHarkin.pdf.; *Joint Statement from U.S. Sen. Tom Harkin, Rep. Eliot Engel and the Chocolate and Cocoa Industry on the Implementation of the Harkin-Engel Protocol* (June 16, 2008),
http://www.csrwire.com/press_releases/14132-Joint-Statement-from-U-S-Senator-Tom-Harkin-Representative-Eliot-Engel-and-the-Chocolate-and-Cocoa-Industry-on-the-Implementation-of-the-Harkin-Engel-Protocol-#,; Tim McCoy, *2018 Child Labor Cocoa Coordinating Group 8th Annual Meeting Remarks*, World Cocoa Foundation (Aug, 21, 2018),
https://www.worldcocoafoundation.org/blog/2018-child-labor-cocoa-coordinating-group-8th-annual-meeting-remarks/.
[32] WORLD COCOA FOUNDATION, https://www.worldcocoafoundation.org/.
[33] *Id.*

international organizations, governments, and civil society members. Members include Nestlé, Hershey, Barry Callebaut, Mars Wrigley, Mondelēz International, Olam International, and Cargill. The landing page of the initiative's website opens with "[p]reventing and addressing child labour and forced labour in cocoa," and "[w]e are a non-profit foundation that works to protect the rights of children and adults in cocoa-growing areas in West Africa."[34] The ICI is, in fact, industry-dominated and serves mainly to create the false impression that the industry is making progress on ending child labor in cocoa harvesting.

22.     In 2005, cocoa industry leaders representing the world's largest chocolate companies that source products from Côte d'Ivoire admitted the goals of the Protocol would not be "fully met" by the 2005 deadline, but assured Sen. Harkin and Rep. Engel they were "committed to achieving a certification system . . . within three years."[35] Then, in 2008, the industry leaders again unilaterally extended their self-imposed deadline by two years.[36] In 2010, the industry delayed the implementation date by a full decade to 2020, and this time the goal was changed to merely reducing by seventy percent the use of child labor in the cocoa industry. At the Eighth Annual World Cocoa Foundation (WCF) meeting in July 2018, the industry admitted it could not make its 2020 or even 2025 goal of eradicating child labor in the cocoa supply chain. Effectively abandoning any set date, the WCF admitted it was not likely it would meet its "aspiration for 2020" or other targets "for the eradication of child labor by 2025."[37]

---

[34] INTERNATIONAL COCOA INITIATIVE, https://www.cocoainitiative.org/.
[35] *Joint Statement from U.S. Sen. Tom Harkin, Rep. Eliot Engel and the Chocolate/Cocoa Industry on Efforts to Address the Worst Forms of Child Labor in Cocoa Growing Protocol Work Continues*, *supra* note 31.
[36] *Joint Statement from U.S. Sen. Tom Harkin, Rep. Eliot Engel and the Chocolate and Cocoa Industry on the Implementation of the Harkin-Engel Protocol*, *supra* note 31.
[37] *2018 Child Labor Cocoa Coordinating Group 8ᵗʰ Annual Meeting Remarks* (2018), https://www.worldcocoafoundation.org/blog/2018-child-labor-cocoa-coordinating-group-8th-annual-meeting-remarks/.

Thus, the major companies acknowledged that two decades after they promised to stop profiting from forced child labor, they still were and would continue to do so.

23.     After a study conducted in 2015 by Tulane University concluded that the number of Ivorian children engaged in the worst forms of child labor on cocoa plantations substantially increased between 2009 and 2014, with 1,203,472 child laborers working on farms in the 2013-2014 harvest season,[38] cocoa companies renewed their false assurances to consumers and regulators, stating they would initiate programs to reduce child labor in their supply chains. These promises remain unfulfilled.

24.     Many WCF leaders are the creators and founding members of the WCF's "CocoaAction Plan." Among other things, the CocoaAction Plan purports to include a monitoring system, the Child Labor Monitoring and Remediation System (CLMRS), to ensure there are no children working on cocoa plantations. Like the Harkin-Engel Protocol, the CocoaAction Plan and the CLMRS are ineffective in ending forced child labor and instead serve as public relations ploys. Chocolate companies know them to be so and purposefully set them up to be narrow, uncomprehensive, and lacking in transparency. The CLMRS "monitoring," like the CocoaAction Plan, extends only to a small percentage of chocolate companies' supply chains. Further, CLMRS does not have any form of independent monitoring, and provides no consequences for a farmer using child slaves. Finally, there is no effective remediation when CLMRS does find children working as slaves, and/or performing hazardous work with dangerous tools and spraying pesticides and herbicides without protective equipment.

---

[38] Tulane University Payson Center for International Development, *Survey Research on Child Labor in West African Cocoa Growing Areas*, Department of Labor (July 30, 2015) https://www.dol.gov/sites/dolgov/files/ilab/research_file_attachment/tulane%20university%20-%20survey%20research%20cocoa%20sector%20-%2030%20july%202015.pdf.

25.     One graphic example of the CocoaAction Plan's willful and ongoing acceptance

of the use of child labor is apparent in the 2015 Fair Labor Association (FLA) audit on Nestlé (a

developer and promoter of the CocoaAction Plan), which occurred at Nestlé's request. The

FLA's audit report explained that "[f]or Nestlé in Ivory Coast, the FLA has been monitoring

since 2013 a growing portion of its cocoa supply served by the Nestlé Cocoa Plan (NCP). As of

mid-2015, the NCP represented around twenty-five percent of Nestlé's total cocoa supply

chain."[39] The NCP areas were what the FLA audited; in other words, Nestlé had the FLA audit

the small subset of its supplying cocoa farms where it had engaged in the most efforts to

eradicate child and slave labor, excluding the majority of its supply. The FLA assessors visited a

sample of 260 farms, less than one percent of the 30,000 that supply Nestlé in the Ivory Coast.[40]

Despite this small sample limited to areas most favorable to Nestlé, the FLA report found that

"[c]hildren younger than 15 continue to work at cocoa farms connected to Nestlé, more than a

decade after the food company promised to end the use of child labour in its supply chain."[41]

These children "were expected to work in hazardous conditions and carry out dangerous tasks,

including using machetes and transporting heavy loads." Additionally, the Fair Labor

Association "found evidence of forced labour, with a young worker not receiving any salary for

a year's work at a farm."[42] Ultimately, and remarkably, even Nestlé's paid agent, when focusing

on the small subset of farms carefully selected to reduce the chances of unfair labor practices,

---

[39] *2014 Executive Summary, Nestlé Cocoa Supply Chain, Ivory Coast*, FAIR LABOR ASSOCIATION 1 (Sept. 2, 2015), https://www.fairlabor.org/reports/2014-executive-summary-nestle-cocoa-supply-chain-ivory-coast/.

[40] *Id.*

[41] Joe Sandler Clarke, *Child labour on Nestlé farms: chocolate giant's problems continue*, THE GUARDIAN (September 2, 2015), https://www.theguardian.com/global-development-professionals-network/2015/sep/02/child-labour-on-nestle-farms-chocolate-giants-problems-continue.

[42] *Id.*

17

immediately discovered many serious instances of exploitative practices harming child workers. If this is what the FLA found in Nestlé suppliers' *monitored* farms, a survey of Nestlé's entire supply chain—or that of other chocolate companies— would almost certainly yield even more devastating findings of child slavery.

26.     Further, in March 2019 interviews with the WCF, the ICI, and the Fair Labor Association (FLA), IRAdvocates learned that, at most, twenty to thirty percent of any producer's cocoa comes from plantations that are in cooperatives and that are participants in the CocoaAction Plan. The remaining seventy to eighty percent comes from "free zones," where there is no monitoring whatsoever and where there is an extremely high incidence of trafficked and forced child labor. Though these percentages may have changed since 2019, it remains clear that unmonitored cocoa still constitutes well over half of the overall cocoa supply (and for many companies, often much more than half).[43]

27.     Meanwhile, the so-called "monitored" cocoa, though an improvement over "free zones" because there is at least the possibility of traceability to the identified cocoa plantations, relies on company-designed and -implemented systems that cannot remotely be considered legitimate, independent monitoring. These systems are not transparent and they do not in actuality prevent unfair labor practices; as with Nestlé's monitoring system, this type of "monitoring" remains inaccurate and misleading. The current company-sponsored "monitoring"

---

[43] *See* Cécile Renier et al, *Transparency, traceability and deforestation in the Ivorian cocoa supply chain*, ENVIRONMENTAL RESEARCH LETTERS Vol. 18, No. 2, DOI 10.1088/1748-9326/acad8e. This number is generous, as many chocolate companies monitor much less than 50% of their cocoa supply; Mars, for instance, traced only 24% as of 2019. Peter Whoriskey and Rachel Siegel, *With its 2005 deadline to end child labour missed, the cocoa industry is bitterly behind – especially in Africa,* THE INDEPENDENT (June 11, 2019), https://www.independent.co.uk/news/world/africa/cocoa-child-labour-africa-hershey-nestle-mars-cadbury-toblerone-a8948316.html.

systems are prime examples of the fox guarding the chicken coop. Chocolate companies, as well as the WCF and ICI, are misleading the public and consumers by creating the false impression that the CocoaAction Plan extends past a small minority of farmers in companies' supply chains. In doing so, the organizations willfully fail to disclose the scale of child labor in cocoa harvesting. In addition, there is still pervasive use of child labor even in the subset of plantations in the CocoaAction Plan; the companies explain this away by claiming, without a factual basis, that the child laborers are the children of the plantation owners. Regardless of whether some child workers are family members of the farmers using them, these children are performing hazardous work that no children are permitted to do under ILO Convention No. 182. As noted, the company-implemented monitoring systems cover only a minority of the relevant cocoa supply. And even for the farms they supposedly cover—the supposedly monitored, sustainable, and slave-free farms—the systems, in actuality, do not prevent forced child labor or other violations of ILO Convention No. 182.

28.    Chocolate companies' repeated delays in stopping their use of child slaves, after twenty-two years of falsely promising to do so under the Harkin-Engel Protocol while continuing to claim to be "committed" and "concerned" about the welfare of children, demonstrates they knowingly benefit from forced child labor without interference. Their "voluntary" initiatives have proven to be shams, and they are getting away with and profiting from an international human rights crime while claiming they are making progress.[44] These companies maintain an ongoing, cheap supply of cocoa through exclusive supplier/buyer

---

[44] *See* Peter Woriskey, *Chocolate companies sell 'certified cocoa.' But some of those farms use child labor, harm forests,* WASHINGTON POST (Oct. 23, 2019), https://www.washingtonpost.com/business/2019/10/23/chocolate-companies-say-their-cocoa-is-certified-some-farms-use-child-labor-thousands-are-protected-forests/.

relationships with local farms and/or farmer cooperatives in Côte d'Ivoire. Despite this control and their specific knowledge of the pervasive use of child labor by the farmers harvesting cocoa for them, chocolate companies have failed to stop the illegal use of forced child labor in cocoa harvesting. This history and methodology of exploitation is well documented, as was irrefutably demonstrated by the 2020 NORC Report showing that illegal child labor has increased since 2015 and there are now 1.56 million children harvesting cocoa.[45] This lawless environment allows chocolate companies to continue to benefit from the forced child labor.

29.    The Petition filed with CBP by IRAdvocates, CAL, and UCI specifically names the major chocolate companies that signed the Protocol in 2001 but remain the worst offenders of their failed promise to stop profiting from forced child labor and other worst forms of child labor; the Petition asks that the cocoa harvested by these companies be banned from importation to the U.S. The named companies are: Nestlé, Mars, Hershey, Barry Callebaut, Blommer Chocolate Co., Cargill, Mondelēz, and Olam. Each of these companies continues to violate the Protocol while engaging in deceptive practices to mislead consumers and regulators into believing they no longer profit from forced child labor. Each of them is knowingly profiting from trafficked and forced child labor and other examples of the "worst forms of child labor" prohibited by ILO Convention No. 182. All of these companies pledged to stop this abuse of West African children when they signed the Protocol in 2001 and have been misleading the public about their efforts to do so since then.

---

[45] NORC Report, *supra* note 5, at 146.

