IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE CLAIRE R. KELLY, JUDGE
_____
                                                          :
INTERNATIONAL RIGHTS ADVOCATES,          :
                                                          :
                                                          :
                              Plaintiff,          :        Court No.  23-00165
                                                          :
              v.                                      :
                                                          :
ALEJANDRO MAYORKAS, Secretary          :
U.S. Department of Homeland Security,       :
                                                          :
TROY A. MILLER, Acting Commissioner      :
U.S. Customs and Border Protection,           :
                                                          :
                              Defendants.        :
_____:

## ORDER

Upon reading defendants' motion to dismiss, plaintiff's response thereto, and upon

consideration of other papers and proceedings had herein; it is hereby

ORDERED that defendants' motion be, and hereby is, granted; and it is further

ORDERED that this action is dismissed with prejudice.


                                                 _____
                                                 CLAIRE R. KELLY, JUDGE


Dated:          _____, 2023
              New York, New York

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

| | | |
|---|---|---|
| INTERNATIONAL RIGHTS ADVOCATES, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Court No.  23-00165 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ALEJANDRO MAYORKAS, Secretary | : | |
| U.S. Department of Homeland Security, | : | |
| | : | |
| TROY A. MILLER, Acting Commissioner | : | |
| U.S. Customs and Border Protection, | : | |
| | : | |
| Defendants. | : | |

_____:

**DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION AND
FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND
SUPPORTING MEMORANDUM**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 2

BACKGROUND ........................................................................................................... 4

    A.  The Statutory and Regulatory Framework ........................................................ 4

    B.  CBP's Investigation of Forced Labor in Imported Goods ................................. 7

    C.  IRAdvocates's Allegation and CBP's Involvement ......................................... 10

ARGUMENT ................................................................................................................. 13

I.   STANDARD OF REVIEW ....................................................................................... 13

II.  THIS ACTION SHOULD BE DISMISSED BECAUSE IRADVOCATES LACKS
     STANDING FOR ITS CLAIMS ............................................................................. 14

    A.  The Court Should Dismiss This Action for Lack of Jurisdiction Because
        IRAdvocates Cannot Establish Constitutional Standing .................................... 14

       1.  IRAdvocates Cannot Demonstrate a Concrete and Particularized Injury-in-Fact ..... 15

       2.  There Is No Causal Connection Between the Injury Alleged and the Agency's
          Conduct, and IRAdvocates's Injury Is Not Likely to Be Redressed by a
          Favorable Decision ..................................................................................... 18

    B.  This Court Should Dismiss This Action for Failure to State a Claim Because
        IRAdvocates Lacks Statutory Standing ........................................................... 20

III. SECTION 1307 AND ITS IMPLEMENTING REGULATIONS DO NOT MANDATE
     ANY AGENCY ACTION THAT CAN BE COMPELLED UNDER THE APA AND
     THE COURT CANNOT PROVIDE DECLARATORY RELIEF ....................................... 22

    A.  The Forced Labor Laws Do Not Mandate Agency Action ............................... 25

    B.  There Is No Unreasonable Delay on the Part of the Agency ............................ 29

    CONCLUSION ............................................................................................................ 35

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
    532 U.S. 275, 121 S. Ct. 1511 (2001) ................................................................... 17

*Allen v. Wright,*
    468 U.S. 737 (1984) ............................................................................................. 20

*American Anti-Vivisection Soc'y v. USDA,*
    946 F.3d 615 (D.C. Cir. 2020) ............................................................................. 15

*Am-Pro Protective Agency v. United States,*
    281 F.3d 1234 (Fed. Cir. 2002) ........................................................................... 33

*Apple Inc. v. United States,*
    375 F. Supp. 3d 1288 (Ct. Int'l Trade 2019) ....................................................... 14

*Arbaugh v. Y&H Corp.,*
    546 U.S. 500 (2006) ............................................................................................. 13

*Arizona Dream Act Coal. v. Brewer,*
    855 F.3d 957 (9th Cir. 2017) ............................................................................... 27

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................. 13

*Asmai v. Johnson,*
    182 F. Supp. 3d 1086 (E.D. Cal. 2016) ............................................................... 29

*Association of Data Processing Service v. Camp,*
    397 U.S. 150 (1970) ............................................................................................. 20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................... 13, 14

*Bennett v. Spear,*
    520 U.S. 154 (1997) ....................................................................................... 14, 20

*Browning v. Clinton,*
    292 F.3d 235 (D.C. Cir. 2002) ............................................................................. 13

*Cmty. for Creative Non-Violence v. Pierce,*
    786 F.2d 1199 (D.C. Cir. 1986) ..................................................................... 27, 28

*CSL Plasma Inc. v. United States Customs & Border Prot.,*
    628 F. Supp. 3d 243 (D.D.C. 2022) ..................................................................... 18

*Design Int'l Grp., Inc. v. United States*,
   113 F. Supp. 3d 1342 (Ct. Int'l Trade 2015) ........................................................ 13

*Dynalantic Corp. v. Dep't of Def.*,
   115 F.3d 1012 (D.C. Cir. 1997) ........................................................................... 18

*Environment One Corp. v. United States*,
   627 F. Supp. 3d 1349 (Ct. Int'l Trade 2023) ................................................. 13, 14

*Exhaustless Inc. v. Fed. Aviation Admin.*,
   931 F.3d 1209 (D.C. Cir. 2019) ........................................................................... 18

*Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
   28 F.3d 1268 (D.C. Cir. 1994) ............................................................................. 17

*Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*,
   141 F.3d 71 (3d Cir. 1998) ................................................................................... 17

*Food & Water Watch, Inc., v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ....................................................................... 15, 16

*Freedom Republicans v. FEC*,
   13 F.3d 412 (D.C. Cir.1994) ................................................................................ 18

*Gardner v. U.S. Bureau of Land Mgmt.*,
   638 F.3d 1217 (9th Cir. 2011) ............................................................................. 24

*Havens Realty Corp.  v. Coleman*,
   455 U.S. 363 (1982) ............................................................................................. 15

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................................. 28

*Heckler v. Ringer*,
   466 U.S. 602 (1984) ............................................................................................. 30

*Hells Canyon Preservation Council v. U.S. Forest Service*,
   593 F.3d 923 (9th Cir. 2010) ......................................................................... 23, 28

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ............................................................................. 27

*In re Barr Lab. Inc. v. Nat'l Ass'n of Pharmaceutical Manu.*,
   930 F.2d 72 (D.C. Cir. 1991) ......................................................................... 29, 33

*In re Bluewater Network*,
   234 F.3d 1305 (D.C. Cir. 2000) ........................................................................... 31

*In re Core Commc'ns, Inc.,*
  531 F.3d 849 (D.C. Cir. 2008) ................................................................ 31

*In re Monroe Commc'ns Corp.,*
  840 F.2d 942 (D.C. Cir. 1988) ................................................................ 33

*In re Pesticide Action Network N. Am.,*
  798 F.3d 809 (9th Cir. 2017) ................................................................. 31

*Inspired Dev. Grp., LLC v. Inspired Prods. Grp., LLC,*
  938 F.3d 1355 (Fed. Cir. 2019) ............................................................. 13

*Invenergy Renewables LLC v. United States,*
  422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019), modified, 476 F. Supp. 3d 1323
  (Ct. Int'l Trade 2020) ........................................................................ 20

*Kent v. Principi,*
  389 F.3d 1380 (Fed. Cir. 2004) ............................................................. 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ................................................................. 14, 20, 21

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................. 14, 15, 18

*Martin v. O'Rourke,*
  891 F.3d 1338 (Fed. Cir. 2018) ............................................................. 30

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) .......................................................................... 20

*McKinney v. U.S. Department of Treasury,*
  799 F.2d 1544 (Fed. Cir. 1986) ............................................ 18, 19, 21, 22, 32

*Milecrest Corp. v. United States,*
  264 F. Supp. 1353, 1370 (Ct. Int'l Trade 2017) .......................................... 21

*Military-Veterans Advoc. v. Sec'y of Veterans,*
  Affs., 7 F.4th 1110 (Fed. Cir. 2021) ................................................... 15, 16

*Motaghedi v. Pompeo,*
  436 F. Supp. 3d 1345 (E.D. Cal. 2020) ..................................................... 30

*N.A.A.C.P. v. City of Kyle,*
  626 F.3d 233 (5th Cir. 2010) ............................................................... 17

*Natural Resources Defense Council, Inc. v. Ross,*
  331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) .............................................. 26

*Norton v. Southern Utah Wilderness All.,*
   542 U.S. 55 (2004) ................................................................................. 23, 24, 26

