IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
                                                  :
INTERNATIONAL RIGHTS ADVOCATES,                   :
                                                  :
                                                  :
                              Plaintiff,          :       Court No.  23-00165
                                                  :
              v.                                  :
                                                  :
                                                  :
                                                  :
                                                  :
ALEJANDRO MAYORKAS, Secretary                     :
U.S. Department of Homeland Security,             :
                                                  :
TROY A. MILLER, Acting Commissioner               :
U.S. Customs and Border Protection,               :
                                                  :
                              Defendants.          :
                                                  :
_____  :


**DEFENDANTS' REPLY MEMORANDUM TO PLAINTIFF'S OPPOSITION TO THE
MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A
CLAIM UPON WHICH RELIEF CAN BE GRANTED**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 2

I.  IRADVOCATES LACKS STANDING FOR ITS CLAIMS ............................................. 2

   A.  IRAdvocates Cannot Establish Constitutional Standing ................................. 3

     1.  IRAdvocates Cannot Demonstrate Injury-In-Fact Due To Perceptible Impairment To Its Mission and Activities ................................. 3

     2.  IRAdvocates Cannot Show A Diversion Of Resources Sufficient To Establish Injury-In-Fact ............................................................ 6

     3.  IRAdvocates Cannot Satisfy the Traceability and Redressability Requirement ........ 11

   B.  IRAdvocates Does Not Fall Within The Zone Of Interests Of Section 1307 ................. 11

III. THE COURT CANNOT COMPEL DISCRETIONARY LAW ENFORCEMENT ACTION UNDER SECTION 1307 ...................................................... 15

IV. THE *TRAC* FACTORS SUPPORT THAT ANY ACTION TAKEN BY CBP HAS NOT BEEN UNREASONABLY DELAYED ................................................. 20

V.  CONCLUSION ............................................................................................ 24

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006)...................................................................4, 5, 6

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986) ..........................................................................4

*American Anti-Vivisection Society v. U.S. Dep't of Agriculture*,
    946 F.3d 615 (D.C. Cir. 2020) ........................................................................10

*Am-Pro Protective Agency, Inc. v. United States*,
    281 F.3d 1234 (Fed. Cir. 2002) ......................................................................23

*Blankenship v. Secretary of HEW*,
    587 F.2d 329 (6th Cir. 1978) ..........................................................................21

*Center for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009)........................................................................11

*Center for Law and Education v. Dep't of Education*,
    396 F3d 1152 (D.C. Cir. 2005)........................................................................10

*Chesapeake Climate Action Network v. Export-Import Bank of the United States*,
    78 F. Supp. 3d 208 (D.D.C. 2015)....................................................................5

*Citizens for Responsibility and Ethics in Washington v. U.S. Office of Special Counsel*,
    480 F. Supp. 3d 118 (D.D.C. 2020)..................................................................5

*Federal Defenders of New York, Inc. v. Federal Bureau of Prisons*,
    954 F.3d 118 (2d Cir. 2020)............................................................................12

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015)..........................................................................4

*Friends of Animals v. Bernhardt*,
    961 F.3d 1197 (D.C. Cir. 2020) ........................................................................3

*Gonzalez v. Cuccinelli*,
    985 F.3d 357 (4th Cir. 2021) ..........................................................................20

*Havens Realty Corp. v. Coleman*,
    455, U.S. 363, 379 (1982) ....................................................................4, 7, 10

*Hazardous Waste Treatment Council v. Thomas*,
  885 F.2d 918 (D.C. Cir. 1989) ................................................................. 12

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................. 15, 19

*Lexmark, Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ................................................................. 11, 12

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ................................................................. 18

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................. 11

*Martin v. O'Rourke*,
  891 F.3d 1338 (Fed. Cir. 2018) ................................................................. 22

*McKinney v. U.S. Dep't of Treasury*,
  799 F.2d 1544 (Fed. Cir. 1986) ................................................................. 14

*Meenaxi Enterprise, Inc. v. Coca-Cola, Co.*,
  38 F.4th 1067 (Fed. Cir. 2024) ................................................................. 13

*Military-Veterans Advoc. v. Secretary of Veterans Affairs*,
  7 F.4th 1110 (Fed. Cir. 2021) ................................................................. 6

*N.A.A.C.P. v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010) ................................................................. 9, 10

*Nat'l Association of Home Builders v. Environmental Protection Agency*,
  667 F.3d 6 (D.C. Cir. 2011) ................................................................. 7

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ................................................................. 4, 8

*Nat'l Treasury Employees Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ................................................................. 3, 4

*Nat'l Veterans Legal Services Program v. United States Dep't of Defense*,
  2016 WL 4435175 (D.D.C. Aug. 19, 2016) ................................................................. 4

*Natural Resources Defense Council, Inc. v. Ross*,
  331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ................................................................. 19, 20

*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004) ..................................................................................... 15, 18

*PETA v. USDA*,
   797 F.3d 1087 (D.C. Cir. 2015) ................................................................................. 4

*Public Citizen Health Research Group v. Auchter*,
   702 F.2d 1150 (D.C. Cir. 1983) ............................................................................... 22

*Telecommunications Research and Action Center v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) .................................................................. 20, 21, 22, 23

*Turlock Irrigation District v. FERC*,
   786 F.3d 18 (D.C. Cir. 2015) ..................................................................................... 7

*Twin Rivers Paper Co. LLC v. Securities & Exchange Commission*,
   934 F.3d 607 (D.C. Cir. 2019) ........................................................................... 12, 13

*United States v. Texas*,
   599 U.S. 670 (2023) ........................................................................................ 18, 19, 20

**Statutes**

16 U.S.C. § 1371(a)(2) ....................................................................................................... 19