**a. Nestl**é

30.     Nestlé, U.S.A. (Nestlé) is a U.S. corporation that is a subsidiary of Nestlé, S.A. Headquartered in Virginia, Nestlé is one of the largest food and beverage companies in the U.S. with 21,000 employees nationwide, forty-two manufacturing facilities, six distribution centers, and fifty-eight sales offices. It is one of the largest purchasers, manufacturers, and retail sellers of cocoa products in North America. The company acknowledges child labor exists in its supply chain.[46] Nestlé bombards the public with nice-sounding policies that are merely false assurances of its compliance with its own standards and universally recognized prohibitions on trafficking and using children to perform hazardous work.

31.     As one example of consumer-facing messaging, Nestlé's Responsible Sourcing Standard provides in section 2.2.5:

> Minimum Age for Employment. In accordance with international labour standards, no person shall be employed under the age of 15 or under the age for completion of compulsory education, whichever is higher, except in the strict frame of the Family Farm Work described in 4.2.1: If the Supplier employs young workers, defined as between the ages of 15 and 18, it shall demonstrate that the employment of young people contributes to their personal education and does not expose them to undue physical risks that can harm physical, mental or emotional development.[47]

32.     Despite this assertion, Nestlé's known suppliers systematically violate this standard. Meanwhile, Nestlé profits from cocoa it obtains from the "free zones" in Côte d'Ivoire, where Nestlé knows the cocoa is produced by young children forced to perform

---

[46] Nestlé Cocoa Plan, *Tackling Child Labor 2017 Report*, NESTLÉ 9, https://www.nestlecocoaplan.com/themes/custom/cocoa/dist/assets/nestle-cocoa-plan-child-labour-2017-report.pdf.
[47] *Nestlé Responsible Sourcing Standard*, NESTLÉ 9, https://www.nestle.com/sites/default/files/asset-library/documents/library/documents/suppliers/nestle-responsible-sourcing-standard-english.pdf.

hazardous work, and where Nestlé knows many of those child laborers were trafficked from Mali and Burkina Faso.

33.    The Nestlé Cocoa Plan provides additional insight into its own "efforts to tackle child labor." In the "Tackling Child Labour 2017 Report," the company lauds its own efforts, which involve the monitoring of **40,728** five-to-seventeen-year-olds and the identification of **7,002** child laborers currently working on farms covered by the Cocoa Plan. The report is self-congratulatory, despite its more quiet acknowledgement that monitoring efforts only covered **one-third** of Nestlé's supply chain.[48] As previously discussed, in meetings with a team from IRAdvocates, officials at the WCF, the ICI, and FLA in 2019 admitted that this estimate is high and, at most, twenty to thirty percent of any member's cocoa supply chain is within any of their programs. Even if Nestlé's one-third figure is accepted as true, Nestlé is still implicitly admitting that two thirds of its cocoa supply chain is not within its program—and officials at the WCF, ICI and FLA acknowledge that child labor is rampant in the "free zones" of cocoa production and that trafficked children also work in those areas. Thus, like other leading chocolate companies, the majority of Nestlé's cocoa is sourced through untraceable channels, where no monitoring takes place and forced child labor and trafficking occur on a widespread basis.

34.    Even within the small percentage of plantations actually covered by the Cocoa Plan, there exists no effective system of monitoring or remediation. Nestlé admits that within the seventy co-operatives in Côte d'Ivoire that supply the small amount of traceable cocoa bought by Nestlé, only tenty-two have implemented Nestlé's Child Labor Monitoring and

---

[48] Nestlé Cocoa Plan, *Tackling Child Labor 2017 Report*, NESTLÉ, ICI 11, https://www.nestle.com/sites/default/files/asset-library/documents/creating-shared-value/responsible-sourcing/nestle-cocoa-plan-child-labour-2017-report.pdf.

Remediation System (CLMRS). In other words, even in the small number of cooperatives where the cocoa is traceable to known farmers, monitoring activities through the Nestlé Cocoa Plan CLMRS take place in only a fraction. There is no secondary system for child labor monitoring and remediation.

35.     Further, Nestlé's CLMRS system is ineffective. It purports to be a community-based monitoring system to identify and remediate child labor. Nestlé's plan relies on either Community Liaison People (community auditors) to spot children engaged in labor activities, or on the children themselves to self-declare that they are engaging in a hazardous activity. There are no trained independent monitors and no consequences for farmers who use child slaves to harvest Nestlé's cocoa. This is evidenced by Nestlé's finding that

> Cases of forced labor are rare in Nestlé's cocoa supply chain. Since 2012, we have uncovered three violations of forced labor guidelines and immediately took action to report and remedy them. The cases were identified in 2013, 2014 and 2015. Since the publication of the 2017 Tackling Child Labor Report, no further instances of forced labor have been identified. This does not mean that forced labor does not exist - **it may be that we are not good enough at identifying it**.[49]

36.     The Nestlé Cocoa Plan reports flagrantly attempt to justify the company's failure to stop the use of child labor in its supply chain. The 2017 report cites as a "challenge" to tackling child labor: "[r]esistance to change: If children have been practicing certain hazardous activities for years they and their families are often resistant to change. This is especially true when they have few alternatives, and when working like an adult brings them status amongst their peers."[50] This unapologetic blame-shifting continues in Nestlé's 2019 report, which states

---

[49] Nestlé Cocoa Plan, *Tackling Child Labour 2019 Report*, NESTLÉ 24 (2019), https://www.nestle.com/sites/default/files/2019-12/nestle-tackling-child-labor-report-2019-en.pdf (emphasis added).
[50] *Tackling Child Labor 2017 Report*, *supra* note 48, at 42.

that "[c]ertain aspects of the laws surrounding child labor can be confusing for farmers and can directly conflict with their beliefs and traditions."[51]

37.     Nestlé makes false assurances that it is determined to "tackle" the problem and that its Nestlé Cocoa Plan is helping to "eliminate the use of child labour" and "stamp out forced labour practices" in the Ivorian cocoa industry. Nestlé also claims that it is "improv[ing] the lives of farmers" through the Plan.[52] However, Nestlé's profiteering from child labor does not help the lives of farmers. Child labor has only increased in Côte d'Ivoire since Nestlé instituted its Cocoa Plan. And Nestlé has yet to commit to even paying farmers a fair price for their cocoa and does not currently have any long-term plans to support farmers achieving a living income.

38.     In the face of its empty promises, Nestlé still had the chutzpah to oppose a proposed law in Australia that would require companies to report on child slaves in their supply chain. In late April 2019, Nestlé issued a warning against the proposed legislation that would mandate that Nestlé report on its efforts to weed out slavery within their company. The company claimed the cost of checking whether its suppliers were forced to work against their will would end up being passed on to the consumer. There is no way for Nestlé to tell if it is on the verge of ending the use of child slaves, as it claims, if it deliberately refuses to count or survey its operations. This refusal amounts to willful blindness—and willful obfuscation of its practices.

39.     The Nestlé Cocoa Plan is a clear attempt to vindicate the company to the public without requiring it to take tangible actions to eradicate this widespread scourge. The plan thus

---

[51] *Tackling Child Labor 2019 Report*, *supra* note 49, at 60.
[52] *Id.* at 6.

24

deceives consumers into believing that buying Nestlé's products will actually benefit farmers in Côte d'Ivoire and misleads them into thinking the products are reliably child labor- and slave labor-free.

**b. Cargill**

40.     Cargill Cocoa is a major cocoa bean originator and processor incorporated in Pennsylvania. It is a subsidiary of Cargill, Incorporated Company (Cargill), one of the largest privately-held corporate providers of food and agricultural products and services worldwide. Cargill is headquartered in Minnesota and incorporated in Delaware. Cargill Cocoa offers a wide range of high-quality cocoa powder, butter, and liquor products under the Gerkens and Wilbur brands to leading manufacturers of food, chocolate, and confectionery products worldwide. Products are sold through an international network of offices, agents, and distributors. However, evidence in the public record indicates Cargill has a long history of profiting from child slavery in cocoa production.

41.     Cargill Cocoa & Chocolate North America is responsible for Cargill's partnerships with farmers in Côte d'Ivoire. Cargill's facilities include a production facility in Côte d'Ivoire that produces cocoa liquor, butter, powder, and origination of cocoa beans. As Carol Off, author of *Bitter Chocolate*, notes, Cargill is possibly the largest privately-owned corporation in the world; its influence over the food we eat, in terms of where it comes from and how it is produced, is staggering.[53] Cargill has a more visible presence in Côte d'Ivoire than any other cocoa importer. There are numerous cocoa cooperatives large and small that have exclusive relationships with Cargill. At one large cooperative in Duekoue that produces for

---

[53] Carol Off, *Bitter Chocolate: Investigating the Dark Side of the World's Most Seductive Sweet*, VINTAGE CANADA (2006).

Cargill, the owner told counsel for Plaintiff that a local representative from Cargill visited his cooperative on a *weekly basis* and that a Cargill representative from the company headquarters visited about once a year.

42.     As part of their ongoing and continued presence on the cocoa farms in Côte d'Ivoire—for purposes of quality control, pesticide eradication, cultivation assistance, harvesting, and packing and shipping, among other activities and assistance to the farmers— Cargill has first-hand knowledge of the widespread use of child slave labor in harvesting cocoa on the farms they work with and purchase from. This direct knowledge of child labor is supplemented by well-documented and prevalent information provided by many public news articles and reports of child labor by both international and U.S. organizations.

43.     After signing on to the Harkin-Engel Protocol in 2001, Cargill posted a series of promises and pledges about its intention to stop using child slaves in its supply chain. These promises and pledges were largely misleading, as none of the stated objectives for solving the child labor problem or reducing its incidence in Cargill's supply chain were met. Cargill's claims from 2005 to 2015 are detailed in the Second Amended Complaint in *Doe v. Nestle*, Case No. CV 05-5133-SVW-MRW (C.D. CA 2016) at ¶¶ 40 and 59. They indicate Cargill's supposed intentions were false, or at best, that Cargill was not as serious about these intentions as it pretended to be.

44.     Cargill has recently rolled out a new set of promises and pledges to stop using child slaves that are likewise misleading and empty. On Cargill's "Ethics and Compliance" webpage, it lists as its number one guiding principle, "[w]e obey the law . . . [a]s a global organization privileged to do business all over the world, we have the responsibility to comply

with all of the laws that apply to our businesses."[54] Cargill's ongoing and admitted profiting

from child slaves harvesting cocoa in its supply chain violates universally recognized law

prohibiting the use of young children to perform any work, and certainly hazardous work.

45.     Cargill introduced a new gimmick in 2017 called the Cargill Cocoa Promise,

which states on its "Cocoa Promise in Action" page:

> At Cargill Cocoa & Chocolate, we believe that improving the lives of cocoa farmers goes hand-in-hand with our business success – and the success of the sector as a whole. While we are proud of the progress we are making, there is still much to do. To achieve a fully sustainable cocoa sector, we're going to have to learn faster, try harder, and go further – together.[55]

Goal Two of the "Cargill Cocoa Promise" is "Community Wellbeing," with the specific goal of

"[z]ero incidents of child labor in our supply chain by 2025."[56] Within these statements, the

conglomerate is tacitly admitting to the existence of child labor in its supply chain.

46.     On Cargill's website, the company describes its efforts to address the known

child labor in its supply chain in Côte d'Ivoire that it and the other large cocoa companies

promised to end back in 2001 when the Harkin-Engel Protocol was signed:

> Since 2016, Cargill has used a Child Labor Monitoring and Remediation System (CLMRS), which we co-designed with the International Cocoa Initiative (ICI), to address child labor in the cocoa supply chain. CLMRS brings networks of local coaches and monitoring agents to visit farms year-round, working with families to raise awareness about the impact of child labor, identify incidents, and implement prevention and remediation programs. Cargill also works together with our partners to address the root causes of child labor by improving access to education, helping farmers to increase their incomes; expanding economic opportunities for women; and delivering programs that improve health, nutrition, and food security in cocoa communities. Our goal, by 2025, is to have a CLMRS in place to identify and address child labor throughout our direct cocoa supply chain, along with monitoring, prevention, and remediation approaches tailored for local needs.[57]

---

[54] *Cargill Code of Conduct*, Cargill, https://www.cargill.com/about/code-of-conduct.
[55] *Our Stories*, Cargill, https://www.cargill.com/sustainability/cocoa/our-stories.
[56] *Committed to More: 2016/2017 Cargill Cocoa Promise Global Summary Report*, Cargill 7, https://www.cargill.com/doc/1432099950824/cargill-cocoa-promise-report-2016-17.pdf.
[57] *Human Rights*, Cargill, https://www.cargill.com/sustainability/human-rights.