*Pittston Coal Grp. v. Sebben,*
   488 U.S. 105 (1988) ............................................................................................. 29

*Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot.,*
   550 F.3d 1121 (Fed. Cir. 2008) ......................................................................... 28

*Sierra Club v. Morton,*
   405 U.S. 727 (1972) ............................................................................................. 16

*Tabacos de Wilson, Inc. v. United States,*
   324 F. Supp. 3d 1304 (Ct. Int'l Trade 2018) .............................................. 25, 26

*Telecommunications Research and Action Center v. FCC,*
   750 F.2d 70 (D.C. Cir. 1984) ...................................................................... *passim*

*United Pac. Ins. Co. v. United States,*
   464 F.3d 1325 (Fed. Cir. 2006) ......................................................................... 13

*United States v. Cotton,*
   535 U.S. 625 (2002) ............................................................................................. 13

*United States v. Texas,*
   599 U.S. 670 (2023) ....................................................................................... 27, 28

*Yanko v. United States,*
   869 F.3d 1328 (Fed. Cir. 2017) ......................................................................... 14

*Zixiang Li v. Kerry,*
   710 F.3d 995 (9th Cir. 2013) ............................................................................. 28

## **Statutes**

5 U.S.C. § 552(b)(7)(E) .............................................................................................. 9

5 U.S.C. § 701(a)(2) ................................................................................................. 23

5 U.S.C. § 706 ............................................................................................................. 3

5 U.S.C. § 706(1) ........................................................................................... 4, 12, 23

6 U.S.C. § 901 ............................................................................................................. 7

6 U.S.C. § 961 ............................................................................................................. 7

16 U.S.C. § 1371(a)(2) ............................................................................................. 26

18 U.S.C. § 1905 .................................................................................................... 9

19 U.S.C. § 943 ..................................................................................................... 7

19 U.S.C. § 1307 .......................................................................................... *passim*

19 U.S.C. § 2071 .................................................................................................. 4

28 U.S.C. § 1581(i)(1)(c) ................................................................................... 12

28 U.S.C. § 2201 ............................................................................................... 23

Public Law 114-125 ............................................................................................. 5

Reorganization Plan No. 26 of 1950 (15 F.R. 4935) ......................................... 4

## **Regulations**

19 C.F.R. § 12.42 ......................................................................................... *passim*

19 C.F.R. § 12.42(a) ..................................................................................... 5, 25

19 C.F.R. § 12.42(b) ..................................................................................... *passim*

19 C.F.R. § 12.42(d) ................................................................................. 3, 6, 25

19 C.F.R. § 12.42(e) ............................................................................. 3, 6, 8, 25

19 C.F.R. § 12.42(f) ........................................................................................ 3, 6

19 C.F.R. § 12.42(g) ............................................................................................ 6

19 C.F.R. § 12.43 .......................................................................................... 4, 5

19 C.F.R. § 12.44 .......................................................................................... 4, 5

19 C.F.R. § 12.45 .......................................................................................... 4, 5

## **Rules**

USCIT Rule 12(b)(6) .................................................................................. 14, 20

## Other Authorities

ILO indicators of Forced Labour
   International Labour Organization (ILO), United Nations,
   https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---
   declaration/documents/publication/wcms_203832.pdf
   (last visited on Dec. 15, 2023) ................................................................................................. 8

International Labour Organization (ILO), United Nations,
   https://www.ilo.org/global/about-the-ilo/lang--en/index.htm
   (last visited on Dec. 15, 2023) ................................................................................................. 7

IRAdvocates, "*About*,"
   https://www.internationalrightsadvocates.org/about-us
   (last visited on Dec. 15, 2023) ............................................................................................... 19

System of Records Notices (SORNs), U.S. Dept. of Homeland Security,
   https://www.dhs.gov/system-records-notices-sorns
   (last visited Dec. 15, 2023) ...................................................................................................... 7

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE CLAIRE R. KELLY, JUDGE

———————————————————————
                                                        :
INTERNATIONAL RIGHTS ADVOCATES,        :
                                                        :
                                                        :
                    Plaintiff,              :      Court No.  23-00165
                                                        :
          v.                                    :
                                                        :
                                                        :
                                                        :
ALEJANDRO MAYORKAS, Secretary         :
U.S. Department of Homeland Security,      :
                                                        :
TROY A. MILLER, Acting Commissioner   :
U.S. Customs and Border Protection,          :
                                                        :
                    Defendants.            :
———————————————————————:


# DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND SUPPORTING MEMORANDUM

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of

International Trade (USCIT R.), defendants, Alejandro Mayorkas, Secretary, U.S. Department of

Homeland Security, and Troy A. Miller, Acting Commissioner,[1] U.S. Customs and Border

Protection (CBP), respectfully request that the Court dismiss this action filed by plaintiff,

International Rights Advocates (IRAdvocates), for lack of subject-matter jurisdiction and failure

to state a claim upon which relief can be granted.

---

[1] After the filing of this action, Mr. Miller's official title was changed to Senior Official Performing the Duties of the Commissioner.

## INTRODUCTION

CBP takes seriously its charge to protect the American marketplace from goods made with forced labor.  Pursuant to 19 U.S.C. § 1307 and 19 C.F.R. § 12.42 *et seq.*, CBP is authorized to investigate allegations that goods made with forced labor are, or are likely to be, imported into the United States and, if warranted, impose import restrictions on those goods.  In furtherance of that authority, CBP is, and has been, actively investigating IRAdvocates's allegations, which have been supplemented twice with additional information, that cocoa imported from Côte d'Ivoire has been produced by forced labor.  CBP has met several times with IRAdvocates and co-allegers, issued questionnaires to cocoa importers, and sent correspondence to IRAdvocates regarding the investigation.  The breadth of the allegations necessarily requires CBP to undertake a complex investigation at significant scale.

In its lawsuit, IRAdvocates challenges CBP's authority under the Administrative Procedure Act (APA) to determine the scope, timing, and outcome of its investigation into the plaintiff's allegations that forced labor is being used to produce cocoa imported, or likely to be imported, into the United States.  In particular, IRAdvocates seeks to compel the agency to act on its allegations, or alternatively, seeks a declaration that the information it submitted is sufficient for CBP to act.  Compl. at ¶ 133; Request for Relief A, B.  The plaintiff's claims and requested relief are legally deficient for several reasons.

First, IRAdvocates lacks constitutional and statutory standing to bring its claims.  The only injuries that it has allegedly suffered are its unilateral expenditure of its own resources to investigate possible forced child labor in Côte d'Ivoire and its unilateral initiation of its own campaign to prevent the importation of merchandise produced with such labor.  The use of resources for investigation in anticipation of litigation or advocacy is insufficient to constitute an

2

Article III injury for purposes of standing.  Moreover, IRAdvocates cannot establish a nexus between its expenditure of resources and CBP's alleged inaction, which is also required for Article III standing.  IRAdvocates also cannot establish statutory standing necessary to bring this action because it does not fall within the "zone of interests" protected or regulated by Section 1307.  The statute was enacted to protect domestic producers and workers, and IRAdvocates does not fall within either category.

Second, IRAdvocates's APA claim should be dismissed because it has not identified any action that has been unlawfully withheld.  Neither the governing statute, 19 U.S.C. § 1307, nor its implementing regulations, 19 C.F.R. § 12.42 *et seq.*, require CBP to take a particular course of action in response to allegations it may receive pertaining to the importation, or likely importation, of goods made with forced labor, much less to take such action by a particular deadline.  Section 1307 expressly directed CBP to promulgate implementing regulations to carry out the objectives of the statute. In turn the applicable regulations expressly recognize CBP's broad discretion in evaluating an allegation, conducting an investigation, and enforcing 19 U.S.C. § 1307 through a withhold release order (WRO) or a published finding that the merchandise is subject to Section 1307, if the regulations' requirements are met and circumstances warrant such actions.  19 C.F.R. § 12.42(d)-(f).  CBP is not obligated to take enforcement action against a particular product merely because allegations regarding that product have been communicated to it, nor is CBP obligated to issue a "decision" on those allegations.  *Id.*  Here, CBP is conducting an investigation that encompasses the allegations submitted by IRAdvocates and that investigation is ongoing.  IRAdvocates's desire for a specific outcome or response from the agency on a specific timeline is not a valid basis to compel an action under Section 706(1) of the APA.  5 U.S.C. § 706.