19 U.S.C. § 706(1) ...................................................................................................... 15, 19

19 U.S.C. § 1307 .................................................................................................... *passim*

Trade Facilitation and Trade Enforcement Act (TFTEA),
P.L. 114-125, Feb. 24, 2016; 130 Stat. 122, 239 .................................................... 13

**Regulations**

19 C.F.R. § 12.42(d) ...................................................................................................... 8, 16

19 C.F.R. § 12.42(e) ......................................................................................................... 16

**Other Authorities**

*Withhold Release Orders and Findings List*
   https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings
   (last accessed May 3, 2024) ..................................................................................... 17

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE CLAIRE R. KELLY, JUDGE

---

|  |  |  |
|---|---|---|
| INTERNATIONAL RIGHTS ADVOCATES, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Court No.  23-00165 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ALEJANDRO MAYORKAS, Secretary | : | |
| U.S. Department of Homeland Security, | : | |
| | : | |
| TROY A. MILLER, Acting Commissioner | : | |
| U.S. Customs and Border Protection, | : | |
| | : | |
| Defendants. | : | |

---

**DEFENDANTS' REPLY MEMORANDUM TO PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

Defendants Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security (DHS), and Troy A. Miller, Acting Commissioner, U.S. Customs and Border Protection (CBP), respectfully submit this reply to plaintiff International Rights Advocates's (IRAdvocates) opposition to defendants' motion for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.

## **INTRODUCTION**

CBP plays a pivotal role in preventing goods manufactured with forced labor from entering the United States.  CBP is the entity charged with investigating allegations that a particular good was produced by forced labor, and 19 U.S.C. § 1307 vests CBP with the authority to carry out this difficult but important task.  To ensure that it effectively discharges its

duties, including the appropriate collection and evaluation of evidence, CBP has broad discretion to determine how to conduct investigations of alleged forced labor practices. Such concerns are at their zenith in a case like this, where CBP is presently investigating forced child labor in the production of cocoa throughout Côte d'Ivoire to determine whether cocoa from this country should be withheld from entry into the United States. Large-scale investigations take significant time and resources, and require balancing CBP's many other enforcement priorities.

In light of these important considerations, IRAdvocates's attempt to compel CBP to make an accelerated decision about whether to issue a withhold release order (WRO) should be rejected. As a threshold matter, IRAdvocates lacks standing to force such a decision. IRAdvocates cannot identify any impairment of its day-to-day activities or any costs that it incurred beyond the normal operating costs of its core advocacy mission, and thus it has failed to demonstrate an actionable injury. Further, IRAdvocates's claim fails on the merits because it cannot demonstrate any specific agency action that CBP was required, but failed to undertake. IRAdvocates has no authority to challenge CBP's inherent discretion to determine the timing, pace, and contours of an investigation into forced labor practices. Finally, given the active and ongoing nature of CBP's investigation, there is no basis for IRAdvocates's contention that CBP's investigation has been unduly delayed, particularly given the scope of its investigation and the significant consequences of the contemplated remedies. These points, which are discussed in our opening brief and further addressed below, compel dismissal of this action.

## ARGUMENT

## II.    IRADVOCATES LACKS STANDING FOR ITS CLAIMS

As we demonstrated in our motion, IRAdvocates cannot establish either the constitutional or the statutory standing necessary to maintain its action. IRAdvocates lacks an injury-in-fact to

the organization caused by any agency action that is redressable by the Court, and its interests do not fall within the zone of interests that Section 1307 was intended to protect. IRAdvocates's attempts to refute these fundamental standing requirements are unavailing.

A.    **IRAdvocates Cannot Establish Constitutional Standing**

1.    **IRAdvocates Cannot Demonstrate Injury-In-Fact Due To Perceptible Impairment To Its Mission and Activities**

IRAdvocates argues that it has suffered an injury-in-fact, and thus has constitutional standing, because CBP's inaction has perceptibly impaired its mission and its operations. To meet this standard, IRAdvocates must demonstrate that it has suffered an injury beyond mere harm to the interests for which it advocates. *See Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1208 (D.C. Cir. 2020) ("[H]arms to an organization's interests in litigation, lobbying, or pure issue advocacy do not qualify" for organizational standing.). IRAdvocates has failed to make any such showing.

IRAdvocates claims it has shown the requisite degree of injury because CBP's conduct directly conflicts with its mission and has impaired its activities. Pl. Br. at 10-11. IRAdvocates is incorrect on both accounts. First, there is no direct conflict between CBP's actions and IRAdvocates's mission of putting an "end to forced labor" and its activities. Pl. Br. at 11. CBP, as the agency charged with preventing the importation of goods produced with forced labor, is investigating whether goods made with forced child labor in Côte d'Ivoire are being imported into the United States. Thus, CBP and IRAdvocates are not at "loggerheads." *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996). That CBP's complex investigation may be taking longer than IRAdvocates would like does not, contrary to IRAdvocates's claim, "directly conflict[] with IRAdvocates' mission of putting an end to forced labor …". Pl. Br. at 11. Indeed, CBP's investigation may result in the very action that

IRAdvocates seeks. IRAdvocates's claim of standing therefore fails because "the presence of a direct conflict between the defendant's conduct and the organization's mission is necessary—though not alone sufficient—to establish standing." *Nat'l Treasury*, 101 F.3d at 1430 (emphasis removed).