47.     As stated in paragraph 24-27, *supra*, the CLMRS does not even purport to be a complete monitoring and certification system. There are no independent monitors, there are no surprise inspections, and there are no consequences to farmers or Cargill when child slaves are found to be working in Cargill's supply chain. These are the most basic foundations of a credible monitoring system. The deficiencies of the CLMRS system is evidenced by Cargill's own report of its methodology, which states that "Cargill trains farm extension workers" and these "farmer coaches visit households throughout the year" to report if any child labor was identified.[58] Relying on farmers who have been using child slaves to now become "farmer coaches" is an incredibly cynical example of hiring the fox to guard the chicken coop.

48.     The Cargill Cocoa Promise assured consumers in its 2017/2018 report that "more than 21,000 members of farm families including 5,400 farmers and nearly 8,400 children were reached with information about child labor prevention and monitoring services. In 2018, an additional 25,000 members of farming families were reached, and the program is expanding further in 2019 and beyond."[59] In its 2021 report, Cargill claims that "51,708 farming households" were included in CLMRS; however, this number includes households in "Côte d'Ivoire, Ghana, Cameroon, and Indonesia."[60] Of this number, 32,220 were located in Côte d'Ivoire.[61] After twenty-three years of inaction, Cargill covering this number of farming households with its faulty monitoring system is shockingly inadequate. Cargill is clearly hoping

---

[58] *Committed to More Infographic*, Cargill, https://www.cargill.com/doc/1432121706389/ccc-committed-to-more-ending-child-labor-infographic.pdf.
[59] *Id.*
[60] *Cocoa and Chocolate Sustainability Progress Report 2021*, Cargill 12, https://www.cargill.com/doc/1432213708736/cargill-cocoa-sustainability-progress-report-2021.pdf.
[61] *Id.* at 24.

that consumers and regulators without knowledge of the cocoa industry will be impressed that Cargill is reaching out in any way to 32,000 farms. But as Cargill well knows, that number represents a miniscule proportion of the farms producing cocoa. The WCF admits that: "[t]he organized supply chains of a handful of companies reach only a fraction of the entire cocoa-growing population of Côte d'Ivoire and Ghana, and efforts to date have only reached a fraction of the farmers in those supply-chains."[62] And, as stated above, these supposed CLMRS efforts include contacting farmers with mere "information about child labor prevention," which is absolutely ineffective even if Cargill had done this for every cocoa producing person in the world.

49.    Cargill also claims it has implemented an innovative "bar code" system to track bags of cocoa produced within the CLMRS system. Again, even if this digital tracing system worked perfectly, CLMRS is only operating in a small portion of Cargill's supply chain, and the rest of their cocoa comes from the unregulated free zone. Cargill claims in its 2021 report that "100% of our direct supply chain is traceable up to the first point of purchase"; however, of its indirect supply chain, only "10% of the cocoa is traceable to the first point of purchase," and "78% is traceable to sourcing region."[63] This vague language is intended to obscure the fact that seventy to eighty percent of Cargill cocoa comes from the completely unregulated free zone, as aforementioned interviews by Plaintiff's counsel uncovered. Further, based on an investigation by Plaintiff's counsel in March 2019, the owner of one major Cargill cooperative—controlling

---

[62] *2018 Child Labor Cocoa Coordinating Group 8th Annual Meeting Remarks*, *supra* note 37.
[63] *Cocoa and Chocolate Sustainability Progress Report 2021*, CARGILL 16, https://www.cargill.com/doc/1432213708736/cargill-cocoa-sustainability-progress-report-2021.pdf.

over 1,000 member farms—admitted he had not yet even received training for the bar code

system. He showed the bar code electronic device, brand new in the box, to Plaintiff's counsel.

50.     The Cargill cooperative owner also admitted that there is no way that Cargill

could know if farmers put cocoa beans that were produced outside of the CLMRS system into

the Cargill bags. Without effective monitoring, farmers are free to purchase beans from the free

zone, pass them off as CLMRS beans, and receive whatever premium Cargill offers for CLMRS

beans.

51.     Cargill clearly has a long way to go to meet its stated goal of "[z]ero incidents of

child labor in our supply chain by 2025."[64] But based on the long history of Cargill and the

other cocoa retailers and chocolate companies doing virtually nothing since signing the Harkin-

Engel Protocol twenty-two years ago, the goal is not to stop profiting from child slavery. The

goal is to deceive regulators and the public and create the false impression that the Cargill

Cocoa Promise is not yet another empty promise. Meanwhile, the alarming results of the NORC

Report conclusively demonstrate that child labor is increasing while Cargill is touting its broken

"Cocoa Promise."

**c. Barry Callebaut**

52.     Barry Callebaut USA LLC (Barry Callebaut) is a U.S. company headquartered in

Chicago and is a subsidiary of Barry Callebaut AG. The company markets and sells cocoa

produced in Côte d'Ivoire in the United States with brands such as Barry Callebaut, Bensdrop,

and Cacao Barry.

---

[64] *Committed to More: 2016/2017 Cargill Cocoa Promise Global Summary Report*, *supra* note 56 at 7.

53.     Barry Callebaut claims that it is now working to make sustainable chocolate the norm. When it launched its "Forever Chocolate" plan in 2016, Barry Callebaut pledged to eradicate child labor and lift 500,000 farmers out of poverty by 2025.[65] In May 2023, however, Barry Callebaut delayed its goals further—as it and the cocoa industry have repeatedly done over the previous two decades—and backed off its promise to eradicate child labor altogether. Instead, the company's new "sharpened goals" are for its supply chain to be covered by Human Rights Due Diligence by 2025 and for farming communities to be "empowered to protect child rights" by 2030.[66] Barry Callebaut has once again failed to implement effective policies, and instead has rolled out new vague goals to keep up its public appearance.

54.     The most recent Forever Chocolate progress report admits that "Barry Callebaut sources cocoa from regions where child labor, defined as work that deprives children of their childhood, their potential and their dignity, and that is harmful to their physical and mental development, occurs."[67] This acknowledgment is repeated by Barry Callebaut's internal "Human Rights Committee," which states "Barry Callebaut sources cocoa and other commodities from regions where child labor . . . is widespread."[68] Again, this is a cocoa company that brings incredible amounts of cocoa product into the United States each year, admitting in its own reports that child labor is prevalent in its supply chain. Given the broken

---

[65] *Forever Chocolate Progress Report 2021/22*, *Eradicating Child Labor,* BARRY CALLEBAUT1, https://www.barry-callebaut.com/system/files/2022-11/Forever%20Chocolate%20Progress%20Report%202021-22%20Barry%20Callebaut_2.pdf.
[66] *Forever Chocolate: Impact Beyond 2025*, Barry Callebaut 4 (2023), https://www.barry-callebaut.com/system/files/2023-05/Our%20impact%20beyond%202025%20brochure_0.pdf.
[67] *Forever Chocolate Progress Report 2021/22*, *Eradicating Child Labor, supra* note 65, at 7.
[68] *Safeguarding Human Rights Update 2021/22*, BARRY CALLEBAUT, https://www.barry-callebaut.com/en/group/forever-chocolate/ethical-sourcing-and-business/safeguarding-human-rights-our-supply-chain#:~:text=We%20expect%20our%20suppliers%20and,of%20our%20products%20by%202025.

promises of chocolate companies since 2001 to end the exploitation of child labor in their supply chains, these new promises by Barry Callebaut and others to end exploitation by 2025 are very likely going to be broken as well. Barry Callebaut even references the 2025 goals, highlighted in public relations material and supposedly mandated by Barry Callebaut's membership in WCF and other organizations, as merely a "springboard."[69]

55.     Further, Barry Callebaut's internal Human Rights Committee acknowledges that the October 2020 NORC report, and a June 2021 report published by the European Commission on ending child labor in Côte d'Ivoire and Ghana, concluded that "current efforts to eliminate child labor are not sufficiently and structurally embedded with a functioning institutional support system."[70]

56.     Barry Callebaut claims that its use of the Child Labor Monitoring and Remediation Systems (CLMRS) and awareness training in collaboration with the International Cocoa Initiative (ICI) and the World Cocoa Foundation (WCF) will provide the necessary monitoring to back up their supply chain transparency. However, as previously stated, CLMRS appears to be a scam to merely create the appearance of meaningful monitoring and remediation. CLMRS does not provide for independent monitoring or remediation, and there are no consequences for farmers using child slaves. Most fundamentally, CLMRS is being applied to a very small percentage of Defendants' supply chains. Monitoring and remediation is in place in only eight-one percent of Barry Callebaut's direct supply chain.[71] However, as the ICI and WCF admit, chocolate company's direct supply chains only account for about twenty to thirty percent of their total supply chain. The company admits that only twenty-three percent of its

---

[69] *Forever Chocolate Progress Report 2021/22*, *Eradicating Child Labor*, *supra* note 65, at 1.
[70] *Id.* at 7.
[71] *Id.* at 10.

indirect supply chain is sourced from third party suppliers covered by "equivalent child labor monitoring systems."[72]

57.     Still, in the minority of farms covered by Barry Callebaut's monitoring scheme, the company identified 25,235 cases of child labor.[73] Barry Callebaut claims to tackle the issue of child labor through awareness training in farmers' communities. According to the company, systematic change must happen from within farming communities who need to be aware "of the consequences of the worst forms of child labor for a child's development, education, and quality access to primary, secondary and vocational education."[74] Its 2017/18 report sheds light on Barry Callebaut's plan to "creat[e] a movement" by signing letters of intent with the Ivorian and Ghanaian governments to "spell out a commitment to increase cooperation on the eradication of the worst forms of child labor."[75] These self-policing measures have been failing miserably for years.

58.     Barry Callebaut's Supplier Code confirms that it knows the legal requirements that prohibit child labor in cocoa harvesting. This Code states suppliers are prohibited from using child labor in their operations and must respect and realize the principles set forth in the ILO convention Nos. 138 and 182, respectively, on the minimum age for employment and on the worst forms of child labor.[76] Barry Callebaut claims to reserve the right to terminate its business relationship with the supplier if it does not act to remediate non-compliance issues.

---

[72] *Id.*

[73] *Id.*

[74] *Forever Chocolate Progress Report 2017/18,* BARRY CALLEBAUT 5, https://www.barry-callebaut.com/sites/default/files/2019-01/barry-callebaut-forever-chocolate-progress-report-2017-18.pdf.

[75] *Id.*

[76] *Supplier Code*, BARRY CALLEBAUT 6 (May 2020), https://www.barry-callebaut.com/sites/default/files/2020-05/Barry%20Callebaut%20Supplier%20Code_EN_2020.pdf.

Barry Callebaut's Code of Conduct accordingly condemns forced labor, child slavery and other practices that exploit children or expose them to harmful conditions.[77] However, there is no record of enforcement of these clear objectives, and given that Barry Callebaut's supply chain is still riddled with child slavery, its Code of Conduct serves only as a clear admission that the company is knowingly violating fundamental laws and principles as it continues to profit from child slavery. The NORC Report confirms that, rather than contributing to overall progress on reducing child labor (let alone eliminating the practice), child labor has increased since Barry Callebaut rolled out its unenforced Code of Conduct.