Finally, IRAdvocates's request for declaratory relief in which the Court would determine the sufficiency of the evidence submitted in IRAdvocates's allegations contravenes the express statutory authority granted to CBP by the terms of Section 1307 and the APA.  Compl. at Request for Relief at A, B; 19 U.S.C. § 1307; 5 U.S.C. § 706(1).  Because IRAdvocates can identify no action that CBP is legally required to take, and because the agency has the discretion to define the manner and timing of an investigation and ultimately to determine whether import restrictions are warranted, the Court should decline to interfere with the agency's role in this process.

## **BACKGROUND**

Section 1307 and its implementing regulations govern CBP's authority to enforce the provisions of the statute, including CBP's discretion to investigate allegations of forced labor and, if warranted, take enforcement actions to prevent the entry of goods into the United States made, wholly or in part, with forced labor.

### A.      **The Statutory and Regulatory Framework**

Section 1307 of Title 19 of the United States Code states in relevant part that:

> All goods . . . produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury[2] is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision.
>
> For purposes of this section, the term 'forced labor or/and

---

[2] Pursuant to 19 U.S.C. § 2071 and Reorganization Plan No. 26 of 1950 (15 F.R. 4935), the Secretary of the Treasury delegated authority to the United States Customs Service, now CBP, to issue regulations under Section 1307.  *See* 19 C.F.R. § 12.42-12.45.

indentured labor' includes forced or indentured child labor.[3]

19 U.S.C. § 1307 (2016).[4]

In Section 1307, Congress barred the importation of goods made with forced labor, but gave CBP discretion about how to enforce that prohibition.  As directed by Congress, the Secretary of the Treasury promulgated implementing regulations, 19 C.F.R. §§ 12.42-12.45 (2017), now enforced by CBP, to carry out the statute's objectives.

These regulations allow CBP to self-initiate an investigation into goods imported, or likely to be imported, into the United States that are being produced, wholly or in part, with forced labor.  *See* 19 C.F.R. § 12.42(a).  The regulations also permit "any person outside CBP" to communicate to the Commissioner of CBP its belief that goods produced with forced labor in a foreign country are being, or are likely to be, imported into the United States.  *See* 19 C.F.R. § 12.42(b).  The communication must contain "(1) [a] full statement of the reasons for the belief: (2) [a] detailed description or sample of the merchandise; and (3) [a]ll pertinent facts obtainable as to the production of the merchandise abroad."  *Id.*  Upon receipt of the communication, if in compliance with 19 C.F.R. § 12.42(b), the Commissioner of CBP[5] "will cause such investigation

---

[3] Section 1307 prohibits importation where goods were made with *forced or indentured* child labor, rather than child labor *per se*.  CBP uses the same factors to analyze whether goods were produced with forced or indentured child labor that it uses to assess whether goods were produced with other forced or indentured labor.

[4] A prior version of Section 1307 allowed for the importation of certain forced labor-produced goods if the goods were produced "in such quantities in the United States as to meet the consumptive demands of the United States."  *See* 19 U.S.C. § 1307 (2000).  In 2016, Congress repealed this "consumptive demand" exception with the passing of the Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA).  Pub. L. 114-125, Feb. 24, 2016, 130 Stat. 122.

[5] The Commissioner delegated his authority to allow the Executive Assistant Commissioner, Office of Trade, to take action on importations of goods reasonably suspected of being mined, manufactured or produced, in whole or in part, in violation of Section 1307 and determine the admissibility of merchandise pursuant to the regulations promulgated pursuant to Section 1307, 19 C.F.R. §§ 12.42-12.45.  Delegation Order No. 19-001, Sept. 11, 2019.

to be made as appears to be warranted by the circumstances of the case and the Commissioner or

his designated representative will consider any representations offered by foreign interests,

importers, domestic producers, or other interested persons."  19 C.F.R. § 12.42(d).  Allegations of

forced labor may be submitted anonymously to CBP.

"If the Commissioner of CBP finds at any time that information available reasonably but

not conclusively indicates that merchandise within the purview of section [1307] is being, or is

likely to be, imported . . . ," CBP has the authority to issue withhold release orders (WRO) to

detain goods subject to the WRO.  19 C.F.R. § 12.42(e).  CBP is authorized to act "at any time"

on information available to CBP—whether through a CBP-initiated investigation (*e.g.*,

subsection (a)) or an allegation made by any person outside CBP (subsection (b))—to issue a

WRO to detain goods suspected of being made, wholly or in part, with forced labor, provided the

information available to CBP warrants such an action.  *Id.*  Neither Section 1307 nor its

implementing regulations prescribe time limits for investigations or the issuance of WROs.  *See*

19 U.S.C. § 1307, 19 C.F.R. § 12.42.

If CBP determines that goods subject to the WRO were made with forced labor, CBP

"will publish a finding to that effect in a weekly issue of the Customs Bulletin and in the Federal

Register."  19 C.F.R. § 12.42(f).  Any class of goods specified in the finding imported directly or

indirectly from the locality specified in the finding that have not been released from CBP

custody prior to the date of publication of the finding in the Federal Register shall be treated as

an importation prohibited by Section 1307 unless the importer "establishes by satisfactory

evidence" that the merchandise was not made with forced labor.  19 C.F.R. § 12.42(g).

**B.      CBP's Investigation of Forced Labor in Imported Goods**

The Forced Labor Enforcement Division (FLD), which falls under the Trade Remedy

Law Enforcement Directorate (TRLED) of the CBP Office of Trade, was established in 2018 to enhance enforcement of Section 1307 by, among other things, investigating alleged violations of the forced labor import prohibition imposed by 19 U.S.C. § 1307.  If an allegation is received from a person outside of CBP, FLD will initiate an investigation if the allegation complies with 19 C.F.R. § 12.42(b) and if the agency determines that an investigation is warranted based on the circumstances of the case.  In investigating such an allegation, CBP may use all investigatory tools at its disposal, including but not limited to the use of law enforcement sensitive information collected in the course of customs enforcement investigations and databases that contain protected trade secret information.[6]  And the scope of CBP's investigation is not limited to the four corners of a submission.  Beyond verifying the facts contained within an allegation, CBP has the discretion to expand the scope of its investigation, which may involve, for instance, the investigation of additional entities (*i.e.*, producers and importers) and supply chains.

     CBP uses the International Labour Organization's (ILO) indicators of forced labor as guidance for determining the existence of forced labor when evaluating an allegation.[7]  The ILO

---

[6] Pursuant to statutes like the Tariff Act of 1930, TFTEA, and the Security and Accountability for Every Port Act of 2006 (codified at 6 U.S.C. § 901 *et seq.*), CBP administers programs and maintains systems which collect sensitive information on the international supply chain of goods entering the United States.  These systems can be cross-referenced during the course of customs enforcement investigations, and include, but are not limited to, the Automated Commercial Environment (*see generally* Section 106 of TFTEA *and* CBP System of Record Notice - 001 Import Information System); the Automated Targeting System (*see generally* 19 U.S.C. § 943 *and* CBP System of Record Notice - 006 Automated Targeting System); and the Customs Trade Partnership Against Terrorism (*see generally* 6 U.S.C. § 961 *and* CBP System of Record Notice - 018 Customs Trade Partnership Against Terrorism).  CBP system of records notices are available at: https://www.dhs.gov/system-records-notices-sorns (last visited Dec. 15, 2023).

[7] The ILO is a tripartite agency of the United Nations which "brings together governments, employers and workers of 187 Member States to set labour standards" and develop policies, among other things.  https://www.ilo.org/global/about-the-ilo/lang--en/index.htm (last visited on Dec. 15, 2023).  The ILO indicators of forced labor are found at: https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---

has eleven indicators to assist in identifying and investigating forced labor: abuse of vulnerability; deception; restriction of movement; isolation; physical and sexual violence; intimidation and threats; retention of identity documents; withholding of wages; debt bondage; abusive working and living conditions; and excessive overtime.  CBP will conduct an extensive and comprehensive investigation of these factors to help inform any potential enforcement action.

The scope of a forced labor allegation may also affect the contours and timing of an investigation.  An allegation involving a single or small group of importers with limited manufacturers and sources (*e.g.*, farms, plantations, mines) and fewer production points may allow for a more streamlined investigation of the supply chains at issue to support the forced labor and traceability to U.S.-import analyses.  By comparison, an allegation involving several large importers, several unique manufacturing and processing facilities, or scores of source locations for goods can significantly impact the timing of an investigation given the amount of information needed to be collected and analyzed.  Further, country-wide investigations may involve a combination of many large, likely interconnected, investigations, which could concern an entire sector of a country's export market, thereby greatly increasing the complexity of such investigations.