Second, even where an organization can show that a defendant's conduct directly conflicts with the organization's mission, the organization must also demonstrate that the "defendant's conduct has made the organization's activities more difficult." *Id.* (emphasis removed). For organizational standing, the plaintiff must show that its services have been "perceptibly impaired," constituting "far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The "[f]rustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Nat'l Treasury*, 101 F.3d at 1429 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). Rather, the alleged impediment must frustrate the organization's day-to-day activities. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.'") (quoting *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (quoting *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986))). To make this showing, the organization must plead specific facts as to how a defendant's action impaired its activities. *Nat'l Veterans Legal Services Program v. United States Dep't of Defense*, 2016 WL 4435175, at *6 (D.D.C. Aug. 19, 2016) ("[O]rganizational plaintiffs cannot satisfy this threshold requirement without alleging specific facts indicating how a defendant's actions undermine the organization's ability to perform its fundamental programmatic

services.").  Thus, the Court's task is to distinguish between "'organizations that allege that their activities have been impeded' — which suffices for standing purposes — 'from those that merely allege that their mission has been compromised' — which does not." *Citizens for Responsibility and Ethics in Washington v. U.S. Office of Special Counsel*, 480 F. Supp. 3d 118, 127–28 (D.D.C. 2020) (quoting *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006)).

Here, IRAdvocates has failed to allege a sufficiently concrete impairment of its services to establish organizational standing.  IRAdvocates generally alleges that its activities have been affected, (Pl. Br. at 10-12), but fails to identify a single operation or service that has been inhibited or disrupted by CBP's alleged inaction.  *See Chesapeake Climate Action Network v. Export-Import Bank of the United States*, 78 F. Supp. 3d 208, 231 (D.D.C. 2015) (plaintiff did not have standing where it did not "identify a single organizational activity or service" that the defendant's actions had impeded).  Indeed, IRAdvocates does not deny that it remains fully able to discharge its mission by engaging in advocacy and by pursuing "legal efforts in multiple forums that are intended to result in direct enforcement actions."[1]  Pl. Br. at 12.  IRAdvocates also remains fully able to communicate to CBP its belief that goods made with forced labor, including cocoa, are being or likely to be imported into the United States and should be prohibited.  There is thus no merit to IRAdvocates's claim that CBP's alleged inaction has

---

[1] For example, IRAdvocates recently filed suit against cocoa manufacturers (some of which are discussed throughout the complaint in this case) for alleged violations of District of Columbia consumer protection laws stemming from cocoa allegedly harvested with forced labor in countries like Côte d'Ivoire.  *See International Rights Advocates v. Mars, Inc. et al.*, No. 23-CAB-7264 (D.C. Superior Court filed Feb. 16, 2024); case removed to District Court as *International Rights Advocates v. Mars, Inc. et al.*, No. 24-cv-894 (D.D.C. filed Mar. 28, 2024).

"eviscerate[d] the legal mechanism" for combatting forced labor at the border and rendered the organization's activities "futile." *Id.* at 11.

IRAdvocates's attempt to equate its position to that of the plaintiff in *Abigail Alliance* is misplaced. *Id.* at 11. The injury alleged in *Abigail Alliance* was that the agency's regulations placed restrictions on access to potentially life-saving drugs that frustrated the organization's mission and diverted time and resources from its activities of assisting its members in gaining access to those drugs. 469 F.3d at 132-33. Here, CBP's alleged inaction is not frustrating IRAdvocates's mission or impeding any of its daily activities.

Rather, IRAdvocates's position is much more akin to that of the plaintiffs in *Military-Veterans Advocates v. Secretary of Veterans Affairs*, 7 F.4th 1110, 1129 (Fed. Cir. 2021), where several organizations challenged regulations enacted to reform the veterans appeal process, and the Federal Circuit held that the organizations could not show injury to their mission of providing services because the regulations did not "directly foreclose" veterans from obtaining benefits. *Id.* at 1129-30. The court explained that the regulations did not "impair or unwind the Organizations' efforts in counseling and representing veterans in the benefits process (or otherwise block the Organizations' efforts to carry out their missions)." *Id.* at 1130. The same is true here. CBP's ongoing investigation does not impair, unwind, or otherwise foreclose IRAdvocates from continuing its organizational activities in furtherance of its stated mission to promote, advocate for, and bring legal actions involving labor rights. Pl. Br. at 10.

## 2.    IRAdvocates Cannot Show A Diversion Of Resources Sufficient To Establish Injury-In-Fact

To establish an injury-in-fact, IRAdvocates must not only show that it has suffered a perceptible impairment of its services, but also show that the alleged injury resulted in a consequent drain on the organization's resources. *Military-Veterans*, 7 F.4th at 1129 (quoting

*Havens Realty Corp.*, 455 U.S. at 379).  IRAdvocates has once again failed to make the required showing.

IRAdvocates concedes that expenditure of resources for litigation, investigation in anticipation of litigation, or advocacy is not a cognizable Article III injury, but contends that it has suffered expenditures for other purposes.  Pl. Br. at 15.  Specifically, IRAdvocates claims that after it had submitted its allegation to CBP, it was required to dedicate resources to "convince CBP to take enforcement action."  *Id*. at 13.  As examples of such efforts, IRAdvocates points to three meetings with CBP (on March 23, 2021, September 10, 2021, and August 15, 2022), trips to Western Africa to collect additional evidence (in August, November, and December 2020), and the preparation of supplemental materials and collaboration with civil society organizations.  *Id*. at 13-14.