**d. Mars**

59.    Mars, Incorporated (Mars), by far the largest manufacturer of chocolate in the world, is a privately held corporation with its U.S. headquarters in McLean, Virginia. It operates its cocoa business and sales in the U.S. through Mars Wrigley Confectionary, which is headquartered in Chicago, Illinois. Mars sells and markets cocoa products all over the United States, with much of its supply hailing from Côte d'Ivoire. Like other chocolate manufacturers, Mars admits the ongoing existence of child labor and forced child labor in its supply chain. After years of knowingly benefiting from child slavery, it claims it is trying to fix the problem with its "Five Principle Plan."[78] These five principles are "Quality, Responsibility, Mutuality, Efficiency and Freedom to life every day."[79] Mars has developed a "global human rights approach" to focus its principles on issues of human rights violations. Specifically, Mars states that its "Supplier Code of Conduct outlines our global human rights expectations of all first-tier

---

[77] *Code of Conduct*, BARRY CALLEBAUT 9 (2023), https://www.barry-callebaut.com/system/files/2023-04/Barry%20Callebaut_Code%20of%20Conduct.pdf.
[78] *The Five Principles*, MARS, https://www.mars.com/about/the-five-principles.
[79] *See Id.*; *California Transparency in Supply Chains Act*, MARS, https://fin.mars.com/en/ca-supply-chain-act?language_content_entity=fi.

suppliers, including workplace standards and guidelines aligned with the International Labour Organization's Fundamental Principles and Rights at Work. It prohibits the use of prison, slave, bonded, forced and indentured labor and human trafficking."[80] This includes "Child labor, forced labor, including slavery and human trafficking, and migrant labor."[81] As with the other Defendants, these high-minded words and standards merely serve to prove that Mars' ongoing use of child slavery violates its own standards.

60.     Mars continuing to profit from child slavery violates the fundamental principles to which Mars purports to adhere. Such principles can be found in its Human Rights Policy statement:

> Significant, complex and systemic human rights issues persist in the global economy and affect people in a number of extended supply chains that we ultimately rely on as a business. These challenges are often linked with poverty, weak rule of law or the vulnerability of migrant workers. For example, the International Labour Organization (ILO) estimates that more than 85 million children are working under hazardous conditions, most in the agriculture sector, and that more than 21 million people are victims of forced labor around the world. Mars does not control and has very limited influence over operations in our extended supply chains. Nevertheless, we believe these practices are unacceptable and that we must renew our individual and collective efforts to take action, boldly test new approaches and form new collaborations to drive sustained progress. [82]

> In consultation with human rights experts and through thorough review of publicly-available data we have identified forced labor and child labor as the human rights issues that may pose the most severe risk to people in our extended supply chains.[83]

---

[80] *Id.*

[81] *Id.*

[82] *Human Rights Position Statement*, MARS, https://www.mars.com/about/policies-and-practices/human-rights.

[83] *Id.*

At Mars, we seek to promote and respect human rights across our entire value chain. From factory workers in Chicago to farmers in Côte d'Ivoire, we believe everyone touched by our business should be treated with dignity, fairness and respect.[84]

61.    Mars claims to have a plan to address its ongoing use of child slavery in five steps.[85] First, Mars will work on verifying the supply chain, not through traceability, but by giving the third-party cocoa suppliers Mars' Supplier Code of Conduct and encouraging suppliers to implement relevant systems. Additionally, Mars "periodically engage[s] suppliers in training and awareness raising to drive continuous improvements."[86] This is just as ineffective as Cargill's mere provision to farmers of information about child labor's harms, discussed in para. 48, *supra*. Second, Mars aims to fix human rights abuses by auditing suppliers: "[i]f a supplier repeatedly fails to meet our Code and other verification standards and does not credibly commit to meeting them in a given time period, we *may* terminate our relationship."[87] Third, Mars promotes the certification of suppliers, but only requires that "suppliers . . . maintain transparent records to demonstrate compliance with applicable law and regulations."[88] Fourth, Mars aims to build international accountability, which is done through "purchasing teams and buyers . . . tak[ing] a course in responsible sourcing and hav[ing] related criteria embedded in their personal development plans."[89] Finally, Mars aims to increase training for Mars associates—namely, training people who have knowingly profited from child slavery, and continue to do so. Mars's entire plan is centered around self-monitoring, which clearly has not

---

[84] *Our Approach to Respecting and Promoting Human Rights*, Mars, https://mex.mars.com/en/news-and-stories/articles/our-approach-respecting-and-promoting-human-rights?language_content_entity=en.
[85] *California Transparency in Supply Chain Act*, *supra* note 79.
[86] *Id.*
[87] *Id.* (emphasis added).
[88] *Id.*
[89] *Id.*

worked based on the massive amounts of cocoa still sourced with child slavery; it is nothing more than a public relations ploy to hide Mars' ongoing use of child slavery. As noted, under no circumstances is self-monitoring considered a legitimate and reliable process for addressing serious supply chain issues. While WCF lists Mars as one of the nine companies committed to "CocoaAction," Mars does not discuss this sham program in its own materials.

62.     Mars, while admitting it still has child slaves in its supply chain, doubles down on emphasizing that the use of child slavery violates international law, U.S. law, California law, and Mars' own standards:

> In accordance with the UN Guiding Principles, we will advance respect for human rights in our value chain by implementing a due diligence process to identify relevant adverse impacts on human rights and establish or support appropriate and effective mechanisms for prevention and remediation. No matter where we operate, Mars strives to comply with the spirit and the letter of the law. Where local laws are less stringent than our Policy, we will operate in accordance with this Policy and our Five Principles.[90]

> We are seeking to advance respect for human rights in our extended agricultural supply chains, which reach past our first-tier suppliers all the way to the farm or fishery level. Some of the most serious human rights issues in our value chain may be at the farthest ends of our agricultural supply chains, where our influence and visibility are typically low.[91]

> We expect our first tier suppliers to align with our Code of Conduct, including its provisions on forced labor, by affirming their commitment to uphold our Code or demonstrating an equivalent policy of their own. Suppliers are expected to maintain transparent records to demonstrate compliance with applicable law and regulations.[92]

63.     In emphasizing new promises to improve compliance in its supply chain, Mars fails to inform the public and regulators what it knows: according to WCF and ICI, Mars, like

---

[90] *Our Human Rights Policy*, MARS, https://www.mars.com/about/policies-and-practices/human-rights-policy/.
[91] *Our Approach to Respecting and Promoting Human Rights*, *supra* note 84.
[92] *California Transparency in Supply Chain Act*, *supra* note 79.

the other Defendants, gets seventy to eighty percent of its cocoa from the "free zone," and while progress in the monitored zones is failing, there is absolutely *nothing* in Mars' sham plan to address the child slavery and trafficking in the "free zone." And as the NORC Report makes clear, child labor has dramatically increased in the years since Mars launched its failed program.

**e. Hershey**

64.     According to the International Cocoa Organization, Hershey, an international chocolate producer headquartered in Hershey, Pennsylvania, is the fifth largest manufacturer of chocolate products in the world. The company's own materials admit to the existence of child labor in its supply chain. Hershey states, "[w]e are on track to meet our commitment of 100 percent [CLMRS] coverage of farmers producing Hershey's cocoa volume in Côte d'Ivoire and Ghana by 2025, achieving 6 percent since we began implementing CLMRS in 2018."[93] Within this sixty-two percent of monitored farms, "7,408 children in total were identified via CLMRS in Côte d'Ivoire and Ghana in 2022 as doing inappropriate work and are in process of remediation."[94] Since 2018, the company has identified 18,927 such children, and reports that 6,167 are no longer part of that group, either due to remediation, or because they aged out.[95] Hershey applauds itself for rehabilitating a small percentage of the child laborers it identified, while flagrantly admitting that many of the rehabilitated simply no longer qualify for monitoring because they "aged out" of the program. For the few former child laborers Hershey claims to have remediated, there is no transparent reporting or programmatic descriptions

---

[93] *Child Labor Monitoring and Remediation*, HERSHEY, https://www.thehersheycompany.com/en_us/home/sustainability/sustainability-focus-areas/cocoa/child-labor-monitoring-and-remediation-system.html.
[94] *Id.*
[95] *The Goodness Inside, 2022 ESG Report*, HERSHEY 32, 40, https://www.thehersheycompany.com/content/dam/hershey-corporate/documents/pdf/hershey-2022-esg-report.pdf#page=24.

regarding what remediation actually entails. There are serious reasons to doubt that Hershey and

the other companies do anything more than simply remove child workers from the plantations,

or provide information to farmers on the harms of child labor without further follow-up.

65.     Like the other companies, Hershey attempts to exonerate its use of child labor by

shifting blame to the impoverished communities it exploits for cheap labor. On its 2021 ESG

Report, it states:

> In cocoa-growing communities, child labor is a complex issue resulting from a mix
> of poverty, cultural norms, and misunderstandings about what constitutes
> appropriate child work. In many communities, child-appropriate work on the family
> farm or in the household is an important part of young people's learning and
> cultural development. However, a lack of stable income and educational
> opportunities in rural areas can lead families to depend on children putting in long
> hours at home and on the farms, which are often the families' sole source of
> income.[96]

This paternalistic and condescending attitude towards the communities that enrich Hershey

through their chocolate production is reprehensible. Hershey resigns itself to the sad reality that

child labor is necessary in these communities, where poverty is rampant, without addressing how

these issues could easily be rectified by paying farmers living wages.

66.     Hershey claims that it knows profiting from child slavery violates international

law, U.S. law, and its own code of conduct and supplier standards. In its Statement Against

Slavery and Human Trafficking, Defendant Hershey states it is "committed to operating

responsibly and sustainably throughout the world."[97] This document also states that:

---

[96] *Powered by Shared Goodness, 2021 ESG Report*, HERSHEY 24,
https://www.thehersheycompany.com/content/dam/hershey-
corporate/documents/pdf/hershey_2021_esg_report.pdf.
[97] *Hershey Company Statement Against Slavery and Human Trafficking*, HERSHEY 1,
https://www.thehersheycompany.com/content/dam/corporate-
us/documents/pdf/HSY_Statement_Against_Human_Trafficking_and_Slavery.pdf

Hershey is purchasing 100% independently verified cocoa and each program prohibits the use of forced and child labor.[98]

Onsite Audits: Hershey facilities undergo the 4-Pillar Sedex Member Ethical Trade Audit ("SMETA") on a three-year cadence, and more frequently as needed based on issue remediation or per customer requests.[99]

Responsible Sourcing Supplier Program: Our Responsible Sourcing Supplier Program ("Supplier Program") verifies our Tier 1 suppliers' compliance with our Supplier Code. The program is aligned with our saliency assessment of our most significant human rights issues and leverages third-party verification tools, including self-assessment questionnaires (SAQ) and independent third-party audits. The high-risk and priority suppliers in Hershey's program are required to complete or update their facility's Sedex SAQ or equivalent on an annual basis and undergo the SMETA 4-Pillar social compliance audit or equivalent on a cadence determined by risk and historic performance. The Supplier Program also promotes ongoing training and capability-building and works to drive suppliers' continuous improvement.

When a Supplier Code violation is identified, the Hershey Global Responsible Sourcing team reviews the findings and suppliers are required to develop a corrective action plan that includes addressing the root cause of the issues. A follow-up audit is then required to verify that the non-conformity has been addressed. In instances where a supplier is unwilling or unable to remediate violations in the appropriate timeframe, Hershey reserves the right to suspend or remove the supplier.[100]

67.    In its Code of Conduct, Hershey states:

Our business is built on a long, interdependent supply chain, and we want every link to be solid and strong. We have zero tolerance for the worst forms of child labor as defined by International Labor Organization Conventions 138 and 182 and expect suppliers to support and participate in industry efforts aimed at eliminating these kinds of practices wherever they exist. We respect the rights of every individual and believe that anyone employed by Hershey or Hershey suppliers should be treated with dignity and respect, paid a fair wage based on applicable law and assured of safe working conditions.[101]

---

[98] *Id.* at 7.
[99] *Id.* at 5.
[100] *Id.* at 6.
[101] *In Good Company, Code of Conduct*, HERSHEY 11,
https://www.thehersheycompany.com/content/dam/hershey-corporate/documents/investors/code-of-conduct-english.pdf.

> As a company, we respect the rights of every individual and abide by the employment laws in the markets where we operate. We support the principles established under the United Nations Universal Declaration of Human Rights and do not knowingly conduct business with any individual or company that participates in the exploitation of children (including child labor), physical punishment, forced or prison labor or human trafficking.[102]

> [Encourage employees to] [f]ollow the employment laws where you work, be alert to abuses and speak up if you see or suspect possible labor law or human rights violations.[103]

68.     Hershey also has available on its website its Supplier Code of Conduct, which it describes as the "backbone of Hershey's commitment to a responsible and sustainable supply chain."[104]  The Supplier Code of Conduct lays out Hershey's policies with regard to, among other things, child labor:

> Hershey does not tolerate child labor in our supply chain. We are committed to the elimination of the "worst forms of child labor," as defined by ILO Convention 182. Hershey requires our Suppliers, including their labor agents/agencies,  to prevent child labor in their operations and in their supply chain and encourages our Suppliers to participate in industry efforts aimed at the elimination of such practices wherever they exist in the supply chain.