Whatever the scope of an initial allegation, CBP takes investigative steps to verify the information contained in the allegation and conducts its own research and investigation into the existence of forced labor, which it treats as law enforcement sensitive or privileged information.  Additionally, CBP regulations require it to determine not only whether forced labor is being used, wholly or in part, to make a good, but also whether those goods are being, or likely to be, imported into the United States.  *See* 19 C.F.R. § 12.42(b), (e).  Even if CBP determines that an

declaration/documents/publication/wcms_203832.pdf (last visited on Dec. 15, 2023).

allegation contains sufficient evidence of forced labor, CBP is not authorized to take enforcement action unless it ascertains a through-line from the forced labor used to make, harvest, or otherwise obtain a good to its importation (or likelihood of importation) into the United States.  In making the latter determination, CBP may take various actions including, but not limited to, using its databases containing commercially sensitive and trade secret information.  CBP is obligated to safeguard information in those databases from disclosure pursuant to 18 U.S.C. § 1905 (2008).[8]  Accordingly, much of the information uncovered by CBP pertaining to the existence of forced labor, supply chains, and traceability to U.S. imports in a forced labor investigation is protected from disclosure to any other party, including an alleger.

Further, as a law enforcement agency, some of the investigative processes, procedures, tools, and techniques CBP uses to determine both the existence of forced labor and supply chain traceability are law enforcement sensitive.  Disclosure of the details or even the existence of such law enforcement processes, procedures, tools, and techniques to anyone outside CBP or other law enforcement partners can jeopardize the integrity of an investigation and risk circumvention of customs laws.  *See generally* 5 U.S.C. § 552(b)(7)(E).  Therefore, many of the details of an ongoing CBP investigation into a forced labor allegation are kept confidential by CBP throughout the pendency of the investigation and even after an action may be taken by CBP.

---

[8] 18 U.S.C. § 1905 is also known as the Trade Secrets Act.  The statute imposes criminal penalties on officers or employees of the United States who disclose certain types of information about companies that are being investigated by the United States when that disclosure is not otherwise authorized by law.  Protected information includes "trade secrets, processes, operations, style of work, or apparatus, or [information pertaining] to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association."  *Id.*  Neither 19 U.S.C § 1307 nor its implementing regulations grant an exception from the Trade Secrets Act.  CBP is thus required to keep confidential, including from the alleger or other potentially interested parties, much of the information it obtains in a forced labor investigation as it relates to importers and manufacturers.

C.      **IRAdvocates's Allegation and CBP's Involvement**

On February 14, 2020, IRAdvocates, Corporate Accountability Lab (CAL), and the Civil Rights Litigation Clinic of University of California Irvine School of Law (CRLC-UCI) submitted a joint "petition to exclude cocoa" produced in Côte d'Ivoire with forced or trafficked child labor.  Compl. at ¶ 105; Exh. A.  Their submission alleged nine companies were importing cocoa produced with forced child labor into the United States and urged the agency to issue a WRO. Exh. A to Compl.  Their allegation recognized that determining whether a person (child or adult) is engaged in forced labor is "highly fact intensive and often speculative," and "the extremely sensitive nature of this sector [makes] it difficult to get access to farms and to have people speak freely."  Exh. A to Compl. at 14.  Moreover, their allegation acknowledged that "an abrupt and immediate exclusion [of cocoa] of this scale would cause collateral harm to farmers, farmworkers, and the [Cote d'Ivoire] economy."  *Id*. at 2.

Following the receipt of the joint allegation, CBP initiated an investigation based on the information contained in the allegation into the use of forced labor in the Ivoirian cocoa harvesting industry and the potential U.S. importation of goods made with such cocoa.  Compl. at ¶¶ 105, 106.  In furtherance of its investigation, CBP issued requests for information (also known as CBP Form 28s) and questionnaires to various importers of cocoa or products made with cocoa from Côte d'Ivoire relating to various issues pertinent to its investigation, including but not limited to: remediation efforts to counteract forced child labor; labor grievance systems; supply chain tracing to the farm level; auditing and third-party monitoring; and importation. Compl. at ¶ 105; Exh. D.  After disseminating the requests for information, in March 2020, CBP met with IRAdvocates and CAL to discuss the allegation set forth in their February 2020 submission.  CBP advised that it had sent detailed questionnaires to several importers and that

those questionnaires were informed, in part, by the submitted allegation.  Compl. at ¶ 105.  CBP

met with CAL again on March 23, 2021, where CBP informed CAL that its investigation into the

allegation detailed in the submission was still ongoing.  Compl. at ¶ 106.

On June 25, 2021, IRAdvocates and CAL jointly submitted a supplemental allegation to

CBP requesting exclusion of cocoa produced in Côte d'Ivoire and providing additional

information.  Compl. at ¶ 107; Exh. E.  In the supplemental allegation, IRAdvocates and CAL

requested that, in addition to the issuance of a WRO, CBP should demand that the cocoa and

chocolate companies and importers publicly release information on their cocoa supply chains

down to their farm levels within 180 days, require the companies to pay the full Living Income

Differential (LID), and establish long-term contracts with cooperatives and farmers in Côte

d'Ivoire.  *Id*.  Exh. E to Compl. at 2-3.  CBP thereafter met with IRAdvocates and CAL on

September 10, 2021, to discuss the supplemental allegation and the status of the investigation.

Compl. at ¶ 108.  During the meeting, CBP informed IRAdvocates and CAL that the information

contained in the allegations was out of date and that the information did not provide a sufficient

basis to take enforcement action in the form of a WRO pursuant to 19 U.S.C. § 1307.  Compl. at

¶ 111; Exh. F.

On August 15, 2022, CBP representatives met with CAL, in response to their request for

information regarding the status of a potential enforcement action.  Compl. at ¶ 110.  On October

13, 2022, IRAdvocates sent then-Acting Commissioner Miller an email inquiring about the

investigation and the status of action taken in response to the allegations.  Compl. at ¶ 111; Exh.

F.  Then-Acting Commissioner Miller responded to IRAdvocates's email by letter dated

December 13, 2022, referring to the March and September 2021 meetings, reiterating that the

information contained in both allegations was dated and insufficient to merit a WRO, and

inviting IRAdvocates and CAL to provide any additional information to CBP if it became available.  *Id.*

On January 17, 2023, IRAdvocates responded to then-Acting Commissioner Miller's December 13, 2022 letter, asserting that the evidence presented in both its allegations was not dated.  Compl. at ¶ 112; Exh. G.  CAL thereafter submitted an additional supplemental allegation to CBP on February 14, 2023, providing "new and recently acquired information" and again urging CBP to issue a WRO and pursue the other relief previously requested.  Compl. at ¶ 113; Exh. H at 1-2.

Despite the fact that CBP is continuing to investigate the alleged existence of forced labor in the cocoa industry in Côte d'Ivoire and whether any cocoa or products made with cocoa harvested using forced labor are or are likely to be imported into the United States, including the most recent information supplied this past year by the allegers, IRAdvocates filed this action on August 15, 2023, under 28 U.S.C. § 1581(i)(1)(c), seeking to compel agency action on the submitted allegations pursuant to the APA, 5 U.S.C. § 706(1), or alternatively, a declaration that the information that IRAdvocates had submitted to CBP is sufficient for CBP to act on the allegations.  The Court should reject IRAdvocates's attempt to dictate how CBP conducts its investigation into the complex allegations raised by the allegers or what action CBP should take based on that investigation.  Instead, for the reasons discussed below, the Court should dismiss this action for lack of subject-matter jurisdiction and failure to state a claim for which relief can be granted.

## ARGUMENT

### I.    STANDARD OF REVIEW

Subject-matter jurisdiction "involves a court's power to hear a case, [and] can never be forfeited or waived." *United States v. Cotton,* 535 U.S. 625, 630 (2002).  "The objection that a federal court lacks subject-matter jurisdiction … may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).  Plaintiffs bear the burden to demonstrate that subject-matter jurisdiction exists.  *Design Int'l Grp., Inc. v. United States*, 113 F. Supp. 3d 1342, 1344 (Ct. Int'l Trade 2015) (citations omitted).  Whether jurisdiction exists is a question of law for the Court.  *Inspired Dev. Grp.*, *LLC v. Inspired Prods. Grp.*, *LLC*, 938 F.3d 1355, 1360 (Fed. Cir. 2019) (citation omitted).