The examples provided by IRAdvocates do not suffice to demonstrate the type of drain on its resources sufficient to demonstrate an actionable injury.  IRAdvocates's continued engagement with, or additional actions in further support of, an administrative process that it voluntarily initiated constitute the very type of advocacy or actions in anticipation of litigation that are not cognizable under Article III.  *Turlock Irrigation District v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (advocacy expenditures are not injury when "advocacy takes place through litigation or administrative proceedings."); *see also Nat'l Association of Home Builders v. Environmental Protection Agency*, 667 F.3d 6, 12 (D.C. Cir. 2011) (rejecting the organization's argument that it had standing because "it ha[d] spent considerable staff time and monetary resources," such as "submitting comments to the [Environmental Protection Agency]," which were not costs beyond those normally expended to carry out its advocacy mission (internal quotation marks omitted)).  Were the law otherwise, a plaintiff could "'manufacture the injury

necessary to maintain a suit'" simply by incurring "operational costs . . . normally expended to review, challenge, and educate the public" about government action. *Nat'l Taxpayers Union*, 68 F.3d at 1434.

The meetings with CBP, for example, were in direct support of its request that CBP investigate its allegations. Upon receiving IRAdvocates's allegations, CBP proceeded to open an investigation. 19 C.F.R. § 12.42(d). It is a usual part of any such investigation for CBP to meet with the alleger to allow CBP to probe those allegations and for the alleger to have an additional opportunity to explain and supplement them. Accordingly, IRAdvocates's preparation for and attendance at meetings to further support its allegations and encourage CBP to take action are properly viewed as part of its normal advocacy mission – which by IRAdvocates's own account "encompasses legal efforts in multiple forums that are intended to result in direct enforcement actions." Pl. Br. at 12.

The trips to Western Africa in 2020 to collect additional evidence to support its then recently filed submission also cannot be said to constitute a unique injury outside the scope of IRAdvocates's normal operations. Rather, IRAdvocates's decision to undertake further investigative efforts to bolster its allegations were in-line with its overall mission to conduct research to advocate and promote labor rights internationally and encourage legal action. Pl. Br. at 10. While IRAdvocates's unilateral decision to provide supplemental information during CBP's investigation is appreciated, it was not required by the statute or the regulations, nor given the timing – the trips occurred mere months after IRAdvocates submitted its original allegation – can it be said to have been the result of any alleged delay by CBP. Pl. Br. at 14.

Similarly, IRAdvocates's organization of a February 2022 letter "joined by many important civil society stakeholders," and time spent interacting with "36 major civil society

organizations that signed the letter," (Pl. Br. at 14), does not amount to a diversion of resources beyond its normal operations. Embedded in IRAdvocates's mission is to "collaborat[e] with labor, government and business groups" to advocate for working people around the world. Pl. Br. at 10. The organization of this letter appears to be exactly that.

IRAdvocates also contends that its claimed expenditures were required to counteract defendant's failure to act. Pl. Br. at 15-16. But as explained above, the nature and timing of the meetings, trips, and letter it relies upon as the basis for its injury indicate that these actions were simply the by-product of IRAdvocates's discretionary choice to continue to pursue its stated mission.

"Not every diversion of resources to counteract the defendant's conduct [] establishes an injury in fact." *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). In *Kyle*, for example, the Home Builders Association of Greater Austin, an advocacy organization promoting the building of affordable housing, challenged zoning and subdivision ordinances that it alleged impaired its mission. The organization pointed to a $15,000 study that it conducted, alleged that it spent significant time challenging the ordinances that could have been spent on other matters, held a meeting, corresponded with the city and others in six emails and one fax, drafted a two-page speech, and obtained minutes of a planning and zoning meeting. *Id*. However, the organization could not show how these efforts differed from its routine lobbying activities and did not identify any specific project that it had to put on hold or otherwise curtail as a result of its efforts to combat the housing ordinances. *Id*. Plaintiffs only speculated that the resources spent on the ordinances could have been spent on other unspecified activities. *Id*. at 239. Under these circumstances, the court concluded that "[p]laintiffs have not demonstrated that the diversion of

resources here concretely and 'perceptibly impaired' the [organization's] ability to carry out its purpose." *Id*.

Although IRAdvocates likens its situation to that in *American Anti-Vivisection Society v. U.S. Dep't of Agriculture*, 946 F.3d 615 (D.C. Cir. 2020) the situation there was inapposite. In *American Anti-Vivisection*, USDA failed to enact regulations for 18 years. As a result, the Coalition had to set guidance on "handling and restraint, feeding, housing, and stress minimization" for captive birds that federal standards would have provided. *Id*. at 619. These expenses were incurred as a result of the lack of regulations and were not part of the organization's normal annual expenditures. *Id*. IRAdvocates is not asserting that it must impose its own guidelines or otherwise take action that differs from its normal advocacy operations to fill a void; instead, it engaged in various actions intended to encourage CBP to take action, which is a core part of IRAdvocates's mission.

In short, to the extent that IRAdvocates directed resources to the CBP proceeding, these expenditures were no different from its normal advocacy operations. *Center for Law & Education v. Dep't of Education*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) ("Here, the only 'service' impaired is pure issue-advocacy—the very type of activity distinguished by *Havens*."). Moreover, IRAdvocates cannot point to any projects or activities that were otherwise forfeited or curtailed as a result of its alleged expenditures. If the types of activities that IRAdvocates relies upon to assert an injury-in-fact are sufficient – activities that are intrinsic to its normal operations – then IRAdvocates would effectively be able to claim standing any time its advocacy efforts failed to achieve a desired enforcement outcome. The test for standing requires more.

### 3. IRAdvocates Cannot Satisfy the Traceability and Redressability Requirements

Finally, IRAdvocates cannot meet the necessary traceability and redressability requirements for constitutional standing. To be fairly traceable, there must be a causal connection between the assertedly unlawful conduct and the alleged injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The more attenuated or indirect the chain of causation between the challenged acts of the defendant and the plaintiff's injury, the less likely there is a causal link sufficient for standing. *Center for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009). As discussed above, the nature and timing of the particular activities that IRAdvocates claims as injury demonstrate that they were consistent with and in furtherance of the organization's advocacy mission and purpose, and not caused by CBP's alleged delay that IRAdvocates now claims in this case.