>    • No individuals are hired under 15 years of age, or 14 years of age where local law allows, consistent with ILO Convention No. 138, or under the legal minimum age for employment in the country, whichever is greatest.

>    • Any employment or utilization of Workers under the age of 18 must not interfere with schooling or vocational education and/or expose children  and young workers (between 15 and 18 years) to work that is mentally, physically, socially or morally dangerous.[105]

69.     The Supplier Code of Conduct also lays out Hershey's policy regarding forced labor and human trafficking:

---

[102] *Id.*

[103] *Id.*

[104] *Hershey Company Statement Against Slavery and Human Trafficking*, *supra* note 97, at 2.

[105] *Hershey Company Supplier Code of Conduct*, HERSHEY 4 (2023), https://www.thehersheycompany.com/content/dam/corporate-us/documents/partners-and-suppliers/supplier-code-of-conduct.pdf.

Hershey does not tolerate forced labor or human trafficking in our supply chains. Hershey requires that all labor in its supply chain be voluntary and that workers are allowed freedom of movement. All forms of forced labor and human trafficking are prohibited including but not limited to any form of prison, slave, bonded or forced indentured labor.

> • The recruitment, transportation, transfer, harboring or receipt of persons, by means of threat or use of force, coercion or other means, for the purpose of exploiting them is prohibited.

> • In advance of employment, Suppliers, including their labor agents/agencies, provide Workers with written, accurate and understandable information in a language understood and acknowledged by the Worker regarding the basic terms and conditions of their employment clearly stating their rights and responsibilities as well as information on wages, working hours, overtime, benefits, leave and disciplinary procedures.

> • Workers are free to leave work and terminate their employment upon reasonable or legally required notice without penalty.[106]

70.    The Code further states:

Suppliers must establish adequate and effective management systems, policies, procedures, financial documentation non-compliance and grievance procedure, and training programs to uphold and ensure ongoing compliance with all applicable laws and standards, including this Supplier Code within their own business operations and supply chain.

We reserve the right to verify compliance with this Supplier Code , at the Supplier's own expense, through internal and external assessment mechanisms, such as self-assessment questionnaires, announced and unannounced on-site independent third-party audits, and worker well-being surveys. Such audits may inspect Suppliers' facilities, operations, books and records, and supplier-provided housing, and confidential worker interviews. If non-compliances are observed, the supplier will be required to take corrective actions.[107]

---

[106] *Id.* at 4-5.
[107] *Id.* at 14.

71.     Hershey's website further states, on its Responsible Sourcing page, that its Global
Sourcing Policies include dedication to "a transparent supply chain."[108] Hershey promises that
"[w]e are committed to complying with the California Transparency in Supply Chains Act of
2010, as well as the United Kingdom Modern Slavery Act. As part of our commitment to Good
Business practices, we constantly strive to ensure our supply chains are responsibly managed."[109]

72.     Hershey knows it has been profiting from child slavery for years, and since 2001,
when it endorsed the Harkin-Engel Protocol through the Chocolate Manufacturers Association
and later through the WCF, it has failed to take effective action to stop profiting from child
slavery. The NORC Report dramatically establishes that Hershey has continued to benefit from
increased numbers of child workers in its cocoa supply chain.

**f. Mondelēz**

73.     Mondelēz International Inc. is a U.S.-based international chocolate producer
headquartered in Deerfield, Illinois. Its major cocoa products containing cocoa produced in Côte
d'Ivoire include Cadbury Chocolates and Dairy Milk. It manufactures, distributes, and sells its
cocoa products all over the United States. On its website, it states:

> We believe that in order to drive long-lasting positive change for children in cocoa-
> growing regions, all actors along the cocoa supply chain should play their part to
> help combat the systemic issues underlying child labor. This is why, as founding
> members, we support the work of the World Cocoa Foundation (WCF) and the
> International Cocoa Initiative (ICI), aiming to help combat the root causes of child
> labor and drive efforts to strengthen public-private partnership with governments,
> development partners and civil society organizations.[110]

---

[108] *Responsible Sourcing,* HERSHEY,
https://www.thehersheycompany.com/en_us/home/sustainability/sustainability-focus-
areas/responsible-sourcing.html.
[109] *Corporate Polices and Global Sourcing*, HERSHEY,
https://www.hersheytrading.ch/en_us/sustainability.html.
[110] MONDELĒZ, https://www.cocoalife.org/the-program/child-protection/.

74.     Mondelēz International thus admits that there is still child slavery in its supply

chain. Like most of the other chocolate companies, it is doing little to stop profiting from child

slavery. It instead chooses to refer the public and regulators to its "Cocoa Life" program, which

relies upon the "monitoring" and "remediation" of the CLMRS system, which, as established

above, is a sham. There is no independent monitoring, no remediation, and no consequences for

using child slaves, and the CLMRS applies, at most, to twenty to thirty percent of Mondelēz

International's supply chain. Hoping to deceive or distract the consuming public and regulators,

Mondelēz International goes on at length to describe its sham programs.

75.     Mondelēz's Cocoa Life website dedicates an entire section to child labor. This

Child Labor page states:

> Our approach to eliminating child labor is three-pronged: it focuses on prevention,
> monitoring and remediation, with a heavy emphasis on addressing the root causes of
> child labor. Cocoa Life – our company program for sustainable cocoa – addresses the
> root causes of child labor around poverty and lack of rural development with holistic
> approach.[111]

The company continues by describing its action plan, which includes:

- Increase income from cocoa farming as well as additional sources
- Empower communities to advocate for their own development
- Empower women at household and community level
- Prosperous cocoa farms mean farmers are less likely to rely on their children to
  support in their work. Empowered women and communities, who understand
  their development needs, will push for their children to remain in school.[112]

76.     Mondelēz also goes to great lengths to demonstrate that it knows that child

slavery and profiting from child labor are abhorrent, illegal, and unethical. Mondelēz features on

its website a 2016 study commissioned from Embode that confirms "[t]he issue of child labour,

---

[111] *Child Labor in Cocoa*, MONDELĒZ, https://www.mondelezinternational.com/Snacking-Made-Right/ESG-Topics/Child-Labour-in-Cocoa.
[112] *Id.*

including the worst forms of child labour, such as child slavery, has been of significant concern to the cocoa industry, particularly in West Africa, over the last two decades . . . Despite efforts, child labour is still largely prevalent in Côte d'Ivoire."[113] The Report continues, outlining how forced labor is still present in Côte d'Ivoire:

> most evidence highlights the reality that children's work and child labour are prevalent, in different forms, throughout the country.[114]
>
> Relatively little evidence is available relating to child slavery, or practices similar to child slavery in the sector. Stakeholder consultations also revealed a general lack of prioritisation of and sufficient attention to these more egregious forms of child exploitation. Police recently identified and recovered 48 alleged 'child slaves' aged 5 to 16 from cocoa farms, and arrested 22 alleged traffickers. This calls urgent attention to the significant concern of child trafficking and slavery in the sector.[115]

The commissioned report itself highlights the persistent failures of Mondēlez and similar companies, stating that "[c]hild labour, in all its forms, including child slavery, is a tenacious problem in Côte d'Ivoire. Even after 15 years of dedicated efforts and millions of dollars of investment, the problem continues, and arguably grows."[116]

77.     The company states on its Snacking Made Right page that it is "on a mission to lead the future of snacking by creating snacks the right way for both people and planet to love . . . We have specific goals to which we hold ourselves accountable, and we're continuing to make progress and scale our efforts to deliver meaningful change."[117]

---

[113] Aarti Kapoor, *Children at the Heart*: *Assessment of child labour and child slavery in Côte d'Ivoire's cocoa sector and recommendations to Mondelēz International*, EMBODE 6 (2016), https://assets.ctfassets.net/qggsjlmpzfmx/7bqOrCJcDmr04upBCF6SnM/b8560d71bbb5596d18d 062ce56e64124/FULL_REPORT_Cote_Ivoire_Mondelez_Embode_ChildrenattheHeart.pdf.
[114] *Id.* at 16.
[115] *Id.* at 6.
[116] *Id.* at 46.
[117] *Snacking Made Right,* MONDELĒZ, https://www.mondelezinternational.com/Snacking-Made-Right.

78.     Mondelēz International acknowledges that "[a]s the world's largest chocolate company" it is vital to "create a sustainable cocoa supply."[118] In support of this proclamation, it references Cocoa Life, one of its "signature programs," which it states "is a holistic, verified program that aims to create a sustainable cocoa supply. . . . We are on a journey towards our goal of empowering at least 200,000 cocoa farmers and reaching over one million community members."[119] The company also promises it is committed to "doing business the right way" in its Code of Conduct.[120] In support of this, it states that it does "not tolerate discrimination, harassment, bullying, intimidation, or any disrespect to human rights, including child and forced labor."[121]

79.     Mondelēz International further cites its published supplier contract provisions, which states, "[w]e expect our suppliers and partners to . . . Never use or tolerate the use of human trafficking, forced labor, or child labor as defined by the International Labor Organization (ILO)"[122] The company also states:

> Our purchasing contracts require suppliers to comply with all laws and support Mondelēz International's policies on child and forced labor. We have various tools to address non-compliance, which may include, but are not limited to, a corrective action plan. If the supplier does not resolve the issues of concern in a timely and

---

[118] *Cocoa Life: Empowering Cocoa Farmers and Communities: 2015 Progress Report,* MONDELĒZ 1, https://assets.ctfassets.net/qggsjlmpzfmx/1CCoDMBtJos4Zs8iC4g78q/1d3085e27e75c207902647f7d9aacaf9/Cocoa_Life_Executive_Summary.pdf.
[119] *Id.*
[120] *Our Way of Doing Business: The Mondelēz International Code of Conduct*, MONDELĒZ 13, https://www.mondelezinternational.com/-/media/Mondelez/PDFs/employeecodeofconduct.pdf.

[121] *Id.* at 6.
[122] *Supplier & Partner Code of Conduct,* MONDELĒZ 1-2, https://www.mondelezinternational.com/-/media/Mondelez/PDFs/MDLZ-Supplier-and-Partner-Code-of-Conduct.pdf.

satisfactory manner, Mondelēz International reserves the right to take more drastic action, such as termination of the business arrangement.[123]

Meanwhile, in its Modern Slavery Statement for 2017, Mondelēz writes:

- **Forced Labor.** Supplier will not use any forced labor, which means any work or service performed involuntarily under threat of physical or other penalty. Supplier shall respect the freedom of movement of its workers and not restrict their movement by controlling identity papers, holding money deposits, or taking any other action to prevent workers from terminating their employment. If workers enter into employment agreements with Supplier, workers should do so voluntarily.
- **Child Labor.** Supplier will not directly (or indirectly through the use of its subcontractors) employ any children under the age of 18 years unless legal, necessary, and appropriate and the following are met:
    - Supplier will comply with the minimum employment age limit defined by national law or by International Labor Organization ("ILO") Convention 138, whichever is higher. The ILO Convention 138 minimum employment age is the local mandatory schooling age, but not less than 15 years of age (14 in certain developing countries), subject to exceptions allowed by the ILO and national law.
    - Supplier will ensure that employees working in facilities that are manufacturing or packaging Mondelēz International finished products, serving as temporary employees to Mondelēz International, or present at Mondelēz International facilities, are at least 15 years of age (and no exceptions allowed by the ILO or national law will apply).
    - Supplier must demonstrate that their employment does not expose them to undue physical risks that can harm physical, mental, or emotional development
- **Safety and Health.** Supplier will (i) endeavor to provide safe working conditions, (ii) provide its employees with appropriate protection from exposure to hazardous materials, and (iii) provide its employees with access to potable water and clean sanitation facilities.
- **Business Integrity**. Supplier will promote honesty and integrity in its business conduct by raising ethical awareness among its employees and providing direction and education on ethical issues. Further, Supplier will not: pay or

---

[123] *Supply Chain Expectations*, MONDELĒZ, https://www.mondelezinternational.com/About-Us/Our-Way-of-Doing-Business/Supply-Chain-Expectations.

accept bribes, arrange or accept kickbacks, or participate in illegal inducements in business or government relationships.[124]

80.     Mondelēz's website contains numerous other sections with similar representations about its policies with regard to respecting and promoting human rights, ethical and sustainable sourcing, and child welfare. There is no question that Mondelēz knowingly benefits from child labor and is extremely aware that its own failure to stop this practice is universally condemned in the world. The NORC Report confirms its failure to even manage to reduce child labor in its supply chain.