A motion to dismiss for failure to state a claim is appropriate when a plaintiff's allegations do not entitle it to a remedy.  *See United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327 (Fed. Cir. 2006).  The motion "tests the legal sufficiency of a complaint," *see Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002), which should be dismissed if it fails to present a legally cognizable right of action.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Dismissal is required when a complaint fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  In deciding a motion to dismiss for a failure to state a claim, the Court must determine whether, accepting all factual allegations as true, and ignoring conclusory allegations, the complaint plausibly states a claim for relief.  *Iqbal*, 556 U.S. at 678.  Mere "possibility" that a defendant acted unlawfully does not suffice.  *Id.*; *see Environment One Corp. v. United States*, 627 F. Supp.

3d 1349, 1361–62 (Ct. Int'l Trade 2023) (applying *Twombly* and *Iqbal* on a USCIT Rule

12(b)(6) motion to dismiss).

Interpretations of governing legal authorities, such as statutes and regulations, involve

questions of law. *See Kent v. Principi*, 389 F.3d 1380, 1384 (Fed. Cir. 2004) (interpretation of a

statute or regulation is a question of law); *see also Yanko v. United States*, 869 F.3d 1328, 1331

(Fed. Cir. 2017) (treating as a "pure legal issue of statutory interpretation" claim based on

interpretation of statutory provision and related executive order). Such issues are appropriately

resolved under Rule 12(b)(6). *See, e.g.*, *Yanko*, 869 F.3d at 1331 (citation omitted).

## II.     THIS ACTION SHOULD BE DISMISSED BECAUSE IRADVOCATES LACKS STANDING FOR ITS CLAIMS

As an initial matter, the Court should dismiss this action because IRAdvocates does not

possess either constitutional or statutory standing. Importantly, standing involves constitutional

limitations on federal court jurisdiction as well as statutory limitations on its exercise. *Bennett v.*

*Spear*, 520 U.S. 154, 162 (1997); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572

U.S. 118, 127 (2014). IRAdvocates must demonstrate both constitutional and statutory standing

to maintain this action, which it fails to do.

### A.     The Court Should Dismiss This Action for Lack of Jurisdiction Because IRAdvocates Cannot Establish Constitutional Standing

IRAdvocates, as a public interest organization, cannot demonstrate that it has

constitutional standing to maintain this action, and this case should be dismissed for lack of

jurisdiction. "[T]he core component of standing is an essential and unchanging part of the case-

or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992). *See also Apple Inc. v. United States*, 375 F. Supp. 3d 1288, 1296 (Ct. Int'l Trade 2019)

(plaintiff's claim is non-justiciable where plaintiff has not suffered an injury or harm that a

14

court's order can redress).  A litigant must establish constitutional standing to bring suit.  The three elements of constitutional standing are: (1) a concrete and particularized injury-in-fact which must be actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560-61; *see also Military-Veterans Advoc. v. Sec'y of Veterans Affs.*, 7 F.4th 1110, 1121 (Fed. Cir. 2021) ("The 'irreducible constitutional minimum of standing' consists of three elements") (citing *Lujan*, 504 U.S. at 560).  Organizations must make "the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *American Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020); *see also Military-Veterans*, 7 F.4th at 1129 ("Organizational standing, like any other theory of standing, requires an Organization to demonstrate the three elements of injury in fact, causation, and redressability.").  As explained below, IRAdvocates cannot establish any of the three requirements for constitutional standing.

**1.  IRAdvocates Cannot Demonstrate a Concrete and Particularized Injury-in-Fact**

IRAdvocates must demonstrate organizational standing in its own right, including an injury to the organization.  To prove an injury-in-fact, an organization must establish a "concrete and demonstrable injury to the [O]rganization's activities—such as a perceptibl[e] impair[ment] of the Organization's mission—with the consequent drain on the [O]rganization's resources." *Military-Veterans*, 7 F.4th at 1129 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (internal quotation marks omitted)).  To meet this requirement, an organization must allege more than simply a frustration of its objectives.  *Food & Water Watch, Inc., v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("An organization must allege more than a frustration of its

purpose because frustration of an organization's objectives is the type of abstract concern that does not impart standing."). An interest in a problem, no matter how longstanding the interest or qualified the organization, is not enough to establish injury. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Moreover, to satisfy organizational injury under a diversion-of-resources theory, the drain on an organization's resources must go beyond normal operating costs. *Military-Veterans*, 7 F.4th at 1129. The "use of resources for litigation, investigation in anticipation of litigation, or advocacy" is insufficient to constitute an Article III injury. *Id.*

Here, IRAdvocates has not demonstrated that its mission has been impaired. IRAdvocates holds itself out as an "advocacy organization" that "promotes enforcement of labor rights internationally through public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups." Compl. at ¶ 117. As described, the organization's mission is neither limited nor diminished by any alleged inaction of CBP. IRAdvocates continues to "promote the enforcement of labor rights … through … education and mobilization, research [and] litigation" irrespective and independent of CBP. *Military-Veterans*, 7 F.4th at 1129.

IRAdvocates also has not shown a drain on its resources that satisfies the requirements for standing. IRAdvocates contends that it is injured by expending "its own resources to investigate allegations of forced child labor in Côte d'Ivoire, and to initiate its own campaign to prevent the importation of this illegal merchandise." Compl. at ¶ 119. It also alleges that it "has expended resources in an ongoing, multi-year effort to obtain enforcement of the Tariff Act by Defendants." Compl. at ¶ 119. However, these alleged expenditures by IRAdvocates are voluntary and "merely part of the ordinary course of [its] operations." *See Military-Veterans*, 7 F.4th at 1130.

16

IRAdvocates's alleged injury is no more than a discretionary action arising from its own choice to pursue its organizational goals and is therefore insufficient to establish an injury-in-fact. *See Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) ("The diversion of resources to testing might well harm the Council's other programs, for money spent on testing is money that is not spent on other things.  But this particular harm is self-inflicted; it results not from any actions taken by BMC, but rather from the Council's own budgetary choices."); *see also N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238–39 (5th Cir. 2010); *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 76–80 (3d Cir. 1998).  Accordingly, IRAdvocates has provided no basis for the Court to depart in this case from the well-established rule that expenditures on "litigation, investigation in anticipation of litigation or advocacy" do not constitute an injury.

While IRAdvocates alleges that it "is within the category of persons entitled to submit a petition under 19 CFR § 12.42," Compl. at ¶ 118, that regulation does not imbue IRAdvocates with standing to bring its claims.  The regulation simply permits "any person" who has reason to believe that goods are being imported in contravention of Section 1307 to communicate that belief to any port director or the Commissioner of CBP.  19 C.F.R. § 12.42(b).  This opportunity to communicate information does not provide IRAdvocates with standing to challenge CBP's subsequent actions simply because it availed itself of this disclosure process and did not receive its preferred response.  *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (holding that regulations cannot provide a right of action that is not present in the statute that it implements).

Likewise, IRAdvocates alleges that, because "it has complied fully with the requirements of 19 C.F.R. § 12.42(b), … Customs is obligated to act on the Petition and issue a WRO . . ., or make a determination that the Petition lacks merit, or make some other appropriate decision in

response to the Petition" as requested by the Petition.  Compl. at ¶ 134.  This argument fails

twice over as a basis for asserting constitutional standing.  As discussed in more detail below, the

statute and regulations do not obligate or require CBP to issue a WRO or take the other action

that plaintiff seeks.  Rather, Section 1307 confers discretion on the agency to determine how to

pursue and conduct an investigation and whether to prohibit the importation of goods alleged to

be made with forced labor.  Moreover, even assuming the statute and regulations imposed some

legal duty on the government, it does not resolve whether IRAdvocates has standing to enforce

that right.  "The mere assertion of a right to have the Government act in accordance with the law

is not sufficient, in and of itself, to satisfy the injury requirement."  *McKinney v. U.S.*

*Department of Treasury*, 799 F.2d 1544, 1550 (Fed. Cir. 1986).

> **2.  There Is No Causal Connection Between the Injury Alleged and the Agency's Conduct, and IRAdvocates's Injury Is Not Likely to Be Redressed by a Favorable Decision**

The second and third elements of constitutional standing require a causal connection

between the injury and the conduct complained of, and that the injury is "likely" to be "redressed

by a favorable decision."  *Lujan*, 504 U.S. at 560-61.  The causation or traceability element of

the standing inquiry looks to the "causal nexus between the agency action and the asserted

injury, while redressability centers on the causal connection between the asserted injury and

judicial relief."  *Freedom Republicans, Inc. v. FEC,* 13 F.3d 412, 418 (D.C. Cir. 1994).