IRAdvocates also has failed to show that a favorable decision by the Court would redress its alleged injury. IRAdvocates contends that it had to expend resources in response to the agency's refusal to accelerate the completion of its investigation and issue a WRO. Compl. at ¶¶ 114, 119; Pl. Br. at 13. But just because IRAdvocates believes the outcome of CBP's investigation should be the issuance of a WRO does not guarantee such a result. CBP has a duty to evaluate all the facts to decide the best course of action. Accordingly, even an order from the Court requiring CBP to act will not necessarily result in the outcome for which IRAdvocates contends it made the expenditures at issue.

### B. IRAdvocates Does Not Fall Within The Zone Of Interests Of Section 1307

IRAdvocates also fails to establish the requisite statutory standing because statutory causes of action "extend only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.

118, 127 (2014) (cleaned up).  IRAdvocates asserts that its interests fall within the zone of

interests protected and regulated by Section 1307, (Pl. Br. at 19), but it misconstrues the

applicable zone-of-interests analysis.

Determining whether a plaintiff comes within the zone of interests "is an issue that

requires [the court] to determine whether a legislatively conferred cause of action encompasses a

particular plaintiff's claim," and "asks whether this particular class of persons ha[s] a right to sue

under this substantive statute" using "traditional principles of statutory interpretation."  *Lexmark,*

572 U.S. at 127-28 (citations and quotations omitted).  "The relevant zone of interests for an APA

claim is 'defined by the statute that plaintiff says was violated,' rather than the APA itself."

*Federal Defenders of New York, Inc. v. Federal Bureau of Prisons*, 954 F.3d 118, 128 (2d Cir.

2020).

IRAdvocates agrees that the "zone of interests" test is applicable here and that Section

1307 is the underpinning of that analysis.  However, IRAdvocates argues that this Court should

adopt the D.C. Circuit's "suitable challenger" approach to the zone of interests test.  The

"suitable challenger" approach creates an alternative route to standing for parties whose interests

Congress did not intend to benefit, *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918,

923 (D.C. Cir. 1989), by "focus[ing] not just on who or what Congress intended to protect, but

also on those who, in practice, can be expected to police the interests that the statute

protects."  Pl. Br. at 19.  The D.C. Circuit has explained its approach to statutory standing as

follows:

> Protected interests are ones asserted either by "intended
> beneficiaries" of the statute at issue or by other "suitable
> challengers"—i.e., parties whose interests coincide "systemically,
> not fortuitously" with those of intended beneficiaries [citation
> omitted].  These rules are designed to prevent litigation by parties

> "whose suits are more likely to frustrate than to further statutory
> objectives" [citation omitted].

*Twin Rivers Paper Co. LLC v. Securities & Exchange Commission*, 934 F.3d 607, 616 (D.C. Cir.

2019).  The Federal Circuit, however, has not adopted the D.C. Circuit's approach, and

IRAdvocates's reliance on the "suitable challenger" doctrine is misplaced.  *See, e.g.*, *Meenaxi*

*Enterprise, Inc. v. Coca-Cola, Co.*, 38 F.4th 1067, 1072 (Fed. Cir. 2024) (adhering to the

*Lexmark* zone of interest standard).  The D.C. Circuit's "suitable challenger" doctrine would

improperly expand the zone of interests of Section 1307 to categories of plaintiffs who were not

contemplated when Congress enacted the statute.

Moreover, even if one were to apply the "suitable challenger" approach, it does not

provide a basis for finding that IRAdvocates is within the zone of interests protected by Section

1307.  IRAdvocates argues that its interests are congruent with the interests of the consuming

public, and that Section 1307 was intended broadly to protect the interests of consumers.  Pl. Br.

at 23.  In particular, IRAdvocates argues that by eliminating the "consumptive demand"

exception from Section 1307, the Trade Facilitation and Trade Enforcement Act (TFTEA), P.L.

114-125, Feb. 24, 2016; 130 Stat. 122, 239, changed the purpose of the statute from protecting

domestic producers and workers from unfair competition to protecting consumers from goods

made with forced labor.  Pl. Br. at 22.  And because in its view Section 1307 now "affords the

consuming public a legal right or interest in preventing the importation of foreign goods

produced by forced labor," (*id.* at 23), IRAdvocates contends that its role as an advocate against

forced labor makes it a suitable challenger to ensure proper enforcement of Section 1307.

While CBP hopes that its enforcement of Section 1307 will have a positive impact on

combatting the use of forced labor worldwide, IRAdvocates misreads Section 1307's history and

focus.   The Federal Circuit has explained that Congress enacted Section 1307 "to protect

13

domestic producers, production, and workers from the unfair competition which would result from the importation of foreign products produced by forced labor." *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1552 (Fed. Cir. 1986). As IRAdvocates acknowledges, the TFTEA removed the exception to the prohibition on importing goods produced with forced labor where such a ban would result in insufficient quantities of the goods to meet consumer demand. Contrary to IRAdvocates's claim, however, the effect of this change was not to eliminate the statute's concern for protecting domestic producers and workers, but rather to expand that concern. In other words, by removing the consumer demand exception, the TFTEA ensured that consumer demand could never override the protections provided by Section 1307 to domestic producers and workers – and that those concerns would remain paramount for all categories of goods.