**g. Olam**

81.     Olam International America, Inc. (Olam) does business and sells and promotes its cocoa products from Côte d'Ivoire all over the United States.[125] It holds itself out as "one of the world's leading suppliers of sustainable cocoa."[126] On its website, Olam claims to be "against all forms of child exploitation" and actively working to "prevent it" through "a number of programmes" such as its Child Labor Monitoring and Remediation Systems.[127]

82.     Despite these empty assurances, there is no disputing the evidence of extreme abuses of child workers in Côte d'Ivoire. Further, Olam's willingness to make empty promises while profiting from forced child labor extends to its cocoa supply chain around the world. In

---

[124] *Modern Slavery Statement*, MONDELĒZ, at 3-4, https://www.mondelezinternational.com/~/media/mondelezcorporate/uploads/downloads/mdlz_modern_slavery_statement_2017.pdf?la=en.
[125] *See* Olam Food Ingredients, *Unicao Cocoa*, OLAM, https://www.olamgroup.com/content/dam/olamgroup/products-and-services/ofi/cocoa/cocoa-ingredient-brands/unicao/unicao-pdfs/Unicao-BM2001.pdf as one example of Côte d'Ivoire-sourced cocoa sold in the U.S.
[126] *Olam Cocoa Sustainability*, OLAM 1, https://www.olamgroup.com/content/dam/olamgroup/files/uploads/2017/09/Olam-Cocoa-Sustainability-Overview-2017.pdf.
[127] *Id.* at 18, 20.

2021, Brazilian prosecutors sued Olam for $58 million after a report by Brazil's Federal Labor Prosecution Office found widespread child labor in the country's cocoa industry.[128] In a hearing, the company admitted that cocoa beans obtained through third party producers were "not liable to tracking."[129] Further, a group of sixty Ghanaian children aged five to seventeen years old have initiated an action against Olam, claiming the hazardous work to which they are subjected violates international and Ghanaian law. They allege that "they have no choice but to help their families by working on the cocoa farms because the insufficient money paid by Olam to the cocoa farmers does not allow for them to hire adult workers. This results in absences from school, food insecurity, and poor living conditions."[130]

83.    Olam identified 11,194 children in child labor supplying its cocoa, in its "Cocoa Compass 2020/21 Impact Report."[131] Again ignoring the effect that paying living wages would have on these communities, Olam highlights how it supposedly remediates identified cases of child labor, stating, "[f]or most cases of child labor, raising awareness on what children are and are not permitted to do on the farm and under what conditions . . . is the first step of remediation."[132] It is unclear whether, or how often, Olam actually takes that first step to remediate—let alone whether Olam takes any second or third steps.

---

[128] Fabio Teixeira, *Exclusive-Cocoa giant in Brazil slave labour probe says it can't trace supplies*, REUTERS (August 12, 2021) https://www.reuters.com/article/us-brazil-labor-cocoa-exclusive/exclusive-cocoa-giant-in-brazil-slave-labour-probe-says-it-cant-trace-supplies-idUSKBN2FD1DO.

[129] *Id.*

[130] *Ghanaian children accuse cocoa supplier Olam of breaching child labour laws*, LEIGH DAY (14 August 2022), https://www.leighday.co.uk/news/news/2022-news/ghanaian-children-accuse-cocoa-supplier-olam-of-breaching-child-labour-laws/.

[131] *Cocoa Compass 2020/21 Impact Report*, OLAM 9 (2021), https://publuu.com/flip-book/24916/132171/page/1.

[132] *Id.* at 11.

84.    Olam outlines its efforts to stop child labor in its supply chain, stating in 2020:[133]

Olam Cocoa has committed to set up dedicated child labour monitoring and remediation systems (CLMRS) across 100 percent of our direct sourcing areas. Earlier this month, we announced a partnership with the Fair Labor Association (FLA) and local cocoa farming cooperatives to digitally register nearly 7,000 farmer suppliers in Cameroon and their households – the first time these measures have been introduced professionally and at scale in Cameroon.

This digital approach to mapping the child labour issue in the supply chain is the first step to resolving the problem. It is essential to allow Olam Cocoa to understand where it can best focus resources and efforts to tackle child labour, and to share data with partners and cooperatives on the ground so that we can co-create together.

We'd like to share with you new details and examples from Côte d'Ivoire for the period 2018-2019 where CLMRS has been scaled up to cover 185 cooperatives from a standing start in 2015. It's a snapshot of the range of measures necessary to make a difference:

- … We are establishing 1,638 birth certificates for children who run the risk of not being admitted to secondary school as a result of lacking such documents.

- …Using the premiums received for the sustainable cocoa that we purchase, our cooperatives have constructed 84 classrooms, built four teachers' residences, constructed 2 canteens and refurbished another four schools and a youth hostel, as well as equipping schools with school benches, school kits and school books. These interventions have improved the quality of education for more than 22,000 children.

- … We have set up over 111 Village Savings and Loans Associations that have managed to save nearly $155,000 in total and granted loans of a total value of $63,482. Given their success in promoting women's economic empowerment and pooling funds for education expenses for children, we are planning to set up another 165 in 2020.

All of this needs to be embedded in the community and local authority level – to that end we have established Child Protection Committees in 33 areas that promote awareness of children's needs.

---

[133] *One intervention is not enough in the fight against child labour*, OLAM (April 3, 2020), https://www.olamgroup.com/news/all-news/blog/one-intervention-is-not-enough-in-the-fight-against-child-labour.html.

85.     Olam professed a goal to "achieve 100% traceable and sustainable cocoa volumes from [its] direct origination supply chain by 2020."[134] In September 2020, Olam claimed it achieved that goal, though in actuality its supposedly 100 percent-accurate tracing of cocoa beans only applies to the small percentage of directly sourced cocoa beans, as is the aforementioned pattern among cocoa company self-reporting.[135] In 2020, when Olam claimed 100 percent traceable and sustainable cocoa, even a very company-friendly report that relies on data supplied by the companies reported that direct supply chains only constituted about half of cocoa purchased by companies.[136] This is itself a highly suspect number that contradicts information provided to IRAdvocates by WCF and ICI that at most twenty to thirty percent of cocoa harvested in Côte d'Ivoire is within a company-sponsored monitoring system. Thus, it is likely that much more of Olam's supply chain remains unmonitored.

86.     The NORC Report confirms that not only did Olam and the other companies fail to stop using child labor by 2020 as they promised, but that the incidence of child labor has actually increased.[137] Olam is thus still profiting from child slavery and has no viable plan to stop the practice. It is hoping to deceive the public and regulators so that it can continue to profit from child slavery and avoid the costs of actual compliance with the promise it made, along with other chocolate companies, years ago to stop profiting from child slavery.

---

[134] *Olam Cocoa hits 100% traceability target across its direct global supply chain*, OLAM (Sept. 21, 2020), https://www.olamgroup.com/news/all-news/press-release/olam-cocoa-hits-100-percent-traceability-target-across-its-direct-global-supply-chain.html.
[135] *Id.*
[136] Antonie C. Fountain and Friedel Huetz-Adams, *2020 Cocoa Barometer*, VOICE NETWORK 30 (2020), https://voicenetwork.cc/wp-content/uploads/2020/12/2020-Cocoa-Barometer.pdf.
[137] NORC Report, *supra* note 5, at 146.

**h. Blommer Chocolate Company**

87.     Blommer Chocolate Company (Blommer) is a chocolate manufacturer based in Chicago, Illinois, and is the largest supplier of chocolate ingredients in North America, accounting for around forty-five percent of the cocoa beans processed in the United States.[138] Around seventy percent of Blommer's business consists of supplying processed chocolate ingredients to branded chocolate companies. Fuji Oil Holdings, Inc. (Fuji Oil) acquired the company in 2018. On the company's landing page, it writes "[w]e pride ourselves on being a leader in advancing **sustainable cocoa farming**, playing an active role in the World Cocoa Foundation and promoting sustainable farming practices through our privately managed programs in Cote d'Ivoire, Indonesia and Ecuador."[139] Côte d'Ivoire farms are Blommer's primary suppliers of cocoa beans.

88.     Blommer is a founding member of the WCF, and is a participant in a number of initiatives such as the African Cocoa Initiative (2011-2016), CocoaAction (2018-2020), Cocoa and Forestry Initiative (2018-Present), and Sustainable Origins (2007-Present).[140] In 2016, Blommer promised to only purchase certified cocoa by 2020[141]; now, the company itself admits that "we have not yet fully achieved what we were set out to do."[142] In Fuji Oil Holding's Sustainability Report, the company lists the results of its first and second human rights impact

---

[138] Phil Rosenthal, *Inside Blommer Chocolate: family and cocoa at 75*, CHICAGO TRIBUNE (May 18, 2014), https://www.chicagotribune.com/business/ct-xpm-2014-05-18-ct-chocolate-smell-chicago-blommer-biz-0518-20140518-story.html.
[139] BLOMMER, https://www.blommer.com.
[140] *Blommer's Global Presence in Sustainability*, BLOMMER, https://www.blommer.com/sustainability/global-presence.php#map.
[141] Reuters Staff, *Blommer Chocolate to buy only certified cocoa by 2020*, REUTERS (Oct. 27, 2016), https://www.reuters.com/article/cocoa-blommer-idAFL8N1CX53R.
[142] *Blommers Sustainability Vision*, BLOMMER, https://www.blommer.com/sustainable-origins.php#CocoaCoopMap.

assessments; both assessments (conducted in 2016 and 2020) identified "forced and child labor" as a present risk.[143]

89.    In the Fuji Oil's "Responsible Cacao Sourcing Policy," one of the company's "Key Commitments" reads:

**Eliminating child labor from our supply chain**

We will seek to eliminate child labor from our supply chain through monitoring and the provision of remedies; raising awareness in cacao farming communities; creating an environment that ensures access to education; and other measures that may be appropriate.[144]

90.    Like the corporations above, Blommer lists CLMRS monitoring as its method to redress child labor and forced child labor within its supply chain. It states:

The Fuji Oil Group is working to end child labor–a significant human rights issue in the cocoa industry. In major cocoa-producing countries, farms face several challenges that can lead to child labor, including poverty, lack of community infrastructure such as schools and health centers, and lack of farm workers, each of which has to be addressed appropriately. The Group focuses on creating an environment to prevent child labor and on developing a mechanism to remediate any violations of children's rights along the supply chain. To identify the causal factors of child labor and be informed of potential violations, we set up the [CLMRS] on a cooperate level at all villages where [Blommer] procures cocoa beans. Community agents who monitor and carry out remediation measures are trained on child protection and household surveys. They identify endangered children and reveal high-risk communities, as well as suggest action plans to remediate issues at the family level or throughout the community. Initiatives on traceability, supporting cocoa farmers, women's empowerment, and environmental conservation also help significantly in preventing and remediating child labor. [145]

---

[143] *Sustainability Report 2022,* FUJI OIL HOLDINGS 50,
https://www.fujioilholdings.com/en/sustainability/download/.
[144] *Fuji Oil Holdings Inc., Responsible Cacao Sourcing Policy*, FUJI OIL HOLDINGS 2,
https://www.fujioilholdings.com/en/news/2018/__icsFiles/afieldfile/2018/08/07/180808_2.pdf.
[145] *Sustainability Report 2022*, supra note 144 at 73.

As this complaint notes above, these CLMRS monitoring systems are ineffective. They mandate

no independent monitoring, are community-led, and cover only small portions of chocolate

companies' actual suppliers.