Traceability and redressability "overlap as two sides of a causation coin" and are frequently

discussed together.  *CSL Plasma Inc. v. U.S. Customs and Border Prot.*, 628 F. Supp. 3d 243,

254 (D.D.C. 2022) (quoting *Exhaustless, Inc. v. Fed. Aviation Admin.*, 931 F.3d 1209, 1212

(D.C. Cir. 2019) (quoting *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir.

1997))).  IRAdvocates also cannot establish either of these elements.

As discussed, IRAdvocates alleges that it has been injured because it had to expend "its own resources to investigate allegations of forced child labor in Côte d'Ivoire" and "to obtain enforcement of the Tariff Act by Defendants." Compl. at ¶ 119. IRAdvocates's injury cannot be traced to CBP because it is the result of IRAdvocates's own choices in how to effectuate its mission. IRAdvocates voluntarily chose to expend its own resources to provide additional information to CBP, to meet with CBP representatives to further the investigation, and to bring this lawsuit.[9] As a result, there is no basis for IRAdvocates to allege that any of the asserted harms flowing from the voluntary actions it took in pursuit of its mission were caused by CBP.

Moreover, it is speculative to assume that IRAdvocates's alleged injury is likely to be redressed by the judicial relief it seeks. Through this action, IRAdvocates seeks an order compelling CBP to act on IRAdvocates's allegations. *See* Compl. at ¶ 134; Request for Relief A, B. Even if the Court were to grant this relief, it is not clear that any CBP action would result in IRAdvocates declining to expend its resources to investigate forced labor in Côte d'Ivoire. *See* Compl. at ¶ 119. Because CBP lacks the authority to regulate labor practices in another country, it is reasonable to anticipate that IRAdvocates will continue to devote resources to "promote[] enforcement of labor rights" in Côte d'Ivoire in accordance with its stated mission. *See* Compl. at ¶ 117; *see, e.g.*, *McKinney*, 799 F.2d at 1558 ("The conduct of the Customs Service has nothing whatsoever to do with the alleged fact that Ukrainians are political prisoners in Soviet

---

[9] As discussed, IRAdvocates's mission is to "promote[] enforcement of labor rights internationally through … litigation, legislation, and collaboration with labor, government and business groups." Compl. at ¶ 117. Indeed, according to IRAdvocates itself, it uses its resources to "engage with local partners to identify and research human rights violations, interview witnesses, and gather evidence" whenever it believes it can "constructively support" amelioration of potential labor rights abuses. It may also use its resources to "develop a legal case that can be filed in a U.S. court" if it believes the circumstances warrant such a case. IRAdvocates, "About," https://www.internationalrightsadvocates.org/about-us (last visited on Dec. 15, 2023).

labor camps, which is the result solely of internal political and policy machinations of the Soviet government.").

In sum, IRAdvocates fails to satisfy the three elements necessary for constitutional standing, and this case should be dismissed for lack of jurisdiction.

**B.     This Court Should Dismiss This Action for Failure to State a Claim Because IRAdvocates Lacks Statutory Standing**

In addition to constitutional standing, a plaintiff must demonstrate that its interests are within the "zone of interests" of the statutory provisions that the plaintiff seeks to enforce. *Lexmark*, 572 U.S. at 129 (2014); *Association of Data Processing Service v. Camp*, 397 U.S. 150, 153 (1970); *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1276 (Ct. Int'l Trade 2019), *modified by*, 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020).  Traditionally, federal courts framed the zone of interests test as an issue of "prudential standing" implicating the court's subject-matter jurisdiction.  *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (The prudential limitations on the court's jurisdiction are "judicially self-imposed limits on the exercise of federal jurisdiction.").  In *Lexmark*, however, the Supreme Court clarified that statutory standing is a question of "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim" and that statutory standing falls within a Rule 12(b)(6) motion for failure to state a claim.  572 U.S. at 127, 128 n. 4.  Thus, the zone of interests analysis focuses on whether the interests IRAdvocates asserts are "'arguably within the zone of interests to be protected or regulated by the statute' that [the plaintiff] says was violated" using "traditional principles of statutory interpretation."  *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Association of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 153); *Lexmark*, 572 U.S. at 127.  The breadth of the zone of interests "varies according to the provisions of law at issue."  *Lexmark*, 572 U.S. at

130 (quoting *Bennett*, 520 U.S. at 163).  If a plaintiff's interests do not fall within that zone of interests, the plaintiff's claim should be dismissed with prejudice for failure to state a claim.

In actions brought under the APA, the zone of interests test does not focus on the APA itself, but rather on the substantive statute that the plaintiff alleges the agency has violated. *Patchak*, 567 U.S. at 224-26 (2012); *Milecrest Corp. v. United States*, 264 F. Supp. 3d 1353, 1370 (Ct. Int'l Trade 2017).  The zone of interests test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Lexmark*, 572 U.S. at 130 (quoting *Patchak*, 567 U.S. at 225).  Because IRAdvocates brings this case to challenge the propriety of CBP's actions pursuant to Section 1307 (Compl. at ¶ 1), IRAdvocates must establish that it falls within the zone of interests protected or regulated by that statute.

In applying the zone of interests test to Section 1307 to determine who has prudential standing to bring an enforcement action, in *McKinney v. U.S. Department of Treasury,* the Federal Circuit held that such standing was limited to domestic workers and producers who are directly impacted by foreign manufacturers or U.S. importers benefiting from the use of forced labor.  799 F.2d 1544, 1557 (Fed. Cir. 1986).  The Federal Circuit expressly recognized that "[t]he moral and ethical interest in avoiding the purchase of or boycotting foreign goods produced by forced labor is shared by most, if not all, of the domestic populace."  *McKinney*, 799 F.2d at 1553.  However, the Court also recognized that such an interest, without more, would result in an unworkable standard that would effectively impose no limits on who could seek to enforce the statute.  *See id*. ("This is the type of wide public concern, amounting to a generalized grievance, which federal courts normally refrain from adjudicating.").  *McKinney*

21

thus held that for purposes of standing the zone of interests protected by Section 1307 is limited to domestic producers and workers.  *Id.* at 1557.

As a result, the *McKinney* Court held that the public interest organization that sued in that case – the Washington Legal Fund (WLF) – did not have prudential standing to assert a claim under Section 1307.  799 F.2d at 1557.  The Federal Circuit stated that the relevant inquiry was whether WLF, "as an organization, is within the 'zone of interests' to be protected or regulated by the statute."  *Id.* (citations omitted).  It concluded that the "WLF, as an organization, is not within either category [i.e. a domestic producer or worker] to be protected or regulated by [Section 1]307," *id.* (citation omitted), and thus the prudential limitation on standing barred the WLF's "claim as an organization to standing."  *Id.*

The same conclusion applies equally here.  IRAdvocates describes itself as a public interest organization "dedicated to achieving just and humane treatment for workers worldwide."  Compl. at ¶ 117.  As in *McKinney*, IRAdvocates does not fall within the categories of individuals or entities whose interests are sufficiently implicated by Section 1307 that have standing to sue.  Accordingly, IRAdvocates also fails to establish the statutory standing necessary to maintain this action.

## III.   SECTION 1307 AND ITS IMPLEMENTING REGULATIONS DO NOT MANDATE ANY AGENCY ACTION THAT CAN BE COMPELLED UNDER THE APA AND THE COURT CANNOT PROVIDE DECLARATORY RELIEF

IRAdvocates's action should also be dismissed for failure to state a claim because it is not lawfully entitled to any agency action or any declaratory relief under the APA.  IRAdvocates claims that defendants "have unlawfully withheld and/or unreasonably delayed an investigation into cocoa imports from Côte d'Ivoire as required by 19 CFR § 12.42," and "failed to take any action whatsoever, including issuing a decision regarding the merits of the Petition."  Compl. at ¶

22

133.  Due to this alleged inaction, IRAdvocates asks this Court to "compel agency action unlawfully withheld or unreasonably delayed" and to declare that the "[p]etition and supplemental materials submitted by [petitioners] constitute a sufficient basis to require CBP to take appropriate action."  Compl. at ¶ 133; Request for Relief A, B.  However, the relief of compelling agency action or issuing a declaration is limited to a discrete action that an agency is required to take.  28 U.S.C. § 2201;[10] 5 U.S.C. § 706(1); *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004) (holding that a court can only grant declaratory relief and compel agency action under 5 U.S.C. § 706(1) that has been unlawfully withheld where plaintiffs have asserted a discrete agency action the agency is required to take).  Thus, because IRAdvocates has failed to identify any required action that CBP has failed to undertake, its claim fails on its face and it is not entitled to any of the relief that it seeks.