This analysis is supported by the Federal Circuit's reasoning in *McKinney.* IRAdvocates erroneously suggests that the Federal Circuit's conclusion in *McKinney* that Section 1307 was designed to protect the economic livelihood of domestic producers and workers, rather than the non-economic injury of consumers, was based solely on the existence of the consumer demand exception. Pl. Br. at 21. As noted, however, the TFTEA's removal of that section does not support IRAdvocates's contention that Congress intended to change the focus of the statute. Moreover, IRAdvocates overlooks that the Federal Circuit's view of the purpose of Section 1307 was also influenced by its concern that the non-economic interests of consumers in avoiding purchasing goods produced with forced labor amounted to "a generalized grievance." *McKinney*, 799 F.2d at 1553. Indeed, the court explained that "[t]he moral and ethical interest in avoiding the purchase of or boycotting foreign goods produced by forced labor is shared by most, if not all of the domestic populace." *Id.* The Federal Circuit thus clearly recognized that

this type of "wide public concern," no matter how well-meaning, cannot serve as a predicate for standing. *Id.* As noted, nothing in the TFTEA indicates Congress' intent to alter the purpose of Section 1307, much less to open the door to every member of the public to challenge CBP's discharge of its duties under the statute.

## II.    THE COURT CANNOT COMPEL DISCRETIONARY LAW ENFORCEMENT ACTION UNDER SECTION 1307

Even if IRAdvocates had standing to pursue its claims, the Court should find that IRAdvocates's allegations fail to state a claim. Those allegations are based on an incorrect premise: that CBP is required to take a particular action, specifically issue a WRO, under Section 1307.

IRAdvocates correctly acknowledges that only a discrete action that the agency is required to take can be compelled under Section 706(1). Pl. Br. at 25 (quoting *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63-64 (2004)). Here, the discrete action to which IRAdvocates believes it is entitled is "an investigation that properly considers the evidence of forced child labor violations in the Ivorian cocoa industry, a finding made on the basis of this evidence, and the issuance of a WRO." Pl. Br. at 25; Compl. at ¶ 134. These actions, however, are committed to CBP's discretion and cannot lawfully be compelled. *See Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985) (holding that an agency's decision not to take enforcement action is presumptively unreviewable under the APA where Congress did not give enforcement guidelines in the substantive statute and instead gave the agency discretion to determine how to enforce).

Section 1307 prohibits the importation of goods when CBP determines that "goods are produced or manufactured wholly or in part with forced labor." It is that determination that is squarely within CBP's discretion. In an attempt to bypass CBP's discretion, IRAdvocates points to

15

the word "shall" in 19 U.S.C. § 1307 as mandating action.  Pl. Br. at 1-2, 4, 27-28, 30, 38.  While the "shall" language in Section 1307 instructs CBP to deny entry to goods made with forced labor, the statute does not tell CBP *whether* or *how* to determine that goods are made with forced labor at points throughout the supply chain, whether those goods are indeed bound for the United States, or the mechanisms by which CBP should deny entry once it makes a determination.

Nor does IRAdvocates point to anything in the regulations that require CBP to take the actions demanded by IRAdvocates.  IRAdvocates misconstrues both the regulations and the facts before the Court by claiming that CBP "fail[ed] to act" on IRAdvocates's submission and was therefore unreasonable.  Pl. Br. at 24.  IRAdvocates conflates CBP's obligation under the regulations to conduct an investigation with its discretion to decide what action to take in response to such an investigation.  Under the regulations, CBP, in response to a conforming submission, is to "cause an investigation" into the facts alleged.  19 C.F.R. § 12.42(d).  By IRAdvocates's own admission, CBP initiated an investigation into potential forced labor in Ivorian cocoa bound for the United States after it received the allegation from IRAdvocates.  Compl. at ¶¶ 105, 106.  Once it initiates an investigation, however, CBP then has the discretion to "find[] at any time that information available reasonably but not conclusively indicates that merchandise within the purview of [Section 1307] is being, or is likely to be, imported" into the United States, and thereafter issue a WRO if warranted.  19 C.F.R. § 12.42(e).  IRAdvocates notes that 19 C.F.R. § 12.42(e) contains certain mandatory language that states that CBP "will promptly advise" port directors of any goods falling within the scope of Section 1307 and that port directors "shall thereupon withhold release" of any such merchandise.  But IRAdvocates ignores that this language is conditional and only becomes operative if, as noted above, CBP in its discretion first finds that merchandise within the scope of Section 1307 is being imported.  *See* 19 C.F.R. § 12.42(e).  Put

simply, after initiating an investigation, CBP is not legally obligated to conduct its investigation in a particular manner or at a particular pace in response to a submission from an alleger like IRAdvocates.

IRAdvocates asserts that CBP's view of the breadth of its enforcement discretion would "effectively repeal" Section 1307, thereby rendering it "utterly meaningless" and a "dead letter." Pl. Br. at 27, 32. But this hyperbolic criticism ignores that CBP regularly and resolutely enforces Section 1307. CBP's commitment to enforcing Section 1307 is evidenced by, for example, the *nine* separate WROs issued against various Chinese manufacturers using prison or forced labor from Xinjiang since 2019.[2] CBP also issued a WRO against the largest sugar producer in the Dominican Republic in 2022.[3] And CBP issued two separate WROs against Malaysian glove manufacturers in 2021; a WRO against a large palm oil producer in Malaysia in 2020; a WRO against a tomato producer in Mexico in 2020; a WRO against a Chinese garments producer using prison labor in 2020; and WROs against five separate fishing vessels in 2020 and 2021.[4] The issuance of these WROs alone, without even accounting for the additional investigations CBP has undertaken, demonstrates that CBP has not winnowed Section 1307 into the equivalent of a "toothless suggestion." *See* Pl. Br. at 29.