91.     Blommer's Labor Compliance Statement notes:

Blommer does not use any forced labor, allow any work or service performed
involuntarily under threat of physical or other penalty, nor does Blommer employ
child labor, specifically anyone under the age of sixteen. Our ingredients are
sourced from companies that conduct themselves in the same manner and Blommer
requires that these suppliers confirm that their organizations understand
International Labor standards and comply with those laws. If we believe that a
supplier is not in compliance with our standards, we will provide that supplier with
the opportunity to address and remedy any potential non-compliance through a
comprehensive corrective action plan. Should noncompliance continue to be an
issue we will remove the supplier from our supply chain. [146]

However, after asserting that neither Blommer nor its suppliers permit the use of child labor, and

even seeming to guarantee that Blommer *does not* use forced or child labor, the statement

continues to acknowledge the presence of child labor in cocoa production.

Blommer is committed to continuing this work to improve labor conditions within
the cocoa community including the elimination of the worst forms of child labor.
We work closely with the leading certification agencies and our West African
programs are annually audited by the Rainforest Alliance, Fair Trade USA, FLO,
UTZ, and Intertek as well as international worker's rights group the Fair Labor
Association. [147]

92.     If Blommer alleges that it does not use nor purchase from suppliers who used

forced child labor, it is unclear where its efforts towards the "elimination of the worst forms of

child labor" are being executed.

---

[146] *Labor Compliance Statement,* BLOMMER,
https://www.blommer.com/_documents/Blommer_Labor-Compliance-Statement-2020.pdf
[147] *Id.*

D.  **EFFORTS BY IRADVOCATES AND OTHERS TO ADDRESS CHILD LABOR IN CÔTE D'IVOIRE**

93.    On May 30, 2002, the International Labor Rights Forum (ILRF)[148] filed a Section 307 Petition seeking a Withhold Release Order (WRO) on all cocoa imported to the U.S. from Côte d'Ivoire. The ILRF Petition detailed the extensive evidence of forced and trafficked child labor in the harvesting and processing of Côte d'Ivoire cocoa and documented that U.S. importers were knowingly importing cocoa produced by illegal child labor. There was little dispute about the facts. The cocoa importers, acting through the Chocolate Manufacturers Association (CMA), one of the entities that signed the Protocol in 2001 pledging to end child labor in the cocoa supply chain, did not dispute that child labor was pervasive in their supply chains. Rather, they argued that the "domestic consumptive demand" exemption allowed them to continue to import cocoa from Côte d'Ivoire even though it was produced by child labor. The domestic consumptive demand exemption was removed in 2015 and thus no longer provides immunity for the cocoa importers' ongoing and admitted use of illegal child labor in their supply chains.

94.    When the cocoa companies that signed the 2001 Protocol had still done little or nothing to implement the pledge to end child labor by 2005, IRAdvocates filed a federal lawsuit under the Alien Tort Statute (ATS), 28 U.S.C. § 1350 against Nestlé and Cargill on behalf of six individuals who, as children, had been trafficked from Mali to Côte d'Ivoire and had been forced to work harvesting cocoa. The case, *John Doe I et al. v. Nestle et al*., was heard by the Supreme Court on December 1, 2020. On June 17th, 2021, sixteen years after the case was filed,

---

[148] IRAdvocates' legal staff was part of the team at ILRF that did the field research and filed the 2002 Petition with CBP. In 2007, the legal department of ILRF formed IRAdvocates to focus exclusively on using the rule of law to address international human rights violations.

the Supreme Court issued a heavily divided opinion which determined that the operative

complaint did not satisfy the standard for the extraterritorial application of ATS created by

*Kiobel v. Royal Dutch Petroleum Co.* in 2013. This decision deprived the plaintiffs, six formerly

enslaved children, of their day in court. Even though the case eventually failed due a

technicality within the Alien Tort Statute, the Ninth Circuit acknowledged the existence of child

slavery within Côte d'Ivoire, stating:

> The use of child slave labor in the Ivory Coast is a humanitarian tragedy. Studies by International Labour Organization, UNICEF, the Department of State, and numerous other organizations have confirmed that thousands of children are forced to work without pay in the Ivorian economy. Besides the obvious moral implications, this widespread use of child slavery contributes to poverty in the Ivory Coast, degrades its victims by treating them as commodities, and causes long-term mental and physical trauma. *Doe I v. Nestle*, 766 F.3d 1013, 1017 (9th Cir. 2014).

95.     In another section of the *Doe I v. Nestle* opinion, the Ninth Circuit identified as

credible the plaintiffs' claims that defendants, major cocoa companies, knowingly benefit from

the use of forced child labor, writing:

> [T]he Ivory Coast remains a critical part of the international chocolate industry, producing seventy percent of the world's supply of cocoa. The defendants in this case dominate the Ivorian cocoa market. Although the defendants do not own cocoa farms themselves, they maintain and protect a steady supply of cocoa by forming exclusive buyer/seller relationships with Ivorian farms. The defendants are largely in charge of the work of buying and selling cocoa and import most of the Ivory Coast's cocoa harvest into the United States. The defendants' involvement in the cocoa market gives them economic leverage, and along with other large multinational companies, the defendants effectively control the production of Ivorian cocoa.
>
> To maintain their relationships with Ivorian farms, the defendants offer both financial assistance and technical farming assistance designed to support cocoa agriculture. The financial assistance includes advanced payment for cocoa and spending money for the farmers' personal use. The technical support includes equipment and training in growing techniques, fermentation techniques, farm maintenance, and appropriate labor practices. The technical support is meant to expand the farms' capacity and act as a quality control mechanism, and either the defendants or their agents visit farms several times per year as part of the defendants' training and quality control efforts.

The defendants are well aware of the child slavery problem in the Ivory Coast. They acquired this knowledge firsthand through their numerous visits to Ivorian farms. Additionally, the defendants knew of the child slave labor problems in the Ivorian cocoa sector due to the many reports issued by domestic and international organizations.

Despite their knowledge of child slavery and their control over the cocoa market, the defendants operate in the Ivory Coast "with the unilateral goal of finding the cheapest sources of cocoa." The defendants continue to supply money, equipment, and training to Ivorian farmers, knowing that these provisions will facilitate the use of forced child labor. The defendants have also lobbied against congressional efforts to curb the use of child slave labor. In 2001, the House of Representatives passed a bill that would have required United States importers and manufacturers to certify and label their products "slave free." The defendants and others in the chocolate industry rallied against the bill, urging instead the adoption of a private, voluntary enforcement mechanism. A voluntary enforcement system was eventually adopted, a result that, according to the plaintiffs, "in effect guarantee[d] the continued use of the cheapest labor available to produce [cocoa]—that of child slaves." 766 F.3d at 1017-18.

96.     In 2010, Filmmaker Miki Mistrati released *The Dark Side of Chocolate*, the first of three documentaries that reveal in shocking detail the realities of child slavery in the cocoa sector. *The Shady Chocolate Business*, released in 2012, further exposed the horrors of chocolate production in Côte d'Ivoire. *The Chocolate War*, Mistrati's most recent film, released in 2022, highlights IRAdvocates' fight to expose Nestlé and Cargill's ongoing use of child labor while these companies deny their responsibility for injuries to forced child laborers.[149]

97.     In 2018, an IRAdvocates team, including the undersigned Executive Director Terry Collingsworth, visited cocoa farms around Côte d'Ivoire. In Duekoue, they observed and interviewed a group of about seven male child workers harvesting cocoa. The following are photos taken by Terry Collingsworth or a member of the team:

---

[149] *The Chocolate War* is available on amazon.com and other streaming services.

 

98.     The two children in the photos above were both about fourteen years old. They

were using machetes to clear brush around the cocoa trees and to cut cocoa pods from the trees

and then open the pods and clean the cocoa beans. Both children said they were brought by a

"man" from Burkina Faso, where they were from. They did not know the man's name, but they

were promised jobs working on a cocoa farm. When IRAdvocates met them, they had been

working on the farm for over a year and were on their second season. They had not yet been paid

anything and were working for food. They slept in a lean-to made of sticks and covered with a

tarp. The boy in the photo immediately above in the white shirt expressed that he was very

hungry and asked for food. He was visibly afraid of the adult male who was the overseer of the

farm. These children can also be seen in the first sixty seconds of this video,

https://vimeo.com/388589094, captured by Miki Mistrati's film crew as a part of *The Dark Side

of Chocolate* documentary.

99.     In March 2019, IRAdvocates returned to Côte d'Ivoire and again visited several farms. In Daloa, IRAdvocates visited a farm that had about eight boys working with machetes cutting down cocoa pods, opening the pods, and cleaning the beans. The following photos were taken by IRAdvocates' Executive Director Terry Collingsworth or a member of the team:







100.    In December 2019, Corporate Accountability Lab and IRAdvocates, with local support, obtained evidence of child labor on cocoa farms in Côte d'Ivoire. Investigators visited four different regions within the country, and spoke with farmers, farmworkers (adult and children), cooperative managers, and others living and working in the area. Many individuals recited prepared answers, and many children simply dropped their work and walked away when they would see the investigators.

101.    In August 2020, investigators working with Corporate Accountability Lab visited Soubré, Daloa, Duékoué, Abengouro, and Aboisso during the mid-crop harvest to investigate the impact of COVID-19 on cocoa farmers. The investigatory team visited the same regions in December of 2020, during the main cocoa growing season, to investigate trafficking routes and identify specific instances of forced and child labor. The team also traveled to the northern border regions in November 2020 to investigate trafficking patterns from Mali and Burkina Faso. On these trips, the investigatory team found evidence of illegal trafficking across closed borders. Local police officials were aware of these trafficking patterns, and in some instances facilitated and profited from it, soliciting bribes from known traffickers.

102.    Although forced child labor is difficult to document in the West African cocoa industry, as many locals are hesitant to speak about such issues, investigators spoke to many young children who presented several of the International Labour Organization's (ILO) forced labor indicators. Investigators found the indicators of abuse of vulnerability, abusive working and living conditions, and isolation were applicable in many of these children's cases.

103.    On February 12, 2021, IRAdvocates filed its most recent complaint against the world's most prominent chocolate companies, including Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz.  The case, *Coubaly v. Nestlé*, was filed on behalf of eight former child slaves. It alleges that these companies violate the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595 *et. seq.* by knowingly benefitting from a venture that utilized trafficked or forced labor. The plaintiffs also seek relief based on common law claims of negligent supervision, intentional infliction of emotional distress, and unjust enrichment. That case is currently pending in the D.C. Circuit Court of Appeals.

104.    Despite chocolate companies' repeated assurances that child labor in West Africa is only due to children working on family farms, the *Coubaly* case highlights that there is no question that pervasive forced and trafficked child labor is used for harvesting cocoa. The eight plaintiffs were trafficked from Mali and subjected to forced labor. Their stories share many tragic traits. Often beginning with false promises of a better life, these children were identified by a locateur, who surreptitiously sneaked them across the border. Upon arrival at cocoa plantations in Côte d'Ivoire, oftentimes having no knowledge of where they were located, the children were forced to live in horrible conditions and given very little food. They performed dangerous work, clearing brush with machetes, applying harsh chemicals without any safety gear, and carrying heavy loads. Several of the children are scarred with injuries sustained while engaging in forced labor, from machetes cuts to untreated snake bites. Many were additionally subjected to beatings by their bosses on the plantations. As they had no money and could not understand the local language, the child slaves had no way to advocate for themselves when year after year passed without any payment for their labor.

### E. THE FAILURE OF CBP TO TAKE ACTION AS REQUIRED BY LAW

105.    As the "consumptive demand" exception was removed from Section 307 of the Tariff Act of 1930, and as the use of forced child labor in cocoa harvesting by the major companies had actually gotten worse in the intervening years, IRAdvocates, CAL, and UCI attempted to reengage CBP by filing a petition under Section 307 of the Tariff Act on February 14, 2020. The Petition, attached as **Exhibit A**, requested that CBP take action, as provided for in its legislation, to ban the importation of cocoa by nine specific companies with clear records of harvesting cocoa with forced child labor in Côte d'Ivoire. It featured evidence collected during the 2019 and 2020 investigatory trips in Côte d'Ivoire. Additionally, the Petition referenced

official, undisputed reports confirming massive numbers of child laborers in cocoa harvesting and supplemental evidence that many of these children are trafficked and forced to work on cocoa plantations. Shortly after filing the Petition, in March 2020, IRAdvocates and CAL met with staff from CBP to discuss the Petition. CBP confirmed that they had sent all of the major cocoa suppliers a detailed questionnaire regarding their supply chains (attached as **Exhibit D**). In subsequent discussions, CBP declined to discuss how or even whether the cocoa companies subject to the Petition responded to the questionnaire.