Section 706(1) of the APA authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed . . . ."  However, "the only agency action that can be compelled under the APA is action legally *required*."  *Norton*, 542 U.S. at 63 (emphasis in original).  The Court's ability to compel agency action is "carefully circumscribed to situations where an agency has ignored a specific legislative command."  *Hells Canyon Preservation Council v. U.S. Forest Service*, 593 F.3d 923, 932 (9th Cir. 2010).  The Court may not review "agency action [that] is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Stated another way, the statute at issue must explicitly direct the agency to take a discrete action and that action must be required by the terms of the statute, thus removing discretion from that

---

[10] 28 U.S.C. § 2201 (2020) provides that "[I]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

particular agency function.  Thus, where agency action is not mandated by the terms of the statute, judicial direction is not permitted.  *Norton*, 542 U.S. at 65 (recognizing the limitation to required agency action rules out judicial direction of even discrete agency action that is not required by law).

The Supreme Court in *Norton* further explained the limitation the APA and Section 706(1) imposes by noting that the purpose "is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  *Id.* at 66.  *See also Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1221-22 (9th Cir. 2011) (finding that even where there is statutory language requiring an agency to act, absent discrete language directing the agency *how* it should carry out that required function, the Court cannot declare that the agency should have acted and thus violated the APA).  The *Norton* Court recognized that it is a matter for the agency "to work out compliance with the broad statutory mandate" and not the place of the judges, lest courts transform into "day-to-day agency [managers]."  542 U.S. at 66-67.

IRAdvocates has not identified any legally required action that CBP has unlawfully withheld.  To the contrary, Section 1307 and its implementing regulations provide CBP with broad discretion when it investigates allegations of forced labor-made goods that are being, or likely to be, imported into the United States, and do not dictate how or when an investigation must be completed, or what, if any, results the agency must impose.  Therefore, there is no agency action that may be compelled, and no declaratory relief that can be granted.

### A.     The Forced Labor Laws Do Not Mandate Agency Action

Section 1307 provides that "[a]ll goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by . . . forced labor . . . shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited . . . ."  19 U.S.C. § 1307.  The statute further expressly directs CBP to "prescrib[e] such regulations as may be necessary for the enforcement of this provision."  *Id.* The terms of Section 1307 thus afford discretion to CBP to determine whether goods are made with forced labor and if any enforcement action is merited.

The implementing regulations at 19 C.F.R. § 12.42 *et seq.* reinforce CBP's discretion to enforce Section 1307.  The regulations allow CBP to initiate an investigation of potential violations of Section 1307 either on its own initiative or based on an allegation received from an external source, 19 C.F.R. §§ 12.42(a)-(b), and thereafter to pursue such an investigation "*as appears to be warranted by the circumstances of the case.*"  *Id.* at § 12.42(d) (emphasis added). Additionally, if the Commissioner of CBP finds "*at any time*" that the information available has met the evidentiary threshold, he "will promptly advise all port directors" and issue a WRO.  *Id.* at § 12.42(e) (emphasis added).  The applicable authorities thus reserve to CBP the right to enforce Section 1307 within its discretion and without dictating a definitive mode of investigation, schedule, or outcome.

The agency action that IRAdvocates seeks to compel thus differs markedly from the type of action that courts have held may be ordered under the APA.  Agency action has been found to have been unlawfully withheld where "the statutory language plainly left no room for discretion," *Tabacos de Wilson, Inc. v. United States*, 324 F. Supp. 3d 1304, 1315 (Ct. Int'l

Trade 2018), such as where the agency was required "to promulgate a rule or take some decision by a statutory deadline." *Norton*, 542 U.S. at 63.

In *Tabacos de Wilson, Inc.*, for example, CBP violated a statutory time limit. The statute at issue provided that "[n]ot later than the date that is 2 years after the date of the enactment of the [Trade Facilitation and Trade Enforcement Act], the Secretary [of the Treasury] shall prescribe regulations for determining the calculation of amounts refunded as drawback under this section." 324 F. Supp. 3d at 1315–16. Faced with a statutory deadline where "the statutory language plainly left no room for discretion," the Court held that CBP had unlawfully withheld the regulations when four months had passed since the statutory time limit. *Id*.

This case also stands in stark contrast to *Natural Resources Defense Council, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1353 (Ct. Int'l Trade 2018) (*NRDC*), where the particular statute at issue dictated a discrete, required, and immediate act. The *NRDC* plaintiffs sought to compel government action pursuant to the APA to impose a government ban on fish and fish products from commercial fisheries that used gillnets under the Marine Mammal Protection Act (MMPA), 16 U.S.C. § 1371(a)(2), to prevent the tangling and strangulation of the vaquita, an endangered species. *Id*. The MMPA provides for a ban on imports of foreign fish and fish products if those fish are caught with "commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2). The statute articulated that "it shall be the immediate goal" that such incidents "be reduced to insignificant levels approaching a zero mortality and serious injury rate." *Id*. The Court held that this language imposed a temporal obligation upon the government to act by banning the importation of fish and fish products caught with gillnets. *NRDC*, 331 F. Supp. 3d. at 1353-55.

Here, Section 1307 does not include language that reflects a legally required, discrete, and immediate action.  While Section 1307 prohibits the importation of forced labor produced goods, it does not – in contrast to the statutory language in the foregoing cases – contain any temporal language or impose any discrete duty on the agency concerning how the agency makes the determination whether goods are produced with forced labor.  The statute delegates to CBP the authority to adopt implementing regulations, and those regulations allow CBP to determine the boundaries of a forced labor investigation, including the pace and timing of that investigation, and ultimately whether the information developed during an investigation warrants the imposition of an import restriction.  19 C.F.R. § 12.42 *et seq.*

CBP is an Executive law enforcement agency with the authority and discretion to decide whether and when to investigate and prosecute violations of the law, including 19 U.S.C. § 1307.  As a general rule, courts lack the ability to compel law enforcement agencies to enforce statutes unless there is a clear, mandatory directive in a statute indicating the manner and means by which a statute must be enforced.  *See United States v. Texas*, 599 U.S. 670, 679 (2023) (holding that the Executive has the discretion to prioritize the enforcement of the laws it is charged to execute, including the manner in which a law is enforced, or whether to take action at all when a law is violated); *see also In re Aiken Cnty.*, 725 F.3d 255, 262-266 (D.C. Cir. 2013) (holding that though the Nuclear Regulatory Commission was required to follow the Nuclear Waste Policy Act and issue a decision on a license application within a discrete three-year time frame, the Executive otherwise has discretion under Article II of the U.S. Constitution not to enforce a law against a specific private party); *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 976 (9th Cir. 2017) ("The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws ...." (quoting *Community for*

27

*Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986))).  As discussed, Congress expressly entrusted the implementation of Section 1307 to CBP, and IRAdvocates's request to compel agency action and for declaratory relief would thus unduly interfere with the agency's enforcement discretion.  *See Texas*, 599 U.S. at 678-79.

Although IRAdvocates may believe that CBP's investigation is taking longer than it would like, IRAdvocates is not privy to many aspects of that investigation.  In any event, Section 1307 does not confer on IRAdvocates the right to constrain the agency's investigative discretion or to require the agency to prematurely conclude its investigation by IRAdvocates's preferred deadline.  *Hells Canyon Preservation*, 593 F.3d at 932 (Section 706(1) "serves important interests, but does not give us license to 'compel agency action' whenever the agency is withholding or delaying an action we think it should take."); *Zixiang Li v. Kerry*, 710 F.3d 995, 1004 (9th Cir. 2013) ("We have no authority to compel agency action merely because the agency is not doing something we may think it should do.").

Further, by seeking a declaration from the Court that CBP has sufficient information and basis to take some sort of action on its allegations, IRAdvocates again invites the Court to interfere in CBP's discretionary law enforcement decisions, decisions which have long been presumed immune from judicial review.  *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (explaining that agencies are "far better equipped than the courts" at analyzing the many variables an agency faces when deciding whether or not to enforce a statute); *see also Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot.*, 550 F.3d 1121, 1128 (Fed. Cir. 2008) (stating that "an agency's decision not to undertake enforcement actions is 'presumptively unreviewable' under the APA").  Thus, in the absence of a legally required action or mandate as

to how the agency must carry out the purpose of the statute, this Court lacks the authority to provide the relief IRAdvocates seeks.