At base, IRAdvocates simply disagrees with the manner in which CBP is conducting the investigation of IRAdvocates's particular allegations. Pl. Br. at 24. But this is not a ground to compel discretionary agency action. By asking this Court to conclude CBP's investigation, IRAdvocates envisions a regime where the Court is involved in CBP's investigatory process: if

---

[2] A list of the WROs issued by CBP can be found at: https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings (last accessed May 3, 2024). Note that enforcement of the nine Xinjiang WROs has been superseded by the UFLPA.

[3] *Id.*

[4] *Id.*

an alleger like IRAdvocates does not approve of how CBP investigates and develops a case, it can simply seek to substitute the Court's judgment for CBP's, bypassing the agency. The Supreme Court in *Norton* rejected this exact scenario, recognizing that "it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into the day-to-day agency management." *Norton*, 542 U.S. at 66-67. IRAdvocates imagines setting up a structure of "pervasive oversight by federal courts," that is not contemplated by the APA, one where the Court would be stepping into CBP's shoes to direct law enforcement action anytime IRAdvocates or another plaintiff felt the action was insufficient. *Id.* This is not the role of the Court, nor should it be.

Consistent with its rulings in *Chaney* and *Norton*, the Supreme Court has recently decided that a statutory mandate alone does not justify compelling agencies to take law enforcement action. In *United States v. Texas*, 599 U.S. 670 (2023), two states sued DHS because it issued guidelines that prioritized the arrest and removal of certain types of noncitizens, and, according to the suing states, the Federal statutes mandated the arrest of more noncitizens. *Id.* at 673-74. The states argued that the statutes contained mandatory "shall" language with respect to making arrests of noncitizens and that DHS was accordingly not in compliance. The Court disagreed, explaining that "in both Article III cases and Administrative Procedure Act cases, this Court has consistently recognized that federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions." *Id.* at 680 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). The Court went on to state that "[i]f the Court green-lighted this suit, we could anticipate complaints in future years about alleged Executive Branch under-enforcement of any similarly worded laws—whether they be drug laws, gun laws, obstruction of justice laws, or the like." *Id.* at 681.

IRAdvocates's complaint is the very sort of complaint anticipated by the Supreme Court in *Texas*: one which alleges that CBP is "under-enforc[ing]" a mandatory statute because it has not issued a WRO. *Id.*; Pl. Br. at 26-27.  Indeed, IRAdvocates's position is even more concerning, because it alleges not just under-enforcement, but also challenges the timing of, and directs the outcome of, a preceding investigation necessary for the enforcement of the statutory mandate. This Court should likewise be skeptical of going "down [an] uncharted path" of permitting suits to compel discretionary law enforcement action under Section 706(1) of the APA.  *Texas*, 599 U.S. at 681.

In support of its attempt to distinguish the Supreme Court's repeated admonitions against judicial branch oversight of discretionary law enforcement functions, IRAdvocates points to *Natural Resources Defense Council, Inc. v. Ross*, 331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018). But as we explained in our motion, *NRDC* is dissimilar from the case before the Court. IRAdvocates claims that it raises the same issue as the plaintiffs in *NRDC*, in that the Government has not effectuated an import ban despite a statutory mandate.  *NRDC*, 331 F. Supp. 3d at 1351; Pl. Br. at 29-30.  However, the statute at issue in *NRDC*, 16 U.S.C. § 1371(a)(2), contains sixteen paragraphs with a precise dichotomy tree, meticulously detailing how to enact the ban at issue and the statute by its terms provided for the immediacy of action.  *NRDC*, 331 F. Supp. 3d at 1355.  The Court determined that, in 16 U.S.C. § 1371(a)(2), Congress gave the Government a discrete task, and further, that "Congress …'indicated an intent to circumscribe agency enforcement discretion, and…provided meaningful standards for defining the limits of that discretion.'"  *Id.* (quoting *Chaney*, 470 U.S. at 834).

By contrast, 19 U.S.C. § 1307 states only that goods made with forced labor shall not be entitled to entry and directs CBP to determine how to enforce this mandate.  There is thus a clear

difference between this provision and the one at issue in *NRDC* as to the amount of enforcement

discretion provided to the Government.  And as discussed above, CBP's implementing

regulations also provide CBP with discretion to determine how and when to enforce the statute.

Thus, the statutory and regulatory landscape here is meaningfully different from the more

detailed regime at issue in *NRDC*, and that distinction must be given particular weight in light of

the Supreme Court's recent ruling in *Texas*.

## VI.    THE *TRAC* FACTORS SUPPORT THAT ANY ACTION TAKEN BY CBP HAS NOT BEEN UNREASONABLY DELAYED

Finally, IRAdvocates has failed to show that any legally required action has been

unreasonably delayed.  Because, as discussed above, IRAdvocates has not identified any agency

action required but not performed by CBP under 19 U.S.C. § 1307, the Court need not decide

whether CBP has failed to act in a timely manner.  *See Gonzalez v. Cuccinelli*, 985 F.3d 357, 374

(4th Cir. 2021) (holding that unless there is both a discrete and required action that an agency

must take with respect to a party, it is beyond the Court's purview to make the agency act faster).

But if the Court determines CBP were required to take some discrete action, CBP has not

unreasonably delayed discharging any such obligation under the factors set forth in

*Telecommunications Research and Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*).

IRAdvocates claims that the first *TRAC* factor weighs in favor of unreasonable delay

because CBP's actions have violated the "rule of reason."  Pl. Br. at 33-35.  In support of its

position, IRAdvocates relies heavily on its own assessment that forced labor is being used in the

production of cocoa from the Côte d'Ivoire.  But CBP has an independent obligation to

investigate IRAdvocates's allegations.  And as part of that obligation, CBP must not only

confirm the existence and scope of such practices in the Côte d'Ivoire, but in addition must

undertake the complicated and challenging task of mapping supply chains from harvest to import

into the United States.  CBP has been actively engaged in collecting and analyzing relevant

information, including information needed from importers to undertake the required supply chain

mapping.  IRAdvocates fails to point to any authority that imposes a strict time limit on when

CBP must conclude these investigative steps and decide whether to take enforcement action.