106.    After a year without response from Customs and Border Protection, CAL met with CBP's Office of Trade on March 23, 2021. CBP claimed to be investigating the facts and gave no indication that there was any issue with the quality or timeliness of the information provided in the Petition.

107.    On June 25, 2021, CAL and IRAdvocates filed a supplemental petition providing further current evidence of trafficking and forced child labor in the Ivorian cocoa industry (attached as **Exhibit E**). This supplemental petition looked not just at specific instances of forced labor, but also documented new information about the manner in which child trafficking occurs, including through specific border crossings, and identified specific actors involved in the trade. The information in the supplemental petition was consistent with the NORC report released by the Department of Labor in October 2020, which found that 1.56 million children are engaged in harvesting cocoa in Côte d'Ivoire and Ghana and ninety-five percent are engaged in the ILO's definition of the worst forms of child labor.

108.    On September 10, 2021, CBP representatives Edward Thurmond, Maria Navarro, and possibly others, met with CAL and IRAdvocates to discuss the status of the investigation and the new information provided in the supplemental petition. CBP gave no useful information

about the status of the case but expressed appreciation for the new information and acknowledged CAL and IRAdvocates' frustration at the lack of action.

109.    On February 14, 2022, after another prolonged period of silence and inaction by CBP, IRAdvocates and co-petitioners wrote Commissioner Magnus to request that he take long overdue action to address the ongoing forced labor in Côte d'Ivoire's cocoa industry. The letter, attached as **Exhibit B**, was signed by many important civil society stakeholders, including the AFL-CIO. These organizations expressed great frustration at CBP's two years of inaction despite the overwhelming evidence that cocoa imported from Côte d'Ivoire is certainly produced "in whole or in part" by forced child labor.

110.    On August 15, 2022, CAL met with CBP representatives Ann Marie Highsmith and Eric Choy and discussed cocoa briefly, among other topics.

111.    Unfortunately, the February 2022 letter, followed up by an email in October 2022 from IRAdvocates to Acting Commissioner Miller, went unanswered until December 13, 2022. On that day, Acting Commissioner Troy Miller made the first written communication from CBP concerning the nearly three-year-old pending Petition and sent a letter to IRAdvocates (attached as **Exhibit F**). Rather than address the merits or explain CBP's incredible delay in addressing the Petition, Acting Commissioner and Defendant herein Miller made the incredible assertion that, after nearly three years of unanswered pleas, the information provided by petitioners is dated. This was the first time any person at CBP had raised the issue of timeliness. Defendant Miller's letter ended with a bureaucratic flair. He claimed that "if evidence reasonably indicates that merchandise is produced by forced labor . . . and is being or is likely to be imported into the United States, CBP will issue a withhold release order (WRO)." This assertion has proven to be unequivocally false.

112.     IRAdvocates responded to Defendant and Acting Commissioner Miller in a letter dated January 17, 2023 (attached as **Exhibit G**). Responding to the baseless assertion that the information provided by IRAdvocates, CAL, and UCI was untimely, IRAdvocates stated, "[o]ur original Petition submitted on February 14, 2020 was explicitly based on evidence of trafficked and forced child labor that we gathered across 2019 and also referred to official government reports from 2019. Our June 25, 2021 Supplemental Petition was explicitly based on interviews, observations, and photos from December 2020 and current government reports. It is hard to imagine given processing and verification time that these submissions could have been more current." IRAdvocates also asked for clarification as to whether Defendant Miller's letter, which did not address the merits of the Petition in any way, was a ruling of some sort on the Petition.

113.     There has been no further response from CBP. On February 14, 2023, CAL submitted an additional Supplemental Petition of ongoing forced child labor in Côte d'Ivoire cocoa harvesting (attached as **Exhibit H**). This was the third anniversary of the original Petition, which CBP has yet to address on the merits. CBP has not responded to the Supplemental Petitions either.

114.     CBP has continuously shirked its duties to answer widely-substantiated claims that cocoa producers are importing cocoa into the United States that has been produced by forced child labor. IRAdvocates, CAL, and UCI have suffered financial harm to the inaction of CBP, requiring ongoing and expensive investigations to provide updated information. This prolonged indecision and failure to act by CBP has left vulnerable and endangered children at risk for exploitation.

64

## II. JURISDICTION AND VENUE

115.    This Court has exclusive jurisdiction over the subject matter of this action

pursuant to 28 U.S.C.S. § 1581(i)(1)(c). Plaintiff's claims arise out of Section 307 of the Tariff

Act of 1930, 19 U.S.C.A. § 1307, which is a law of the United States that provides for

"embargoes or other quantitative restrictions on the importation of merchandise for reasons other

than the protection of the public health or safety." 28 U.S.C.S. § 1581(i)(1)(c), *see* 19 U.S.C.A. §

1307. Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

116.    Venue in the U.S. Court of International Trade is proper by virtue of 28 U.S.C. §

1391(b) and (e) because defendants are officers of the United States, acting in their official

capacity, and agencies of the United States.

## III. PARTIES

### Plaintiff

117.    Plaintiff IRAdvocates was founded in 2007 as an advocacy organization dedicated

to achieving just and humane treatment for workers worldwide. IRAdvocates advocates for and

with working people around the world, including in Côte d'Ivoire, and is committed to

overcoming the problems of child labor, forced labor, and other abusive labor practices in the

global economy. IRAdvocates promotes enforcement of labor rights internationally through

public education and mobilization, research, litigation, legislation, and collaboration with labor,

government and business groups.

118.    IRAdvocates is within the category of persons entitled to submit a petition under

19 CFR § 12.42.

119.    Due to the failure/refusal of the Defendants to properly enforce the law, Plaintiff

IRAdvocates has expended its own resources to investigate allegations of forced child labor in

Côte d'Ivoire, and to initiate its own campaign to prevent the importation of this illegal merchandise. Further, IRAdvocates has expended resources in an ongoing, multi-year effort to obtain enforcement of the Tariff Act by Defendants. This expenditure of resources constitutes a judicable, concrete and specific injury on the part of IRAdvocates.

## Defendants

120.    Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security (DHS) and is sued in his official capacity. Secretary Mayorkas is authorized and obligated to properly enforce Section 307 of the Tariff Act and the regulations promulgated thereunder. He is required to direct his subordinate officers to properly implement the law.

121.    Defendant Troy A. Miller is the Acting Commissioner of the Bureau of Customs and Border Protection at DHS. He is sued in his official capacity. Defendant Miller is obligated to comply with and enforce the Customs regulation 19 CFR § 12.42 and the enabling statute, the Tariff Act of 1930, 19 U.S.C. § 1307. He is further required to direct his subordinate officers to properly implement the law.

122.    Defendant DHS is an agency of the United States that houses the Bureau of Customs and Border Protection. As of March 1st, 2003, DHS is responsible for implementing and enforcing the Tariff Act's prohibition on the importation of goods that are the fruits of forced child labor. 19 U.S.C. § 1307; 19 CFR § 12.42.

## IV. CAUSE OF ACTION

### Violation of Administrative Procedure Act - 5 U.S.C. § 706(1)

123.    The Tariff Act of 1930, 19 U.S.C. § 1307 (1997), prohibits the importation of goods that are produced wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanction. The Act declares that such goods "shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited."

124.    In 1997, the Sanders Amendment was passed, clarifying the definition of "forced labor" for the purposes of the Act so as to explicitly include forced or indentured *child* labor: "'Forced labor' as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily. For purposes of this section, the term 'forced labor or/and indentured labor' includes forced or indentured *child* labor." 19 U.S.C. § 1307 (1997) (emphasis added).

125.     The regulations promulgated pursuant to this statute entitle "[a]ny person outside the Customs Service who has reason to believe that merchandise produced [by convict, forced, or indentured labor] is being, or is likely to be, imported into the United States" to "communicate his belief to any port director or the Commissioner of Customs." 19 CFR § 12.42(b).

126.    The regulations further require that any such communication be accompanied by: "(1) a full statement of the reasons for the belief; (2) a detailed description or sample of the merchandise; and (3) all pertinent facts obtainable as to the production of the merchandise abroad." *Id.*

127.    If the communication does not conform to these requirements, the regulations require that "the communication shall be returned promptly to the person who submitted it with

detailed written advice as to the respects in which it does not conform." 19 CFR § 12.42(c).

128.    Upon receipt of a communication that conforms to the requirements of 19 CFR § 12.42(b), the regulations require that "the Commissioner *will* cause such investigation to be made as appears to be warranted by the circumstances of the case." 19 CFR § 12.42(d) (emphasis added).

129.    If the Commissioner "finds at any time that information available reasonably *but not conclusively* indicates that merchandise within the purview of Section 307 is being, or is likely to be, imported, he *will promptly* advise all port directors accordingly and the port directors shall thereupon withhold release of any such merchandise." 19 CFR § 12.42(e) (emphasis added).

130.    If it is determined that the merchandise in question was produced, wholly or in part, by convict, forced, or indentured labor, such merchandise *must* be denied entry into the United States, "unless the *importer* establishes by satisfactory evidence that the merchandise was not mined, produced, or manufactured in any part with the use of a class of labor specified in the finding." 19 C.F.R. § 12.42(f) and (g) (emphasis added).

131.    As previously alleged in paragraphs 1-114, *supra*, IRAdvocates, CAL, and UCI filed a comprehensive Section 307 Petition in compliance with the operative regulations on February 14, 2020, and have supplemented it twice with additional timely information. CBP has failed to take any action with respect to the Petition as is required by law. In taking no action for more than three years, CBP has allowed hundreds of millions of dollars' worth of tainted cocoa produced by forced child labor to *illegally* enter the United States. As such, Defendants have violated their own regulations and the laws of the United States. 19 CFR § 12.42, 19 U.S.C. § 1307 (1997).

132.     Pursuant to Section 706(1) of the Administrative Procedure Act, this Court may "compel agency action unlawfully withheld or unreasonably delayed."

133.     Defendants Secretary of Homeland Security Mayorkas and CBP Acting Commissioner Troy Miller have unlawfully withheld and/or unreasonably delayed an investigation into cocoa imports from Côte d'Ivoire, as required by 19 CFR § 12.42, and, further, to deny entry into the United States the products of forced child labor, as required by the Tariff Act of 1930, as amended. 19 U.S.C. § 1307. More fundamentally, they have failed to take any action whatsoever, including issuing a decision regarding the merits of the Petition.

134.     Plaintiff IRAdvocates has complied fully with the requirements of 19 CFR § 12.42(b), and thus Customs is obligated to act on the Petition and issue a WRO as requested by the Petition, or make a determination that the Petition lacks merit, or make some other appropriate decision in response to the Petition.

## V. REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A.     Declare that the February 14, 2020 Petition and supplemental materials submitted by IRAdvocates, CAL, and UCI constitute a sufficient basis to require CBP to take appropriate action under the Tariff Act of 1930, 19 U.S.C. § 1307 and the applicable implementing regulations, 19 CFR § 12.42 *et seq*.;

B.     Declare that the failure and refusal of the defendants Secretary of Homeland Security and Acting Commissioner of CBP to issue a decision in response to the February 14, 2020 Petition violates Section 706(1) of the Administrative Procedure Act. These agencies have a statutory duty to make a decision within the scope of their statutory authority. They do not have the power to simply ignore a federal law passed by Congress;

C.      Award Plaintiff their costs and attorneys' fees pursuant to 28 U.S.C. § 2412; and

D.      Grant such other relief as the Court deems just and equitable.


        Respectfully submitted this 15th day of August, 2023,

                        s/ _Terrence P. Collingsworth_
                        Terrence P. Collingsworth
                        Executive Director
                        INTERNATIONAL RIGHTS ADVOCATES
                            621 Maryland Ave. NE
                            Washington, D.C. 20002
                            202-543-5811
                            tc@iradvocates.org


                        _Counsel for Plaintiff_