### B. There Is No Unreasonable Delay on the Part of the Agency

To allege that agency action has been unlawfully delayed, IRAdvocates must not only identify a legally required discrete action (which it has failed to do), but it also must "further demonstrate that the agency unreasonably delayed or unlawfully withheld processing its decision." *Asmai v. Johnson*, 182 F. Supp. 3d 1086, 1093 (E.D. Cal. 2016). Even if IRAdvocates could establish that CBP was legally required to take some action, IRAdvocates cannot demonstrate that any such action has been unreasonably delayed.

When considering agency delay, courts have been generally reluctant to compel agency action, and have reserved this extraordinary remedy for "exceptionally rare cases." *In re Barr Lab. Inc. v. Nat'l Ass'n of Pharmaceutical Manu.*, 930 F.2d 72, 76 (D.C. Cir. 1991). Courts widely follow the factors for determining unreasonable delay articulated by the D.C. Circuit in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*). There, the plaintiff sought to compel the Federal Communications Commission to issue decisions concerning overcharge claims. The *TRAC* Court observed that "[i]n the context of a claim of unreasonable delay, the first stage of judicial inquiry is to consider whether the agency's delay is so egregious as to warrant mandamus." *Id.* at 79. Mandamus is appropriate only where "a clear nondiscretionary duty" is at issue. *Pittston Coal Grp. v. Sebben,* 488 U.S. 105, 121 (1988) (quoting *Heckler v. Ringer*, 466 U.S. 602, 616 (1984)). To determine whether agency delay is egregious, the *TRAC* Court developed a six-part standard for evaluating whether a court should compel agency action:

> (1)   the time agencies take to make decisions must be governed by a rule of reason;

> (2)      where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for the rule of reason;
>
> (3)      delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4)      the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5)      the court should take into account the nature and extent of the interests prejudiced by delay; and
>
> (6)      the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (citations and quotations omitted). In *TRAC*, the agency had repeatedly failed to issue decisions by the agency's own self-imposed deadlines. *Id*. at 73-74. The *TRAC* Court, nonetheless, did not compel agency action.

Here, IRAdvocates alleges that "defendants have unreasonably delayed in acting on [plaintiff's] petition to prohibit the importation of cocoa produced wholly or in part with forced labor." Compl. at ¶ 123. The allegations claim wide-spread forced labor in the cocoa industry in Côte d'Ivoire warranting a country-wide prohibition on imports of cocoa or cocoa related products. CBP's investigation of these complex and wide-ranging allegations necessarily requires extensive time and resources, and cannot be said to be unreasonably delayed under any of the *TRAC* factors.

The first *TRAC* factor, which is that "the time agencies take to make decisions must be governed by a 'rule of reason,'" is considered to be the most important factor. *Martin v. O'Rourke*, 891 F.3d 1338, 1345 (Fed. Cir. 2018) (quoting *TRAC*, 750 F.2d at 80). The amount of time that has passed must be considered in context. *Motaghedi v. Pompeo*, 436 F. Supp. 3d

1345, 1359 (E.D. Cal. 2020) (reasonableness determination is fact-specific and the length of delay alone is not dispositive.)  Courts have found agency delays to be unreasonable when the delay spanned years, which is not the case here.  *See, e.g.*, *In re Core Commc'ns, Inc.*, 531 F.3d 849, 857 (D.C. Cir. 2008) (seven-year delay unreasonable); *In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (nine-year delay unreasonable); *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 814 (9th Cir. 2017) (eight-year year delay unreasonable).

IRAdvocates submitted an allegation to CBP on February 14, 2020 (Exh. A to Compl.), just before the COVID-19 pandemic at a time when it was a challenge to engage in any overseas investigation.  Following receipt of the allegation, CBP began investigating the information contained in the allegation.  Compl. at ¶ 106 ("CBP claimed to be investigating the facts[.]").  CBP met with the allegers, IRAdvocates and CAL, and sent questionnaires in March 2020 to several importers.  Compl. at ¶ 105; Exh. D.  CBP met with the allegers on March 23, 2021, September 10, 2021, and August 15, 2022.  Compl. at ¶¶ 106, 108, 110.  The allegers then submitted a supplemental allegation to CBP on June 25, 2021.  Compl. at ¶ 107; Exh. E.  As recently as February 13, 2023, IRAdvocates submitted yet another supplemental allegation to CBP providing "new and recently acquired information."  Compl. at ¶ 113; Exh. H.  CBP continues to evaluate that and other information pertinent to its investigation.

The facts alleged by the plaintiff are not sufficient to show that CBP has acted unreasonably.  As acknowledged by IRAdvocates, an allegation of country-wide forced labor requires extensive work, and considerable time and resources to investigate.   Exhs. A, E to Compl.  An investigation of cocoa plantations in the whole of Côte d'Ivoire and various supply chains to determine whether cocoa and cocoa products were made with cocoa harvested with forced child labor is highly fact-intensive and challenging.  It is often difficult to gain access to

cocoa farms to establish the use of forced labor.  Exh. A to Compl. at 14.  Additionally, CBP must trace the presence of forced labor to U.S. imports, which may include collection and review of confidential and law enforcement sensitive information.  Taking the unique factors involved in forced labor investigations into consideration, the allegations are insufficient to show that CBP has acted unreasonably from the time it received the allegers' initial allegation and two supplemental allegations, the most recent of which was submitted in February 2023.  The time that has passed is not unreasonable or egregious, much less so unreasonable or egregious that it warrants the extraordinary remedy of judicial intervention.

As for the second *TRAC* factor, as discussed above, neither Section 1307 nor its implementing regulations contain a mandatory timeframe for CBP to institute or conclude an investigation based on allegations asserted in communications submitted to the agency pursuant to section 12.42.

The third *TRAC* factor considers the nature of the interests alleged.  Delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake.  According to IRAdvocates, the interests alleged here involve the health and welfare of those in Côte d'Ivoire.  IRAdvocates incorrectly assumes that CBP's issuance of a WRO would impact the health and welfare of individuals in Côte d'Ivoire.  There is no obligation for affected companies to respond to a WRO, and therefore, no guarantee that a WRO would necessarily address human health and welfare interests in Côte d'Ivoire.

Moreover, as the Federal Circuit has recognized, while forced labor raises "moral and ethical" concerns, *McKinney*, 799 at 1553, Section 1307 is also concerned about protecting U.S. domestic producers and workers from unfair economic competition caused by imported goods produced with forced labor.  *McKinney*, 799 F.2d at 1552.  The type of action IRAdvocates

seeks, *i.e.*, a country-wide WRO for all imports of cocoa and cocoa products from Côte d'Ivoire, could adversely impact the U.S. economy by curtailing imports that in turn could affect U.S. businesses and jobs. Accordingly, the varied interests at issue, and how they may interrelate, weigh against the Court interfering with the agency's investigation of IRAdvocates's allegation.

The fourth *TRAC* factor requires the Court to consider the effect of expediting delayed action on agency activities of a higher or competing priority. The circumstances here do not provide a basis for reordering agency priorities. "The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *In re Barr Labs, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). Agencies should be given the latitude to determine their own agendas, especially when considering delicate issues. *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 946 (D.C. Cir. 1988). That the investigation and overall process may be taking more time or is more complex than IRAdvocates desires is not a basis to expedite an agency decision to the potential detriment of other agency priorities.

The fifth *TRAC* factor looks to the nature and extent of interests prejudiced by the delay, and thus focuses on issues similar to the third factor. As noted above, the interests at stake do not support judicial intervention here.

Finally, the sixth factor, which relates to the impropriety of the alleged delay, does not support the plaintiff's claim. While the factor makes clear that impropriety is not necessarily required to find unreasonable delay, it is noteworthy that there are no allegations of any impropriety here. Indeed, government officials are presumed to act in good faith in the execution of their duties, *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002), and here the agency's abiding concern is to conduct a thorough investigation

before acting on the allegations and instituting a potentially broad remedy such as a WRO. Accordingly, the *TRAC* factors collectively and individually establish that CBP has not unreasonably delayed its investigation of the plaintiff's allegations, which remains active and ongoing.

Because there is no discrete action that is legally required, or any undue delay, this Court should decline to compel any agency action or grant any declaratory relief, and dismiss this complaint for failure to state a claim upon which relief can be granted.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court dismiss this action for lack of

jurisdiction and failure to state a claim upon which relief can be granted.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ Marcella Powell
MARCELLA POWELL
Senior Trial Counsel

/s/ Christopher Berridge
CHRISTOPHER BERRIDGE
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-9253 or 9230

Date:  December 15, 2023            *Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

I, Aimee Lee, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the Defendants' motion to dismiss for lack of jurisdiction and failure to state a claim upon which relief can be granted and supporting memorandum, dated December 15, 2023, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 10,600 words.


/s/ Aimee Lee