While IRAdvocates asserts that the rule of reason has been violated here because CBP's

continued investigation has caused its information to become "dated," (*id*. at 35), IRAdvocates

ignores that its information was dated at the time it was originally provided to CBP (Compl.

Exhibit G) – which is presumably why IRAdvocates scheduled additional trips to Africa soon

after its initial submission to collect more timely evidence, and is also part of the reason why

CBP has had to continue its own investigative efforts.

  This Court should resist IRAdvocates's attempt to impose a one-size-fits-all approach on

CBP's investigations under Section 1307.  As discussed above, CBP has taken numerous actions

under the statute to combat forced labor practices.  However, application of the rule of reason

must be sensitive to the specific facts and circumstances of the specific agency action at issue.

Here, where CBP is investigating and considering whether to take action against the entirety of a

nation's largest export, the first *TRAC* factor strongly counsels against the Court's intervention in

CBP's discretionary law enforcement process.

  The remaining *TRAC* factors also support a finding that CBP's actions have not been

unreasonably delayed.  Congress did not specify any timetable or otherwise indicate the pace at

which CBP must enforce 19 U.S.C. § 1307.  Absent such requirements, the second *TRAC* factor

also weighs in favor of allowing CBP to complete its investigation as it determines appropriate.

  The third *TRAC* factor, whether there is an impact on human health and welfare that

warrants a finding of delay, further weighs against any such finding.  While IRAdvocates points

to the *TRAC* court's reliance on *Blankenship v. Secretary of HEW*, 587 F.2d 329 (6th Cir. 1978), and *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150 (D.C. Cir. 1983), in arguing that this factor supports a finding of delay, (Pl. Br. at 36 (citing *TRAC*, 750 F.2d at 77-80)), both of those cases involved agency actions that had a direct, causal effect on the health and welfare of the persons at issue.  In this case, as discussed above, the Federal Circuit has described the primary purpose of 19 U.S.C. § 1307 as the protection of domestic producers and workers from unfair competitive effects of forced labor practices.  While CBP hopes that its enforcement of Section 1307 to prevent goods made with forced labor from entering the United States will also have a positive impact on combatting the use of forced labor worldwide, such a result is not assured, and any such benefits resulting from CBP's enforcement actions is not the same direct connection to human health and welfare that the courts found to exist in the cases cited by IRAdvocates.

The fourth *TRAC* factor focuses on the effect of expediting agency action on other agency priorities.  While CBP already prioritizes its enforcement of Section 1307, and has taken significant enforcement actions under this statute, CBP is in the best position to determine how to allocate its resources in enforcing both this statute as well as its other mandates.  Accordingly, where, as here, the agency has an ongoing investigation of IRAdvocates's allegations, the Court should not seek to substitute its judgment for the agency's about the pace of the investigation, to the potential detriment of the investigation or the agency's other obligations.

The fifth *TRAC* factor asks courts to consider the nature and extent of the interests prejudiced by agency delay.  Although we noted in our motion that in this case the fifth factor largely overlaps with the third *TRAC* factor, *cf. Martin v. O'Rourke*, 891 F.3d 1338, 1347 (Fed. Cir. 2018) (noting specifically that the third and fifth *TRAC* factors are particularly prone to

overlapping), IRAdvocates's statement that we found this to be a "throwaway factor," (Pl. Br. at 38), is inaccurate. CBP takes seriously both the primary purpose of Section 1307, to protect domestic workers and producers from unfair competitive effects of forced labor practices, as well as the hoped for indirect benefit of enforcing Section 1307, the reduction in the use of forced labor abroad. At the same time, these interests must be balanced against allowing CBP adequate flexibility to evaluate how to enforce Section 1307, particularly when CBP is investigating a foreign country's industry-wide practice.

The sixth and final *TRAC* factor, whether impropriety has caused an alleged delay, also cuts against a finding of delay. There is no information that in any way supports an allegation of impropriety here. CBP is entitled to the presumption that it has acted in good faith, *see, e.g.*, *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002), and it has in fact done so. That IRAdvocates disagrees with how CBP is conducting its investigation does not provide a basis for the Court to find, or even for IRAdvocates to allege, any impropriety.

Ultimately, consideration of the *TRAC* factors supports the conclusion that CBP has not unreasonably delayed investigating or otherwise acting upon IRAdvocates's allegations, and CBP should be permitted to continue to pursue its ongoing and active investigative efforts.

## <u>CONCLUSION</u>

For these reasons, and for the reasons set out in our initial motion, we respectfully request that the Court dismiss this action for lack of jurisdiction and failure to state a claim upon which relief can be granted.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

<u>/s/ Aimee Lee</u>
AIMEE LEE
Assistant Director

<u>/s/ Marcella Powell</u>
MARCELLA POWELL
Senior Trial Counsel

<u>/s/ Christopher Berridge</u>
CHRISTOPHER BERRIDGE
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-9253 or 9230

Date:  May 3, 2024                     *Attorneys for Defendants*

**<u>CERTIFICATE OF COMPLIANCE</u>**

      I, Christopher Berridge, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, who is responsible for the Defendants' reply memorandum to plaintiff's opposition to motion to dismiss for lack of jurisdiction and failure to state a claim upon which relief can be granted, dated May 3, 2024, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 6,994 words.

<u>/s/ Christopher Berridge</u>